Joshua Adam Kaplan

       Debtor.

_____/

ZB Verified Investments LLC,

       Plaintiff,

v.

Joshua Kaplan,

       Defendants.

_____/

Chapter 7
Case No. 25-48523-tjt

Hon. Thomas J. Tucker


Adv. P. Case No. 25-4234

## PLAINTIFF'S MOTION FOR PROTECTIVE ORDER PRECLUDING DUPLICATIVE DISCOVERY ON ISSUES RESOLVED BY COLLATERAL ESTOPPEL

Plaintiff, ZB Verified Investments LLC ("ZB" or "Plaintiff"), by and through its undersigned counsel, Taft Stettinius & Hollister LLP, hereby moves this Court pursuant to Federal Rule of Civil Procedure 26(c), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7026, for entry of a Protective Order precluding Defendant Joshua Kaplan ("Defendant" or "Kaplan") from conducting discovery on issues that were previously the subject of discovery and / or were conclusively determined by the Circuit Court for the County of Oakland, State of Michigan (the "State Court") in *ZB Verified Investments, LLC v. Adam*

1

*Kessler, et al.*, Case No. 24-207081-CB (the "State Court Action"). In support

thereof, Plaintiff submits its attached Brief.

WHEREFORE, Plaintiff requests entry of a Protective Order regarding

continued discovery on issues already litigated.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

/s/ Kimberly Ross Clayson
Kimberly Ross Clayson(P69804)
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
kclayson@taftlaw.com
eholtz@taftlaw.com
emayer@taftlaw.com
*Counsel for ZB Verified Investments, LLC*

Dated: May 4, 2026

Joshua Adam Kaplan

    Debtor.

_____/

ZB Verified Investments LLC,

       Plaintiff,

v.

Joshua Kaplan,

       Defendants.

_____/

Chapter 7
Case No. 25-48523-tjt

Hon. Thomas J. Tucker

Adv. P. Case No. 25-4234

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PROTECTIVE ORDER PRECLUDING DUPLICATIVE DISCOVERY ON ISSUES RESOLVED BY COLLATERAL ESTOPPEL

Plaintiff ZB Verified Investments LLC ("ZB" or "Plaintiff"), by and through its undersigned counsel, Taft Stettinius & Hollister LLP, for its *Brief in Support of Plaintiff's Motion for Protective Order Precluding Duplicative Discovery on Issues Resolved by Collateral Estoppel* states as follows:

## PRELIMINARY STATEMENT

On or about April 29, 2024, ZB[1] commenced a State Court action against

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed in the foregoing *Motion for Protective Order Precluding Duplicative Discovery on Issues Resolved by Collateral Estoppel.*

Defendant Joshua Kaplan and his co-conspirator Adam Kessler ("<u>Kessler</u>"), along with related entities Divided Sky LLC ("<u>Divided Sky</u>"), Supply Line International ("<u>SLI</u>"), and Supply Line International Medical, LLC ("<u>SLIM</u>"), for fraud and breach of contract, among other claims, the very same issues that are before the Court in this Adversary Proceeding from April of 2024 through April 2025, pursuant to the State Court's Scheduling Order, Defendant had the opportunity to and did conduct all possible discovery related to this matter. The parties exchanged interrogatories, thousands of pages of documents from parties and non-parties alike, and Defendant conducted depositions of all relevant parties, including both of ZB's principal members/manager. In August 2025, a month after discovery had concluded, Defendant filed a Chapter 7 petition in bankruptcy and the State Court Action was stayed as to him – no further discovery was conducted, or permitted to be conducted in that case after the Debtor filed his chapter 7 bankruptcy case.

On April 28, 2026, following a full trial on the merits, the Honorable Michael Warren of the Oakland County Circuit Court, Business Court Division, entered Findings of Fact and Conclusions of Law and Judgment (the "<u>State Court Judgment</u>") in the State Court Action against Defendant's co-conspirators and affiliated entities (including two entities of which the Debtor serves as and appeared at trial as the Manager and corporate representative), awarding ZB compensatory damages of $6,787,226, trebled to $20,361,678 pursuant to MCL 600.2919a. A true

2

and correct copy of the State Court Judgment is attached hereto as **Exhibit A**, the State Court Action scheduling order is attached hereto as **Exhibit B**.

Although the State Court did not adjudicate Kaplan's individual liability because his bankruptcy filing stayed the claims against him, the State Court made extensive, detailed findings of fact regarding Kaplan's personal conduct, credibility, and participation in the fraudulent scheme that forms the basis of ZB's nondischargeability claims in this adversary proceeding. The State Court found, by clear and convincing evidence, that Kaplan co-concocted and co-implemented the fraudulent scheme with Kessler, that Kaplan's testimony was incredible and consisted of "outright, bald face lies on key issues," and that Kaplan acted "on behalf of, coordinated with, and in concert with Divided Sky, SLI, and SLIM" in perpetrating fraud upon ZB to induce ZB to make the loan and keep it invested.

Now, in this adversary proceeding, Defendant wishes to conduct duplicative, harassing and unnecessary discovery. Defendant was already given the opportunity to conduct all discovery that it wanted or needed to test ZB's very same claims asserted in this case during the year-long discovery period in the State Court Action,. Permitting the Defendant to repeat the same discovery serves no purpose and creates unnecessary burden, delay and expense. Indeed, collateral estoppel will determine this adversary proceeding, since the claims have already been decided by the State Court. Accordingly, ZB respectfully requests that this Court enter a Protective Order

3

limiting discovery in this adversary proceeding to issues, if any, not already resolved by the State Court Judgment.

On May 4, 2026 the parties, through counsel, had a meet and confer meeting to discuss the outstanding discovery issues. Defendant's counsel failed or refused to narrow the scope of discovery issues and rejected the relief requested herein.

## FACTUAL BACKGROUND

On or about April 27, 2023, ZB loaned $4,850,000 to Divided Sky, evidenced by a Promissory Note executed by Divided Sky through Kaplan as its Manager (the "Note"). The Note was guaranteed by Kaplan, Kessler, and Sami Ahmad pursuant to a joint and several Guaranty (the "Guaranty"). ZB funded the loan based on representations made by Kaplan and Kessler that the proceeds would be used to finance affiliate marketing for a purportedly legitimate and highly profitable business selling COVID-19 test kits to Medicare and Medicaid beneficiaries.

As the State Court found after a full trial, the representations made by Kaplan and Kessler to induce ZB to make the loan were materially false. Among other things: (a) Kaplan and Kessler falsely represented that a Medicaid program (the "Aid Program") would be implemented when no such program was ever intended to exist; (b) the loan proceeds were not used for their represented purpose but were diverted to Kaplan's, Kessler's, and their affiliated entities' own uses; (c) Kaplan and Kessler concealed from ZB that the Centers for Medicare & Medicaid Services had

4

suspended payments based on "credible allegations of fraud"; and (d) Kaplan and Kessler continued to make false representations about the success of the business and the existence of the Aid Program to prevent ZB from exercising its contractual right to accelerate repayment of the loan.

ZB commenced the State Court Action on April 29, 2024. The case proceeded through extensive fact and expert discovery, facilitation, dispositive motions, and a full bench trial before Judge Warren. Defendant fully participated in discovery, including by serving and responding to discovery requests and sitting for multiple depositions. Indeed, the discovery period was extended by the State Court through July, 2025, and Defendant was engaged in discovery through the end of the period. **Exhibit C,** *Order Denying Motion or Stipulation to Adjourn* (denying a six month extension of discovery by permitting a 90-day extension through April 2025). In August 2025, months after discovery had concluded, Defendant filed a Chapter 7 petition in bankruptcy and the State Court Action was stayed as to him. At trial for the State Court Action went to trial, Defendant testified, though his individual liability was not adjudicated.

On April 28, 2026, the State Court entered its Judgment following detailed *Findings of Fact and Conclusions of Law*. The State Court found, by clear and convincing evidence, that Kessler, Divided Sky, SLI, and SLIM committed fraud in the inducement, ongoing fraud, statutory stealing, civil conspiracy, and concerted

action – all in concert with Kaplan. The State Court further found that SLI and SLIM were alter egos of Divided Sky, pierced the corporate veil, and awarded treble damages for statutory stealing.

Critically, the State Court made the following specific findings regarding Kaplan's personal conduct and participation in the fraudulent scheme:

- The State Court found that Kaplan's "credibility swung wildly between 100% accurate on immaterial matters to outright, bald face lies on key issues," that "[h]is incentive was to avoid liability and salvage his now tainted reputation," that "[h]e has been caught perpetuating a fraudulent scheme and was attempting to evade responsibility for the same," and that "his testimony is afforded no weight and is incredible."

- The State Court found that "Kessler and Kaplan concocted a scheme to get rich quick" and that Kaplan co-authored and co-presented the fraudulent Offer Letter containing material lies about the Aid Program that were designed to fraudulently induce ZB into making the loan.

- The State Court found that after the loan was funded, Kaplan sent ZB false memoranda and financial statements misrepresenting the success of the business, including a July 5, 2023 memorandum falsely claiming the Medicaid program was operational and a Project Income Statement showing fabricated revenue of over $58 million and net income of over $21 million. The State Court further found that Kaplan assured ZB in early 2024 that the CMS investigation would not affect the viability of the scheme, which was false.

- The State Court found that "All of the foregoing lies were made by Kaplan and Kessler with each other's knowledge, on behalf of, coordinated with, and in concert with Divided Sky, SLI, and SLIM, knowing that they were lies, with the intention of inducing ZB into loaning the money and not asking to be repaid the principal until the maturity date of the loan."

- The State Court found that "Kaplan and Kessler treated each other and their affiliated entities as one blob entity," that "Kaplan managed Divided Sky, SLI,

6

and SLIM," and that "in light of the lack of corporate formalities, Kessler and Kaplan, along with their corporate affiliates, simply sloshed around and acted in any manner necessary to effectuate the scheme."

Despite these clear findings of fact and law by the State Court, Defendant wishes to conduct duplicative and unnecessary discovery to adjudicate these same issues. This Court should not permit such wasteful discovery.

## ARGUMENT

**I.** **Good Cause Exists For A Protective Order Because Discovery On Precluded Issues Would Be Unduly Burdensome And Duplicative**

**A.** **Standard for Issuance of a Protective Order**

Federal Rule of Civil Procedure 26(c)(1), made applicable by Federal Rule of Bankruptcy Procedure 7026, provides that a court may, for good cause, issue an order to protect a party from "annoyance, embarrassment, oppression, or undue burden or expense," including by forbidding discovery on certain matters or limiting the scope of discovery. See also Fed. R. Civ. P. 26(b)(2)(C)(i) (court must limit discovery that is "unreasonably cumulative or duplicative"). Courts enjoy "broad discretion to decide when a protective order is appropriate and what degree of protection is required." *Bailey v. Michigan Dep't of Corr.*, 342 F.R.D. 420, 424 (E.D. Mich. 2022) (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984)). In exercising that discretion, "a court must balance the competing interests and hardships of the parties." *Id.* (internal citations omitted).

To that end, "[g]ood cause exists if specific prejudice or harm will result from

7

the absence of a protective order. *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 236–37 (6th Cir. 2016) (internal quotation marks and citations omitted). "A court must balance the right to discovery with the need to prevent fishing expeditions." *Id.* (internal quotation marks and citations omitted).

**B. Defendant had a Full Opportunity to Conduct All Required Discovery**

Permitting Defendant to conduct discovery on issues that have been fully discovered would serve no legitimate purpose and would impose undue burden and expense on ZB. Defendant, over the one-year discovery period in the State Court Action, served three sets of requests for production, two sets of interrogatories, and two sets of requests to admit. Indeed, that included over 70 requests for production of documents, 64 requests to admit, and 19 interrogatory requests. Defendant also conducted several depositions of ZB, third-parties, and non-parties.

Defendant has not shown why any additional discovery is required, nor how any additional discovery would be different than that which was already taken. Accordingly, requiring ZB to respond to duplicative discovery requests would be oppressive, wasteful of judicial and party resources, and contrary to the policies underlying the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 26(b)(2)(C)(i).

**II.   This Court Should Enter A Protective Order Limiting Discovery On Issues Conclusively Determined By The State Court Judgment**

**A.      The Doctrine of Collateral Estoppel Precludes Relitigation of Issues Determined in the State Court Action**

In addition to limiting discovery because Defendant has already conducted all

required discovery, there is good cause to limit discovery where the same issues were already conclusively decided by the State Court Action. Accordingly, ZB does not seek to preclude all discovery in this adversary proceeding. To the extent Defendant can identify discrete issues that were not actually litigated and determined in the State Court Action and that are material to the nondischargeability determination, ZB does not oppose narrowly tailored discovery on such issues. Defendant cannot demonstrate that any proposed discovery is directed at issues not already resolved by the State Court Judgment.

Good cause to issue a protective order exists where discovery sought is duplicative of issues already conclusively resolved by a prior adjudication. And where collateral estoppel bars relitigation of issues, discovery directed at those issues serves no legitimate purpose and imposes undue burden on the party against whom it is directed. See *Grogan v. Garner*, 498 U.S. 279, 284-85 (1991) (recognizing the application of collateral estoppel in bankruptcy nondischargeability proceedings)[2] also see *Rally Hill Prods. v. Bursack (In re Bursack)*, 65 F.3d 51, 53 (6th Cir. 1995).

Under Michigan law, which governs the preclusive effect of the State Court

---

[2] Indeed, it is well established that collateral estoppel, or issue preclusion, applies in bankruptcy nondischargeability proceedings under 11 U.S.C. § 523(a). *Grogan v. Garner*, 498 U.S. 279, 284-85 (1991). A bankruptcy court may rely on findings made by a state court to preclude relitigation of factual issues that are common to both the State Court Action and the nondischargeability proceeding. See *In re Calvert*, 105 F.3d 315, 317-18 (6th Cir. 1997).

9

Judgment, collateral estoppel applies when: (1) a question of fact essential to the judgment was actually litigated and determined by a valid and final judgment; (2) the same parties or their privies had a full and fair opportunity to litigate the issue; and (3) there is mutuality of estoppel. *Monat v. State Farm Ins. Co.*, 469 Mich. 679, 682-84 (2004); *Estes v. Titus*, 481 Mich. 573, 585 (2008). Each element of collateral estoppel is satisfied here:

First, the issues of fact essential to ZB's fraud claims were actually litigated and determined in the State Court Action. The State Court conducted a full bench trial, heard testimony from multiple witnesses, including Kaplan himself (and a party representative at the trial), reviewed scores of exhibits, and made detailed findings of fact by clear and convincing evidence. The State Court's findings address the precise factual issues underlying ZB's nondischargeability claims against Kaplan under §§ 523(a)(2), (a)(4), and (a)(6), including: (a) whether Kaplan made false representations to ZB regarding the nature, purpose, and profitability of the business and the use of loan proceeds; (b) whether Kaplan knew those representations were false when made; (c) whether ZB reasonably relied on those representations; (d) whether Kaplan intended to defraud ZB; (e) whether the loan proceeds were converted and stolen through false pretenses; and (f) whether Kaplan acted willfully and maliciously in causing injury to ZB.

Second, Kaplan had a full and fair opportunity to litigate these issues.

10

Although the State Court did not enter judgment against Kaplan individually due to the automatic stay, Kaplan was a named defendant in the State Court Action, participated in discovery, was present throughout trial as a party representative on behalf of the entity defendants and testified at trial. The State Court's findings regarding Kaplan's conduct were made after Kaplan had the opportunity to present his version of events and be cross-examined. The State Court explicitly assessed Kaplan's credibility and found his testimony incredible. Kaplan cannot now claim that he lacked an opportunity to litigate the very issues on which testified, particularly so where Kaplan also served as a party representative throughout trial.

Third, mutuality of estoppel is satisfied. ZB was the plaintiff in the State Court Action and is the plaintiff in this adversary proceeding. Kaplan was a named defendant in the State Court Action, was a participant in all discovery in the State Court Action and had his interests represented there, was party representative, and is the defendant in this adversary proceeding. Both parties had the opportunity to litigate the issues in the State Court Action.

**B.  The State Court Judgment Conclusively Resolves the Factual Issues Underlying Each of ZB's Nondischargeability Claims**

Section 523(a)(2)(A) excepts from discharge debts obtained by "false pretenses, a false representation, or actual fraud." The State Court found, by clear and convincing evidence, that Kaplan and Kessler made material misrepresentations to ZB – including lies about the existence of the Aid Program, the use of loan

11

proceeds, and the financial performance of the business – with the intent that ZB rely upon them, that ZB did in fact reasonably rely upon them, and that ZB suffered millions of dollars in damages as a result. These findings satisfy every element of § 523(a)(2)(A). The State Court further found that the Offer Letter, co-authored by Kaplan, contained specific written misrepresentations regarding the financial condition and prospects of the business, satisfying the requirements of § 523(a)(2)(B).

Section 523(a)(4) excepts from discharge debts arising from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The State Court found that the Defendants, including Kaplan, obtained ZB's funds through false pretenses and converted them to their own use, constituting statutory stealing under MCL 600.2919a and satisfying the elements of the crime of false pretenses under MCL 750.218. These findings establish embezzlement and/or larceny for purposes of § 523(a)(4).

Section 523(a)(6) excepts from discharge debts arising from "willful and malicious injury by the debtor to another entity or to the property of another entity." The State Court found that Kaplan and Kessler deliberately concocted and implemented a fraudulent scheme, knowingly made false representations to ZB, intentionally diverted loan proceeds to their own uses, and concealed material facts from ZB to prevent ZB from exercising its contractual rights. These findings

establish that Kaplan acted willfully and with the intent to cause injury to ZB, or with the substantial certainty that injury would result, satisfying the requirements of § 523(a)(6).

## **CONCLUSION**

For the foregoing reasons, Plaintiff ZB Verified Investments LLC respectfully requests that this Court enter a Protective Order: (a) precluding Defendant from conducting discovery that is duplicative of discovery already conducted, (b) precluding discovery on issues of fact that were actually litigated and determined in the State Court Judgment; (c) requiring Defendant to demonstrate, before propounding any discovery, that such discovery is directed at issues not resolved by the State Court Judgment; and (d) granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

/s/ Kimberly Ross Clayson
Kimberly Ross Clayson(P69804)
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
kclayson@taftlaw.com
eholtz@taftlaw.com
emayer@taftlaw.com
*Counsel for ZB Verified Investments, LLC*

Dated: May 4, 2026

13

# EXHIBIT 1

# PROPOSED ORDER

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHER DIVISION

Joshua Adam Kaplan

       Debtor.

_____/

ZB Verified Investments LLC,

       Plaintiff,

v.

Joshua Kaplan,

       Defendants.

_____/

Chapter 7
Case No. 25-48523-tjt

Hon. Thomas J. Tucker

Adv. P. Case No. 25-4234

### *PROPOSED*
### PROTECTIVE ORDER PRECLUDING DUPLICATIVE DISCOVERY ON ISSUES RESOLVED BY COLLATERAL ESTOPPEL

THIS MATTER came before the Court upon Plaintiff ZB Verified Investments LLC's ("Plaintiff" or "ZB") *Motion for Protective Order Precluding Duplicative Discovery on Issues Resolved by Collateral Estoppel* (the "Motion"), together with Plaintiff's Brief in Support thereof; and Plaintiff served notice of the Motion upon Defendant Joshua Kaplan ("Defendant") and his counsel as stated in the Certificate of Service filed therewith; and the Court reviewed the Motion, the Brief in Support, the Findings of Fact and Conclusions of Law and Judgment entered by the Circuit Court for the County of Oakland, State of Michigan, in ZB Verified Investments, LLC v.

1

Adam Kessler, et al., Case No. 24-207081-CB (the "<u>State Court Judgment</u>"), and all other relevant pleadings and papers on filed in connection with the Motion; and the Court having determined that good cause exists pursuant to Federal Rule of Civil Procedure 26(c)(1), made applicable by Federal Rule of Bankruptcy Procedure 7026, to enter this Protective Order; and being otherwise fully advised in the premises;

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant is precluded from propounding or pursuing discovery in this adversary proceeding that is duplicative of discovery already conducted during the State Court Action, including but not limited to interrogatories, requests for production of documents, requests for admission, and depositions directed at the same subject matter as discovery previously served and responded to in the State Court Action. To the extent Defendant seeks documents or information already produced or obtained in the State Court Action, Defendant shall utilize the discovery record from the State Court Action rather than propounding duplicative requests upon Plaintiff.

# EXHIBIT 2

# NOTICE OF OPPORTUNITY TO RESPOND

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHER DIVISION

Joshua Adam Kaplan

      Debtor.

_____/

ZB Verified Investments LLC,

      Plaintiff,

v.

Joshua Kaplan,

      Defendants.

_____/

Chapter 7
Case No. 25-48523-tjt

Hon. Thomas J. Tucker

Adv. P. Case No. 25-4234

## NOTICE OF PLAINTIFF'S MOTION FOR PROTECTIVE ORDER PRECLUDING DUPLICATIVE DISCOVERY ON ISSUES RESOLVED BY COLLATERAL ESTOPPEL

Plaintiff, ZB Verified Investments LLC, has filed papers with the court to request entry of a protective order to preclude duplicative discovery on issues resolved by collateral estoppel.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)**

If you do not want the court to enter a protective order regarding discovery, or if you want the court to consider your views on the motion, within <u>twenty one</u> (21) days, you or your attorney must:

1.      File with the court a written response or an answer, explaining your position at

1

**United States Bankruptcy Court**
211 West Fort Street
Detroit, Michigan 48226

If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above. All attorneys are required to file pleadings electronically.

You must also send a copy to:

Kimberly Ross Clayson
27777 Franklin Road, Suite 2500
Southfield, MI 48034

2. If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

/s/ Kimberly Ross Clayson
Kimberly Ross Clayson(P69804)
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
kclayson@taftlaw.com
eholtz@taftlaw.com
emayer@taftlaw.com

*Counsel for ZB Verified Investments, LLC*

Dated: May 4, 2026

2

**EXHIBIT 3**

**CERTIFICATE OF SERVICE**

Joshua Adam Kaplan

     Debtor.

_____/

ZB Verified Investments LLC,

       Plaintiff,

v.

Joshua Kaplan,

       Defendants.

_____/

Chapter 7
Case No. 25-48523-tjt

Hon. Thomas J. Tucker

Adv. P. Case No. 25-4234

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2026, my office caused to be served a copy of the *Plaintiff's Motion For Protective Order Precluding Duplicative Discovery On Issues Resolved By Collateral Estoppel,* with all accompanying exhibits, with the Clerk of the Court, which sends notice by operation of the Court's electronic filing service to all ECF participants registered to receive notice.

1

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

/s/ Kimberly Ross Clayson
Kimberly Ross Clayson(P69804)
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
kclayson@taftlaw.com
eholtz@taftlaw.com
emayer@taftlaw.com

*Counsel for ZB Verified Investments, LLC*

2

# EXHIBIT 4

# AFFIDAVITS - NA

# EXHIBIT 5

# DOCUMENTARY EXHIBITS

# EXHIBIT A

ZB VERIFIED INVESTMENTS, LLC,

        Plaintiff,

v                                       Case No. 24-207081-CB
                                       Hon. Michael Warren

ADAM KESSLER, et al.,

        Defendants.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## &
## JUDGMENT

**At a session of said Court, held in the
County of Oakland, State of Michigan
April 28, 2026**

**PRESENT: HON. MICHAEL WARREN**

---

## OVERVIEW

This dispute centers on a $4,850,000 loan made by Plaintiff ZB Verified Investments LLC ("ZB") in connection with a fraudulent scheme concocted by Defendants Adam Kessler ("Kessler"), Joshua Kaplan,[1] Divided Sky, LLC ("Divided Sky"), Supply Line International, LLC ("SLI"), and Supply Line International Medical, LLC ("SLIM"). The remaining viable counts in the Second Amended Complaint that proceeded to trial allege:

---

[1] Although he testified, the trial in this case did not address Kaplan's liability because he is embroiled in bankruptcy.

FILED   Received for Filing   Oakland County Clerk   4/29/2026 10:21 AM

> Breach of Contract against Divided Sky and SLI (Count I);

> Breach of Contract against Kessler (Count II);

> Breach of Contract against Kessler (Count III);

> Unjust Enrichment against SLI (Count IV);

> Fraud against Kessler, Divided Sky, and SLIM (Count V);

> Fraud against Kesler, Divided Sky, SLI, and SLIM (Count VI);

> Fraud against Kessler, Divided Sky, SLI, and SLIM (Count VII);

> Conversion/Statutory Stealing MCL 600.2919a against Kessler, Divided Sky, SLI, and SLIM (Count VIII);

> Civil Conspiracy against Kessler, Divided Sky, SLI, and SLIM (Count IX); and

> Concert of Action against Kessler, Divided Sky, SLI and SLIM (Count X).

That the loan has not been paid back is not in dispute. Instead, the Defendants robustly argue that they should not be held to account because the loan was usurious, and the failure to repay the loan was because the underlying business it financed soured, not because of fraud.

Firstly at stake is whether ZB was entitled to call a witness at trial who was never named on its witness list and on whom no discovery was conducted? Because allowing the witness would amount to trial by ambush, the answer is "no."

Secondly at stake is whether is whether the loan is unenforceable as usurious or under the Wrongful-Conduct Rule? Because the loan at issue was not facially usurious and was not in fact usurious, the answer is "no."

Thirdly at stake is whether SLI is liable for unjust enrichment when the Plaintiff failed to pursue this claim at trial? Because the argument is deemed abandoned, the answer is "no."

Fourthly at stake is whether ZB was fraudulently induced to enter into the transaction when the Defendants misrepresented that the loan was being used to finance a Medicaid Program that was never intended to exist? Because ZB only entered into the transaction because of this material misrepresentation, the answer is "yes."

Fifthly at stake is whether ZB was the victim of fraud when the Defendants repeatedly misrepresented the existence of the Medicaid program and misrepresented and hid from ZB that a federal investigation of their scheme was threatening its viability and in fact shut it down? Because ZB did not act to protect its loan based on such material misrepresentations, the answer is "yes."

Sixthly at stake is whether ZB was the victim of statutory stealing? Because the funds were obtained through false pretenses, the answer is "yes."

3

Seventhly at stake is whether the Defendants engaged in a civil conspiracy and concerted action when they plotted and implemented the fraudulent scheme together? The answer is "yes."

Eighthly at stake is whether SLI and SLIM are alter egos of Divided Sky and the corporate veil should be pierced? Because there was no maintenance of corporate formalities, Divided Sky was undercapitalized, the companies shared resources and employees, and the companies engaged in fraudulent, long-standing misconduct, the corporate veil is pierced.

Ninthly at stake is whether ZB is entitled to exemplary damages? Because the issue was only cursory addressed in the Trial Brief and at trial, it is deemed abandoned and the answer is "no."

Tenthly at stake is whether ZB is entitled to treble damages for statutory stealing? Because the Defendants engaged in a pervasive, dishonest, fraudulent scheme, the Court exercises its discretion and awards treble damages.

Lastly at stake is whether ZB is entitled to attorneys' fees? Because ZB failed to cite appropriate law or engage in any analysis proving the reasonability of the fees, the argument was deemed abandoned and the answer is "no."

4

# FINDINGS OF FACT

The Court makes the following general findings regarding the credibility, demeanor, veracity, vocal tone and expression, tonality, honesty, motivations and perceptions of the witnesses:

➢ *Michael Berger.* The Manager for ZB, Berger is an experienced lawyer and real estate investor. Berger's testimony was straightforward, genuine, and authentic. He was knowledgeable and had no incentive to mislead the Court or otherwise lie. Unless otherwise indicated by the Findings of Fact, his testimony is afforded great weight and credibility.

➢ *Adam Kessler.* Kessler was a member of Verified Health LLC, although he disclaims even knowing how much he owns, and Divided Sky. The credibility and veracity of his testimony swung wildly between 100% accurate involving the mundane to outright, bald face lies. His incentive and motivation was to avoid liability and salvage his now tainted reputation as an unimpeachable creator of reliable investment opportunities. He has been caught perpetuating a fraudulent scheme and was attempting to evade responsibility for the same. Unless otherwise indicated by the Findings of Fact, his testimony is afforded no weight and is incredible.

➢ *Sami Ahmad.* Ahmad was the President of Orchard Laboratories Corporation. His testimony was straightforward, genuine, and authentic. Like Kesller, not all of his testimony is believable, but much of it is. The Findings of Fact reflect the same.

➢ *Michael Kahaian.* Expert witness for ZB, his testimony was straightforward, authentic, and well-supported. Unless otherwise indicated by the Findings of Fact, his testimony is afforded great weight and credibility.

➢ *Josh Kaplan.* Kaplan is the co-founder of SLI and SLIM, an owner of Verified Health and a member of Divided Sky. Like Kessler, his credibility and swung wildly between 100% accurate on immaterial matters to outright, bald face lies on key issues. His incentive was to avoid liability and salvage his now tainted reputation as an upright creator of reliable investment opportunities. He has been caught perpetuating a fraudulent scheme and was attempting to evade responsibility for the same. Unless otherwise indicated by the Findings of Fact, his testimony is afforded no weight and is incredible.

Although a lengthy and engaging novella could be written based on the testimony and scores of exhibits admitted at trial, such an exercise is unnecessary as the facts constituting the Defendants' breach of contract and fraudulent conduct are easily distilled. The Court makes the specific Findings of Fact based on the Court's assessment of the credibility, demeanor, veracity, vocal tone and expression, tonality, and honesty of the witnesses and the exhibits before it by clear and convincing evidence:

➢ The United States was gripped with the COVID-19 pandemic beginning in 2020. The federal government responded in a number of innovative ways, including distributing COVID-19 tests directly to consumers over the counter ("OTC") paid by Medicare and Medicaid. As evidenced in this case, these programs had poor controls in connection with avoiding fraud and corruption by unsavory characters looking to perpetuate get rich quick schemes during a public health crisis off of the backs of American taxpayers.

➢ Taking advantage of the pandemic, Kessler and Kaplan concocted a scheme to get rich quick. In particular, they hurriedly generated a scheme by which they would enter the market to provide COVID-19 test kits to consumers by establishing a web of relationships between various companies. This web would trap federal funds by (1) establishing a website for consumers to order COVID-19 test kits operated by Verified Health (owned by Kessler and Kaplan), (2) advertising the website to consumers through the efforts of Divided Sky, (3) purportedly filling orders and

billing the federal government through the previously federally approved and credentialled Orchard (in theory, Orchard was to oversee the entire scheme), and (4) using SLI and SLIM (managed and at least partially owned by Kaplan) to fill in various functions necessary for the scheme to work.

➢ The scheme was intended to take advantage of a rapidly vanishing opportunity – to provide consumers with OTC COVID-19 test kits during the last few days of the Medicare OTC Test Demonstration program (the "Care Program"). In addition, Kessler and Kaplan lied and told potential lenders that a parallel Medicaid COVID-19 OTC test kits program (the "Aid Program") would be implemented.

➢ Kessler and Kaplan, acting on behalf of the Defendant entities, convinced ZB to make a loan in the amount of $4,850,000 to Divided Sky. They did so pursuant to various communications, including a confidential offer letter (the "Offer Letter"). The Offer Letter in particular had the following lies that Kessler and Kaplan knew were lies at the time of the Offer Letter:

  o They would create a "Direct consumer program paid for by government (Medicare and Medicaid)." *The truth is that there was no Aid Program and no intention to create one.*

  o "Verified Health has been tasked to garner subscriptions from both Medicare and Medicaid patients throughout the country." *The truth is that it was not tasked with Medicaid patients.*

7

- o "Going forward, the opportunity for Medicaid is even greater, because of the longer lasting nature of the program – it goes until September 2024. Below, we assume that we are only able to obtain 20% of our current volume for a 6 month period (this is an extreme floor to our projections)." *The truth is that they were projecting no Aid Program sales.*

➢ The Offer Letter was made by Kessler as President of Verified Health and Kaplan as President of SLIM.

➢ After the Offer Letter was presented by Kessler and Kaplan, on April 18, 2023, Kessler sent ZB an email that included sales and profit projections that included Aid Program Sales. This was a lie because Kessler knew no such sales were to be made.

➢ Kessler sent another text to a representative of ZB, asserting that the Aid Program "will be largely self funded because we will have already received all the large payments back from CMS for Medicare billings. . . . By the time Medicaid comes, the machine will largely run itself." This is a lie because Kessler knew that the Aid Program was not going to be operational, there was no program to self-fund.

➢ All of the forgoing lies were intended to induce ZB into entering the loan transaction.

➢ Kessler and Kaplan represented that prompt funding was essential to take advantage of the last few days of the Care Program and to provide bridge

8

financing to expand the scheme into the parallel Aid Program after the close of the Care Program. The proceeds of the loan were to be used to pay roughly $750,000 in advertising per day, to entice consumers to subscribe for OTC test kits. Kessler and Kaplan represented that the funding would result in huge profits for Divided Sky and related entities, making the loan a safe investment with a high return.

➢ Effective as of April 27, 2023 (the "Effective Date"), ZB funded the loan of $4,850,000 to Divided Sky, evidenced by a Promissory Note signed by Divided Sky. The terms of the Promissory Note include that the loan was due to be paid 12 months later, "however, at any time after the ninetieth (90th) day" after the Effective Date, ZB "may accelerate the Maturity Date to a date selected by" ZB "upon sending at least twenty-one (21) days prior written notice to" Divided Sky "and the date set forth in the notice . . . shall become the Maturity Date" of the loan. The Promissory Note also provides that in the event the Maturity Date was accelerated "as long as the Loan is paid off on the date required . . . and no other defaults have occurred under this Note or the loan documents executed in connection therewith, the interest rate shall be reduced from twenty (20%) percent to twelve percent (12%)." The Promissory Note also provides that "Beginning on the Effective Date, the outstanding principal of the Loan shall accrue interest at a rate of twenty percent (20%) per annum" due and payable on the first day of each month. "On the Maturity Date, the entire unpaid principal balance of the Loan, together with all accrued and unpaid interest and all outstanding fees and

9

expenses of Lender, if any, shall be due in full, and subject to the payment provision stated above." Further, "Interest due under this Note will be computed, payable and allocated on the basis of an actual/365 interest calculation (interest is payable for the actual number of days in each month, and each month's interest is calculated by multiplying the unpaid principal amount of the Loan as of the first day of the month for which interest is being calculated by the interest rate, dividing the product by 365, and multiplying the quotient by the number of days in the month for which interest is being calculated)."

➢ The Promissory Note also provides that the debt can be repaid in full or in part, without penalty 180 days after the Effective Date. However, "In the event this Loan is paid off for any reason," Divided Sky "shall be required to pay interest of at least" $582,000.00.

➢ The Promissory Note also provides that upon "any default" of Divided Sky or under any Guaranty related to Promissory Note, "this Note and all indebtedness shall, at the option of" ZB "become immediately due and payable in full without notice, presentation or demand for payment, all such being hereby waived by" Divided Sky. "Upon an occurrence of a default, the interest . . . shall automatically increase by three percent (3.0%) over the interest rate otherwise in effect hereunder until such a default is cured." In addition, "Notwithstanding anything in this Note or the Guaranty to the contrary, if any required payment under this Note is not received within fifteen (15) days from the date same is due, then" ZB may without

notice "charge a late charge fee of five percent (5.0%) of such late payment or One Hundred and 00/100 Dollars ($100.00) whichever is greater, provided, however, that any such late charge shall not be applicable to the final payment maturity."

➤ Furthermore, the Promissory Note provides that "Notwithstanding anything in this Note to the contrary, nothing herein nor any transaction related hereto shall be construed or shall operate either presently or prospectively to: (a) require Divided Sky "to pay interest at a rate greater than is now lawful in such case to contract for, but shall require payment of interest only to the extent of such lawful rate; or (b) require" Divided Sky "to make any payment or od any act contrary to law; and if any clause or provision herein contained shall otherwise so operate to invalidate this Note, in whole or in part, then such clauses or provisions only shall be held for naught as though no herein contained, and the remainder of the Note shall remain operative and in full force and effect."

➤ During negotiations over the Promissory Note, concerns were raised in connection with compliance with usury laws, and after discussion between counsel among the parties, ZB and all parties in good faith believed that as structured and finalized, the Promissory Note would not violate such laws.

➤ The Promissory Note was executed by Kaplan as Manager of Divided Sky. An Acknowledgment signed by Divided Sky and SLI separately by Kaplan as Manager, provides that Divided Sky "acknowledges, consents and agrees it is

11

directing ZB Verified Investments, LLC to fund the loan proceeds under this Note to Supply Line International, LLC on behalf of Divided Sky, LLC and Supply Line International will accept such funds on behalf of Divided Sky, LLC."

➢ The Promissory Note provides that Divided Sky "agrees to pay all costs of collection, including reasonable attorney's fees, incurred by" ZB "in collection or enforcing payment."

➢ The Promissory Note also provides that Divided Sky "shall provide financial statements, balance sheets and any other financial information as may be requested by" ZB "from time to time."

➢ The payment of the Promissory Note was guaranteed by Kaplan, Kessler, and Ahmad pursuant to a single Guaranty that all three signed on the Effective Date.

➢ As an incentive to enter into the Promissory Note, on April 27, 2023, ZB was provided a 2.425% membership interest in Verified Health, LLC. The principals of Verified Health were Justin Shane, Kessler, Garrett Lang, and Kaplan or their affiliates pursuant to a letter dated April 27, 2023 (the "Membership Subscription"). The Membership Subscription provides that if Divided Sky (an affiliate of Verified Health) "elects to prepay" the Promissory Note, then Verified Health "shall also make a preferred distribution to" ZB of $388,000.00. The Membership Subscription was signed by Kessler and Kaplan. This investment was not a loan or disguised interest or fee for the Promissory Note, but an actual equity

12

investment in Verified Health, and was understood so at the time of the transaction.

➢ On April 28, 2023, ZB funded the loan to SLI.

➢ After the loan was funded, ZB sent a steady stream of requests for information to ensure that its debt and investment were protected and to determine when to seek repayment. Kessler and Kaplan consistently told ZB's representatives in emails, texts, and phone calls that all was going to plan, and that the scheme was collecting millions of dollars from both the Care Program and the Aid Program. For example (not exclusive by any stretch of the imagination), Kessler claimed that the scheme had already collected $20,000,000 and was expecting another $22,000,000 "in this week."

➢ On June 23, 2023, a contractor (CoventBridge Group) of the Centers for Medicare & Medicaid Services ("CMS") issued a Notice of Suspension of Part B Medicare Payments (the "Notice of Suspension") to Orchard on "credible allegations of fraud" in connection with the scheme. The Notice of Suspension explained that "Here, there have been 429 complaints filed by beneficiaries against Orchard, 107 of which were from beneficiaries who did not receive the COVID-19 OTC test kits billed to Medicare, 167 beneficiaries who had not heard of Orchard, 136 that were listed as 'other', and 18 that were listed as suspected identify theft. Thus, the complaints allege that Orchard is billing COVID-19 OTC test kits to beneficiaries

13

who did not request, or receive them, which is contrary to the Medicare statue and CMS guidance under the OTC COVID-19 Test Demonstration."

➢ In fact, before the Notice of Suspension, all Care Program payments were frozen as of June 15, 2023.

➢ On July 5, 2023, Kaplan sent ZB a written memorandum, noting that the Care Program had resulted in 350,000 Medicare recipients signing up to receive OTC test kits and that roughly 300,000 received at least 2 shipments. "During the Program, Orchard dispensed more than 5,000,000 Tests. CMS has requested some additional information from Orchard for roughly 70 patients (out of 400,000 since Program's inception) which we have provided (including proof of sign up, tracking and information, and we are working with CMS to answer any outstanding questions they may have. During the Program, Verified Health exceed its revenue projections." The memorandum also asserted that with regard to the Aid Program, "Due to the increased risk resulting from multiple Payers, Orchard has started the Medicaid Program with a slow ramp. The first two months of the program have been spent testing various insurers state-by-state, to ensure payment runs smoothly. To date, payment in full has been received on the billings for Michigan. Payments for the other states is expected in the next few weeks. We are excited with the results to date."

14

➢ On July 10, 2023, Kaplan sent to ZB a Project Income Statement, showing net revenue of $58,319,293 and net income of $21,176,591.

➢ On July 27, 2023, ZB's option to accelerate repayment was available, but not exercised because ZB was confident based on the information provided to it by Kessler and Kaplan that its investment was safe and working better than planned. Had the option been exercised, ZB would have been repaid as Divided Sky had sufficient funds to cover the option. Meanwhile, during July and August 2023, other lenders exercised parallel options and their debts were repaid in full.

➢ On July 31, 2023, legal counsel for Orchard sent a rebuttal correspondence letter to the Notice of Suspension (the "Orchard Rebuttal"), seeking to refute the allegations of fraud and relief from the Notice of the Suspension.

➢ By the end of August 2023, Divided Sky transferred over $6,000,000 to SLI and SLIM, all but eliminating the ability for Divided Sky to fully repay ZB. Nevertheless, interest only payments continued through February 2024.

➢ A November 9, 2023 letter from CoventBridge to Orchard declined the relief sought in the Orchard Rebuttal Letter and maintained the suspension of payments to Orchard.

➢ In early 2024, in a phone call with ZB, Kaplan assured ZB that the CMS investigation was not going to affect the viability of the scheme, that CMS had to

pay approximately 96% of the claims, and there was more than enough money to pay back the lenders.

➢ April 26, 2024 was the Maturity Date of the Promissory Note and Divided Sky failed to pay the principal amount plus accrued interest. Default interest began accruing at 23% per annum.

➢ Orchard never sold a single COVID-19 OTC under the Aid Program. Orchard never billed Medicaid. No Aid Program was ever started.

➢ Divided Sky and Orchard never actually entered into an agreement about how Divided Sky was going to be paid for services. Under federal guidelines, Divided Sky was likely unable to obtain a profit for any services it provided. As such, there was no way to repay ZB once the other investors in the scheme had been paid back.

➢ All of the foregoing lies were made by Kaplan and Kessler with each other's knowledge, on behalf of, coordinated with, and in concert with Divided Sky, SLI, and SLIM, knowing that they were lies, with the intention of inducing ZB into loaning the money and not asking to be repaid the principal until the maturity date of the loan. ZB in fact reasonably relied upon those lies when lending the money and not exercising its rights under the loan documents to ask for repayment of the principal until the maturity date.

16

➢ Although Divided Sky received over $21,000,000 from Orchard, ZB received $0 in principal. Meanwhile, Kessler, Kaplan, and their affiliated companies pocketed at least $6,000,000 with no accountability about how the funds were used.

➢ ZB's funds were not used for the purpose of funding the scheme. They were used for the Defendants' own purposes rather than those designated in the Offer Letter. After all, the Aid Program was a phantom.

➢ Accrued interest as of the date of trial was $2,241,864 and $15,907.44 was a late charge.

➢ ZB claims $464,112 in attorney fees and costs.

➢ Verified Health was worth $0. Thus, ZB's 2.425% interest in Verified Health is also worth $0. Actually, it has a negative bank account balance of $698.12.

➢ The cold, hard reality is that Kaplan and Kessler treated each other and their affiliated entities as one blob entity. They did not maintain corporate formalities and played loose and fast with finances and company governance. They purposefully violated the rules applicable to health care reimbursements from the federal government using their various entities as hollow chess pieces to move around in their scheme with a vain hope of keeping the federal government and lenders at bay. Kaplan managed Divided Sky, SLI, and SLIM; the loan funds were wired to SLI's account; and they shared employees, resources, and office space. In

17

fact, there were no meaningful formalities with regard to the companies. They were in a get rich quick scheme, and were making it up as they went along. They vainly hoped that their scheme would result in them becoming rich and somehow avoided responsibility to pay back ZB. They kept each other abreast of their machinations and each had full knowledge of their misrepresentations to ZB. In light of the lack of corporate formalities, Kessler and Kaplan, along with their corporate affiliates, simply sloshed around and acted in any manner necessary to effectuate the scheme. As such, they consistently presented themselves as agents for each other.

➢ Divided Sky, SLI, and SLIM were undercapitalized, as proven by this very case.

## CONCLUSIONS OF LAW

### I
### The Plaintiff's Surprise Witness was Properly Barred from Testifying

### A
### The Procedural Posture of the Case

This case was filed on April 29, 2024. On July 26, 2024, the Court issued a Business Court Scheduling Order requiring each party to submit its fact witness list on October 1, 2024, nearly a year and half before trial. Fact discovery was to be completed no later than January 31, 2025. Motions for summary disposition were to be filed no later than April 25, 2025, the parties were to facilitate no later than Tax Day (April 15), 2025, and trial was

18

set for December 1, 2025. On December 12, 2024, the Court issued a second Scheduling Order, requiring that each party submit its fact witness list on January 2, 2025, and fact discovery was to be completed no later than April 30, 2025. Motions for summary disposition were to be filed no later than July 25, 2025, the parties were to facilitate no later than July 15, 2025, and trial was set for March 2, 2026. Lowell D. Salesin was never listed by ZB. However, the witness list of Defendants Divided Sky, Kessler, Kaplan, SLI, and SLIM listed him. No discovery was ever conducted in connection with Salesin, and the Defendants determined not to call him. However, at trial, ZB wished to call him as its first witness. The Defendants vigorously objected, and this section of the Opinion follows.

**B**
**The Law on Undisclosed Witnesses**

Michigan's constitutional system of government vests the judicial power in one court of justice. Mich Const 1963, art 6, § 1. With regard to the judiciary, "'[t]he primary functions of the judiciary are to declare what the law is and to determine the rights of parties conformably thereto.'" *Johnson v Kramer Freight Lines, Inc*, 357 Mich 254, 258 (1959), quoting 16 CJS, Constitutional Law § 144, p 687. Thus, as Justice Campbell explained, Michigan jurisprudence has long recognized that "[b]y the judicial power of courts is generally understood the power to hear and determine controversies between adverse parties, and questions in litigation." *Daniels v People*, 6 Mich 381, 388 (1859). See also *Underwood v McDuffee*, 15 Mich 361, 368 (1884); *Johnson*, 357 Mich at 258, quoting *Risser v Hoyt*, 53 Mich 185, 193 (1884) (finding that judicial power "'is the authority to hear and

19

decide controversies, and to make binding orders and judgments respecting them'").

Intertwined with the substantive power to decide cases and controversies is the authority of the courts to establish general rules to control the "practice and procedure" of the courts. Mich Const 1963, art 6, § 5. Thus, inherent within the power judicial is the authority of "the court to control its docket." *United States v Reaves*, 636 F Supp 1575, 1578 (ED Ky, 1986). Indeed, "[o]ptimum service to the public, to victims, witnesses, jurors, litigants, and to counsel mandates that trial judges have the authority and discretion to manage dockets." *People v Grove*, 455 Mich 439, 470 (1997). Thus, "[i]t is fundamental that a court has the power and duty to manage its docket and the individual cases before it . . . ." *Id.*

To ensure that public interest in justice is met, the Michigan Supreme Court has established the Michigan Rules of Court to "to secure the just, speedy, and economical determination of every action and to avoid the consequences of error that does not affect the substantial rights of the parties." MCR 1.105. Essential to ensuring the effective administration of justice is the ability of the trial courts to establish scheduling orders. MCR 2.401(B)(2). Indeed, scheduling orders, and the ability of courts to enforce them, are critical instruments to ensuring the public interest is protected. *Grove*, 455 Mich at 465 ("[t]he court rules provide for and encourage the use of scheduling orders to promote the efficient processing of civil and criminal cases"). A trial court's insistence that the parties adhere to such orders is justified to "'enhance[] its docket control, [and] eliminate[] unjustifiable expense and delay . . . .'" *Id.*, quoting *People v Grove*, 209 Mich App 567 (1995).

Moreover, the Michigan Rules of Court "implicitly confer the discretion to decline to entertain actions beyond the agreed time frame. Were the rules not so construed, scheduling orders would quickly become meaningless." *Id.* at 469. Thus, Michigan jurisprudence has long "recognized the inherent power of a court to control the movement of cases on its docket by a variety of sanctions including dismissal, discontinuance or involuntary nonsuit even when requests for continuances are timely made and, lacking persuasive merit, are denied." *Banta v Serban*, 370 Mich 367, 368 (1963) (affirming a trial court's dismissal of a case for the failure of the plaintiff to appear at trial). Simply put, enforcement of scheduling orders is an indispensable tool to ensuring a vibrant, effective, fair, and efficient administration of justice. The failure to establish and enforce meaningful scheduling orders is the surest path to ensuring dilatory, lengthy, uneconomical, inefficient, time-consuming, and unproductive litigation that undermines the fair administration of justice. This path leads to chaos and the undoing of justice. This is a path this Court will not follow.

Under MCR 2.401(I)(1) all witness lists are to be filed and served no later than the date set by this Court. In fact, the Michigan Rules of Court clearly provide that this Court may order that any witness not listed in accordance with MCR 2.401(I) "be prohibited from testifying at trial except upon good cause shown." MCR 2.401(I)(2). See also *Waknin v Chamberlain*, 467 Mich 329, 331 n 1 (2002) (per curiam) ("The trial court may, pursuant to MCR 2.401(I)(2), preclude any witnesses not named in a witness list from testifying"); *Jernigan v General Motors Corp*, 180 Mich App 575, 584-585 (1989) (holding that witnesses

attempted to be added a month prior to trial were properly excluded when the moving party failed to show good cause for the delay); *Wilson v General Motors Corporation*, 183 Mich App 21, 28-29 (1990) (holding that a rebuttal witness was properly excluded when no good cause was shown as required by a local rule of evidence paralleling MCR 2.401(I)); *Pannell v Hawasli*, unpublished per curiam opinion of the Court of Appeals, issued December 23, 2008 (Docket No. 279582), p 3 ("plaintiff never offered any good cause for not timely filing the witness list. Thus, the trial court properly precluded plaintiff from calling any witnesses. MCR 2.401(I)(2)"). Thus, a trial court's decision to strike or reject proposed new witnesses is generally well within its discretion. See, e.g., *Hayes-Albion v Kuberski*, 421 Mich 170, 188 (1984) (affirming a trial court's refusal to admit an unlisted witness as it was an issue "for the trial court to decide in the exercise of discretion"); *Waknin*, 467 Mich at 331 n 1 (affirming the Court of Appeals' holding that the trial court acted well within its discretion in striking witnesses who were never disclosed on a witness list while not striking those who were duly disclosed pursuant to discovery); *Herrera v Levine*, 176 Mich App 350, 355-356 (1989) (per curiam) (affirming a trial court's refusal to permit an unlisted expert to testify after a case was placed on standby status for trial); *Carmack v Macomb County Community College*, 199 Mich App 544, 546 (1993) ("This Court will not disturb a trial court's decision regarding whether to permit a witness to testify, after a party has failed to comply with a deadline for submission of a witness list, absent an abuse of discretion"); *Todd v Steiner*, unpublished per curiam opinion of the Court of Appeals, issued April 24, 2003 (Docket No. 234007), p 4; ("The enforcement of a pretrial scheduling order and whether to allow a party to add

22

expert witnesses not properly identified in a final pretrial order is a matter left to the sound discretion of the trial judge"). Thus, a court may strike a proposed witness even when such proposed witness is listed on the opposing party's witness list. See, e.g., *Jones v Pere Marquette R Co*, 168 Mich 1, 15 (1911) (holding that the adverse party statute does not allow a party to call as their own witnesses the witnesses of the adverse party); *City of Detroit v Porath*, 271 Mich 42, 75 (1935) (holding that the adverse party statute does not "give the right to make . . . witnesses of the adversary the party calling them"); *Todd*, unpub op (affirming the trial court's striking as a plaintiff's witness a proposed expert who was not listed on the plaintiff's witness list but who was listed on the defendant's witness list). Indeed, the trial court in its discretion may even prohibit a party from calling the adverse party if that party is not listed on the witness list. See, e.g., *Beattie v Firnschild*, 152 Mich App 785, 794 (1986). In other words, the fact that the party's undisclosed witness is the party itself does not relieve the moving party of the requirement of showing good cause for failing to list the party on a witness list, and such witnesses may be struck within the sound discretion of the trial court. See e.g., *Id.*

Thus, a trial court acts well within its discretion by striking witnesses not properly identified until after the conclusion of discovery, see, e.g., *Family Independence Agency v Miller*, unpublished per curiam opinion of the Court of Appeals, issued December 26, 2000 (Docket No. 220706) (affirming trial court's order prohibiting the respondent from calling witnesses in a child protective proceeding in which his parental rights were terminated when the respondent filed the witness list two months late without good

cause); *Kapp v Evenhouse,* unpublished per curiam opinion of the Court of Appeals, issued March 6, 2001 (Docket No. 216020) (affirming the trial court's order striking the plaintiff's expert witnesses when they were not disclosed until after a motion to strike the witnesses was filed, nearly 3 months after the original filing deadline and holding that the plaintiff's desire to wait until after the deposition of the defendant did not constitute good cause excusing the failure to file the list); *Porcelli v Kirchner,* unpublished per curiam opinion of the Court of Appeals, issued January 24, 2003 (Docket No. 236822) (affirming the trial court's order striking the plaintiff's expert who had not been disclosed until 6 months after the filing deadline for the witness list, was never disclosed during discovery, and who was only listed after the filing of a motion to dismiss for failure to file a witness list); or attempted to be added just before trial, see, e.g., *Eddings v Fleming,* unpublished per curiam opinion of the Court of Appeals, issued March 23, 2001 (Docket No. 214987) (affirming the trial court's order refusing to allow the amendment of a witness list just prior to trial when the moving party failed to show good cause for failing to include the witness on the original witness list); *Sound Around, Inc v Midwest Electronics, Inc,* unpublished per curiam opinion of the Court of Appeals issued April 27, 2001 (Docket No. 219295) (affirming the striking of the sole defendant's expert who was only named two weeks prior to trial and months after the close of discovery and after a first adjournment of trial, even though the proposed expert was from the Plante Moran accounting firm and the witness list had identified an unspecified representative from such firm because the defendant had not shown good cause for the delay in naming the expert); *In re Brown,* unpublished per curiam opinion of the Court of Appeals issued July

24

19, 2005 (Docket No. 258968) (finding that striking of all of the respondent's witnesses would have been justified because a witness list was not filed as required by the scheduling order even though the respondent had verbally informed at least one of the opposing parties of his intention of calling a witness).

In fact, summary disposition may be granted months prior to trial even in the face of a proposed new witness by the non-moving party, which witness will support the non-moving party's case, in the event that such proposed witness has not been timely and properly listed on the witness list – even when the proposed witness is an opposing party. *Beattie*, 152 Mich App at 795 ("We find no abuse in the trial court's determination that plaintiffs could not call the defendant as an expert witness. Defendant was entitled to some notice that he was to be called as an expert to testify against himself and establish a standard of care"); *Moy v Detroit Receiving Hospital,* 169 Mich App 600, 607 (1988) ("Plaintiff also responds that he could have established his prima facie case of medical malpractice through the testimony of the parties alone, including the individual defendants. However, plaintiff has no right to call Drs. Stanley or Levine as expert witnesses during his presentation of the case, since neither physician had been named in a timely filed witness list" (citation omitted)). Similarly, the involuntary dismissal of a case based on the failure to comply with the appropriate scheduling order of the court, including witness list deadlines, is appropriate. See, e.g., *Stevens v Equity Investments Management, LLC,* unpublished _____ of the Court of Appeals, issued November 12, 2002 (Docket No. 235201) (affirming the involuntary dismissal of the action when the

plaintiff's counsel repeatedly ignored the scheduling order including the appropriate filing of witness lists); *Comerica Bank v Alkhafaji,* unpublished per curiam opinion of the Court of Appeals, issued August 18, 2005 (Docket No. 252472) (affirming this Court's involuntary dismissal of an action because the Plaintiff had failed to file a witness and exhibit list prior to the day of trial).

Moreover, a litigant cannot avoid the requirement of naming witnesses by relying on "catchall" categories. Michigan law has long held that witness lists which set forth sim "general description of a category" of witnesses "when the party is able to give specific names fairly easily" are insufficient and may not be used to permit the non-disclosing the party the right to introduce witnesses at trial. *Stepp v Dep't of Natural Resources,* 157 Mich App 774, 778 (1987). This is so because to place the burden of obtaining additional details regarding the witnesses "would encourage intransigence and delay with the ultimate effect of further burdening the lower courts." *Id.* Thus, a trial court errs when it finds that a party must move to require a more specific witness list. *Id.* at 779. MCR 2.401(I)(1)(a) (emphasis added) specifically provides that a witness list must include "the *name* of each witness, and the witness' address, if known; however, records custodians whose testimony would be limited to providing the foundation for the admission of records may be identified generally . . . ." As general rules of statutory construction dictate, the listing of a specific exemption for having to list the name of record custodian, reveals that no such exception exists for any other category of witnesses.

Indeed, allowing a witness to testify who was not listed on a properly and timely filed exhibit list at the time of trial can constitute an abuse of discretion. See, e.g., *Pollum v Borman's, Inc,* 149 Mich App 57, 62 (1986) (per curiam) (holding that admission of an unlisted expert witness "fundamentally impaired the defendants' ability to present their side of the issue. The pursuit of truth on the issue of plaintiff's future damages resulting from her fall was fundamentally impaired when the court allowed Dr. Newman to testify without being listed or otherwise disclosed as a witness" even though the opposing party knew of the witness's expert report two months prior to trial); *Stepp,* 157 Mich App at 779. Such an abuse can especially occur in the event such undisclosed witnesses are used to virtually build the entire case of the non-disclosing party. *Id.* When this occurs, the result becomes "exactly what discovery is intended to avoid, trial by surprise." *Id.* In fact, witness lists which set forth simply a "general description of a category" of witnesses "when the party is able to give specific names fairly easily" are insufficient and may not be used to permit the non-disclosing the party the right to introduce witnesses at trial. *Id.* at 778. This is so because to place the burden of obtaining additional details regarding the witnesses "would encourage intransigence and delay with the ultimate effect of further burdening the lower courts." *Id.* Thus, a trial court errs when it finds that a party must move to require a more specific witness list. *Id.* at 779. Further, when the striking of a witness list occurs as a discovery sanction, the Court may also bar the testimony of undisclosed rebuttal witnesses, since to hold otherwise would "negate the sanction imposed." *Grubor Enterprises, Inc v Kortidis*, 201 Mich App 625, 630 (1993).

# C
## Analysis

First, the authorities cited by this Court in Section III of this Opinion and Order overwhelmingly support granting the objection to strike Salesin. See, e.g., *Stepp*, 157 Mich App at 778-779; MCR 2.401(I)(1)(a).

Second, the factors set forth in *Dean v Tucker*, 182 Mich App 27, 32-33 (1990) also support striking Salesin. The factors that should be considered in determining whether to permit a witness untimely listed to testify are: (1) whether the violation was willful or accidental, (2) the party's history of refusing to comply with discovery requests (or refusal to disclose witnesses), (3) the prejudice to the other party, (4) actual notice to the other party of the witness and the length of time prior to trial that the defendant received such actual notice, (5) whether there exists a history of the moving party engaging in deliberate delay, (6) the degree of compliance by the moving party with other provisions of the court's order, (7) an attempt by the moving party to timely cure the defect, and (8) whether a lesser sanction would better serve the interests of justice. With regard to these factors:

1. *Whether the violation was willful or accidental.* The failure to list Salesin was obviously willful. This case has been pending for well over a year, and ZB simply never bothered to list him.

2. *The parties' history of refusing to comply with discovery requests (or refusal to disclose witnesses).* ZB failed to provide notice of Salesin in its Initial Disclosures or in

28

the witness list. No discovery was taken with regard to Salesin because ZB never listed him.

3. *Prejudice.* ZB argues there is no prejudice. Actually, the witness list was due long ago and fact discovery has been closed for many months. The summary disposition deadline has passed and such motions have been filed and ruled upon. Facilitation has been conducted. The trial briefs had been submitted. Trial had already begun. The prejudice is palpable -- truly trial by ambush. This factor strongly favors granting striking Salesin.

4. *Actual notice of the witness and the length of time prior to trial that the party received such actual notice.* There was no actual notice that ZB intended to call Salesin until the day of trial or shortly before.

5. *Whether there exists a history of the moving parties' engaging in deliberate delay.* Again, there has been deliberate delay in connection with the disclosure of the Salesin.

6. *The degree of compliance by the moving party with other provisions of the court's order.* This factor is immaterial to the Court's decision.

7. *An attempt by the moving party timely cure the defect.* There was no attempt to cure. This strongly favors denying the Motion.

8. *Whether a lesser sanction would better serve the interests of justice.* The only potential appropriate lesser sanction in the instant case would be to reopen discovery, reopen facilitation, adjourn the dispositive motion deadline for an extended period of time, and adjourn the trial date for probably at least six-

29

nine months, and permit the filing of new trial briefs. This would lead to an even more dilatory and uneconomical determination of the action because it, in essence, would add many months of delay and expense to the case without necessarily any corresponding improvement of the substantial rights of the parties. It would also encourage parties to flaunt the scheduling orders of the court with no concomitant sanction and reward gamesmanship. As noted above, the Court is entitled to enforce its Scheduling Order and need not reward such untoward conduct.

Likewise, ZB's reliance on "categorical" reference to various categories of individuals, including witnesses listed by the Defendants, is inappropriate and eviscerates the entire point of the witness list. Why not just state: "Everyone the Defendants know about who might be witnesses in this case"? This argument is meritless. See authorities above.

## II
## ZB has Proven a Breach of Contract in Count I Against Divided Sky and Count II Against Kessler, but not with regard to Count I against SLI or Count III Against Kessler; and the Promissory Note is Not Usurious or Unenforceable Under the Wrongful-Conduct Rule

### A
### The Law of Contracts

To show a valid contract exists, the plaintiff must demonstrate that the following elements are present: (1) parties competent to contract; (2) a proper subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation. *Thomas v Leja*, 187 Mich App 418, 422 (1991). Mutuality of agreement (also called mutual assent)

requires a "meeting of the minds" on all essential terms in the contract. *Kamalnath v Mercy Mem'l Hosp Corp*, 194 Mich App 543, 548-549 (1992). "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Id.*, quoting *Stanton v Dachille*, 186 Mich App 247, 256 (1990). A contract is made "when both parties have executed or accepted it, and not before." *Id.* at 549 (citations omitted).

A court's "goal in contract interpretation is to give effect to the intent of the parties, to be determined first and foremost by the plain and unambiguous language of the contract itself." *Wyandotte Elec Supply Co v Electrical Technology Sys, Inc*, 499 Mich 127, 143-144 (2016). "[I]t has long been the law in this state that courts are not to rewrite the express terms of contracts." *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 199-200 (2008). See also *Kendzierski v Macomb County*, 503 Mich 296, 311-312 (2019) (emphasis in original) ("A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written*" and a court "will not create ambiguity where the terms of the contract are clear"). "Contracts of guaranty are to be construed like other contracts, and the intent of the parties as collected from the whole instrument and the subject-matter to which it applies is to govern." *In re Landwehr's Estate*, 286 Mich 698, 702 (1938), quoting *Morris & Co v Lucker*, 158 Mich 518, 520 (1909). "[A] guarantor is not liable beyond the express terms of his contract." *Bandit Indus, Inc v Hobbs Int'l, Inc* (After Remand), 463 Mich 504, 513 (2001) (citation omitted).

25-04234-tjt   Doc 37   Filed 05/04/26   Entered 05/04/26 14:50:04   Page 58 of 88

To establish a prima facie case for breach of contract, "[a] party asserting a breach of contract must establish that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming the breach." *Miller-Davis Co v Ahrens Construction, Inc*, 495 Mich 161, 178 (2014).

**B**
**ZB has Proven a Breach of Contract in Count I Against Divided Sky and Count II Against Kessler, but not with regard to Count I against SLI or Count III Against Kessler**

The Defendants do not claim that the Promissory Note and Kessler's Guaranty were not contracts or fulfilled. Instead, they argue they are not enforceable because the Promissory Note was usurious and recovery is barred under the Wrongful-Conduct Rule. As established in the Findings of Fact, there is no question that ZB was never paid the principal and accrued interest due under the Promissory Note. As such, ZB has proven a breach of contract by Divided Sky (Count I) and Kessler as a guarantor under the Guaranty (Count II).

The breach of contract claim in Count III involves Kessler's breach of representation that Kessler had and would maintain a net worth of at least $10,000,000 during the term of the Promissory Loan. Perhaps the Court missed it in its 56 pages of notes on this trial, but there did not appear to be any testimony about Kessler's net worth, and this issue does not appear to have been argued in closing argument. Furthermore, ZB does not explain the damages it suffered as a result of this purported misrepresentation. In ZB's Trial Brief, there are three conclusory sentences dedicated to

32

Count III. As such, Count III is deemed unsupported and abandoned. This Court's job

description does not include scouring the record and making legal arguments for ZB.

*Barnard Mfg v Gates Performance,* 285 Mich App 362 (2009), citing *Carmen v San Francisco*

*Unified School Dist,* 237 F3d 1026, 1031 (CA 9, 2001); *Adler v Wal-Mart Stores, Inc,* 144 F3d

664, 672 (CA 10, 1998) ("Thus, where the burden to present such specific facts by reference

to exhibits and the existing record was not adequately met below, we will not reverse a

district court for failing to uncover them itself" ); *Forsyth v Barr,* 19 F3d 1527, 1537 (CA 5,

1994) (noting that vague and conclusory assertions that the evidence demonstrates a

question of fact are insufficient-the nonmoving party must identify specific evidence in

the record); *L S Heath & Son, Inc v AT & T Information Sys, Inc,* 9 F3d 561, 567 (CA 7, 1993)

(concluding that "a district court need not scour the record to determine whether there

exists a genuine issue of fact to preclude summary judgment"); *Guarino v Brookfield Twp*

*Trustees,* 980 F2d 399, 404 (CA 6, 1992) (stating that the appellants' "argument that the

district court erred in not searching the record sua sponte is wholly without merit").

In a parallel fashion, ZB's Trial Brief does not argue that SLI committed a breach

of contract. As such, the argument is deemed abandoned. See authorities above.

## C
## The Defense of Usury Fails

## 1
## The Law of Usury

Our Supreme Court has explained the deeply rooted prohibition against usury:

'Usury is, generally speaking, the receiving, securing, or taking of a greater sum or value for the loan or forbearance of money, goods, or things in action than is allowed by law.' *People v Lee*, 447 Mich 552, 556 (1994) (cleaned up). 'The law of usury is not a new concept in law. Indeed, it dates back as far as Biblical times.' *Id.* 'America has historically been deeply committed to usury law,' and '[t]he first American usury law, adopted by the Massachusetts colony in 1641, predates the U.S. Constitution by nearly 150 years.' Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn L Rev 1110, 1116, 1117 (2008). 'Today, most states have statutes setting interest rate limits and prohibiting usury.' Cremades, *Usury and Other Defenses in U.S. Litigation Finance*, 23 Kan J L & Pub Pol'y 151, 160 (2014). While there are many historical justifications for usury laws, we have recognized that the primary purpose of Michigan's usury laws 'is to protect the necessitous borrower from extortion.' *Lee*, 447 Mich. at 556-557, 526 quoting *Wilcox v Moore*, 354 Mich 499, 504 (1958).

[*Soaring Pine Capital Real Estate and Debt Fund II, LLC v Park Street Group Realty Services, LLC*, 511 Mich 89, 103-104 (2023) (footnotes omitted).]

Michigan's criminal usury statute provides:

A person is guilty of criminal usury when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding 25% at simple interest per annum or the equivalent rate for a longer or shorter period. Any person guilty of criminal usury may be imprisoned for a term not to exceed 5 years or fined not more than $10,000.00, or both.

[MCL 438.41.]

Determining whether a debt instrument is usurious is not always particularly clear. Often debt instruments will have a variety of charges in addition to interest, such as late fees and penalties. The task of a court is to look past the labels and ascertain whether usurious interest was charged regardless of the posturing of the debt instrument:

Consistently with the assumption that borrowers are 'at the mercy of the lender' and therefore in need of protection, this Court has held that lenders cannot avoid civil remedies for usury through creative contracting or by claiming ignorance. In determining whether interest is usurious, '[i]t is elementary that . . . we are not bound by the form of the transaction, and that, notwithstanding how it may be characterized by the parties in their written agreement, its real nature must be determined from all of the facts and circumstances.' *Abeloff v Ohio Fin. Co,* 313 Mich 568, 577 (1946); see also *Wilcox,* 354 Mich at 504 ('[A] court must look squarely at the real nature of the transaction, thus avoiding, so far as lies within its power, the betrayal of justice by the cloak of words, the contrivances of form . . . . We are interested not in form or color but in nature and substance.'). Moreover, at least in the civil context, a lender's mistaken belief that interest is not usurious does not preclude the statutory remedy for the borrower.

[*Soaring Pine Capital Real Estate and Debt Fund II, LLC v Park Street Group Realty Services, LLC,* 511 Mich 89, 111-112 (2023) (citations and footnotes omitted).]

One common method to address this issue is for the parties to agree to a "savings clause," i.e., a provision that provides that no matter what, the debt will never be construed to require a rate of interest above the legal limit. However, such a savings clause is ineffective if the face of the debt instrument imposes a usurious rate. For example, if a promissory note requires an interest rate of 33% and contains a savings clause, the savings clause will not salvage the note from usury. The Supreme Court has reasoned:

We first consider whether a usury savings clause can be enforced to avoid an illegal interest rate. We hold that a usury savings clause is ineffective if a note otherwise facially requires the borrower to pay a usurious interest rate, even if the stated interest in the note is not usurious. This holding is consistent with longstanding Michigan public policy that protects borrowers from excessive interest rates by placing the primary burden on

the lender to know and comply with the law when imposing interest, fees, and charges on a loan. However, a usury savings clause may be enforceable in circumstances where this public policy is not undermined, such as if the interest due is pushed above the legal amount because of a future contingency or event after the loan is entered.

We leave it to the circuit court on remand to reassess, as necessary, the note in this case and its effect on Soaring Pine's claims.

[*Soaring Pine Capital Real Estate and Debt Fund II, LLC v Park Street Group Realty Services, LLC,* 511 Mich 89, 100-101 (2023).]

This analysis applies to civil usury as well. *Soaring Pine Capital Real Estate and Debt Fund II, LLC,* 511 Mich at 127.

## 2

### a
### The Savings Clause is Effective, But Moot

If the Promissory Note was facially usurious, the savings clause cannot salvage it. *Soaring Pine Capital Real Estate and Debt Fund II,* 511 Mich at 100-101. However, since the Promissory Note is not facially usurious, see below, the savings clause could have applied to salvage the Promissory Note. However, since that contingency never occurred, it is in essence a moot point.

### b
### The Promissory Note is not Facially Usurious

Contrary to the zealous arguments of the Defendants, the Promissory Note is not facially usurious. A facially usurious note requires that there be a *mandatory* payment of interest above 25%. The Defendants' arguments hinge on the provision of the Promissory

Note that permitted ZB to require payment of the debt with at least $582,000. In theory, ZB could have called in the loan after 112 days and received this minimum amount of interest, which would equate to far about 25%. But this contingency never happened and it was not required under the face of the Promissory Note. Because this hypothetical contingency was not triggered, it cannot be the basis of usury. *Barck v Grant State Bank*, 137 Mich App 440, 443-444 (1984) (finding no violation of usury laws based on a contingency that a "balloon note" loan arrangement just because the parties fully expected the borrowers to be unable to pay off the balance owing at its expiration without obtaining new financing, which might be at a higher interest rate, because "To find a violation because the parties expected that new financing would be necessary would make the result turn on the speculative expectations of the parties at the time the promissory note was executed, regardless of whether future events confirmed or disproved those expectations"). See also *Teireny v Collen*, 272 Mich 200, 204 (1935), quoting 3 ALR 877 (usury is to be determined "'with reference to the time it was entered into'"); *Patrick v Shaw*, 275 Mich App 201, 211 (2007) (declining to find a violation of the usuary statute under MCL 438.31c(2) based on the potentiality of an increase in the interest rate); *Green Ridge Corp v South Jersey Mortg Co*, 211 SO2d 70, 72 (Fla 2d Dist, 1968) ("The test of usury . . . is not based upon the contingencies inherent in a transaction, but upon what actually develop"); *Indus Nat Bank of Rhode Island v Stuard*, 113 RI 124, 127 (1974) ("the vast majority of cases from other jurisdictions have held that the inclusion in a promissory note of such an acceleration provision does not render the note usurious, even though the note, if enforced according to the terms of the acceleration clause, will

37

result in giving the holder a rate of interest greater than the maximum allowed by statute. *Armstrong v Alliance Trust Co*, 88 F2d 449 (5th Cir 1937); *Small v Ellis*, 90 Ariz 194; 367 P2d 234 (1961); *Easton v Butterfield Live Stock Co*, 48 Idaho 153, 279 P 716 (1929); *Sager v American Investment Co.*, 170 Ark 568; 280 SW 654 (1926); *Garland v Union Trust Co.*, 63 Okla 243; 165 P 197 (1917); *Cissna Loan Co. v. Gawley*, 87 Wn 438; 151 P 792 (1915); *Goodale v Wallace*, 19 SD 405; 103 NW 651 (1905). We agree").

Because the Promissory Note was not facially usurious and no usurious amount was ever charged, the usury defense fails.

## c
## The Membership Interest in Verified Health is Not a Disguised Fee or Interest Charge Applicable to the Interest Rate of the Promissory Note

Because ZB's 2.425% membership interest in Verified Health was not a hidden fee or interest charge, it has nothing to do with the issue of usury.

## D
## The Wrongful-Conduct Rule Defense Fails

## 1
## The Law on the Wrongful-Conduct Rule

The Wrongful-Conduct Rule is a common law rule which generally provides that a plaintiff cannot maintain an action if the cause of action is based, in whole or in part, on his own illegal conduct. *Orzel v Scott Drug Co*, 449 Mich 550, 558 (1995). The rule is rooted in the public policy that courts should not lend their aid to a plaintiff whose cause of

action is premised on his own illegal conduct. *Id* at 560, citing *Manning v Bishop of Marquette,* 345 Mich 130, 133 (1956); *Robinson v City of Detroit,* 462 Mich 439 (2000). In other words, "the rule rests on the public policy premise that courts should not, directly or indirectly, encourage or tolerate illegal activities." *Al Hashem v Les Stanford Oldsmobile, Inc,* 266 Mich App 61, 89 (2005), citing *Orzel,* 449 Mich at 560-561. The Rule incorporates the fundamental maxim:

> [A] person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party.
>
> [*Orzel,* 449 Mich at 558, citing 1A CJS, Actions, § 29, p 386. See also 1 Am Jur2d, Actions, § 45, p 752.]

However, the mere fact that a plaintiff was engaged in illegal conduct at the time of his injury does not automatically bar his claim. *Id.* at 561. Like all general rules, the Wrongful-Conduct Rule has its limitations and exceptions. *Id.* Thus, to appropriately invoke the Wrongful-Conduct Rule, two factors must exist: (1) the plaintiff's conduct must be prohibited or almost entirely prohibited under a penal or criminal statute, *id.* at 561,[2] and (2) there must be a sufficient causal nexus between the plaintiff's illegal conduct and the plaintiff's asserted damages, *id.* at 564.[3] The causation (second) prong of the rule

---

[2] In contrast, where a plaintiff's illegal act only amounts to a violation of a safety statute, the act, while illegal, does not rise to the level of serious misconduct sufficient to bar a cause of action by application of the Wrongful Conduct Rule. *Id.* at 561.

[3] The Supreme Court went on to outline two exceptions to the Rule – degree of culpability among illegal wrongdoers and the existence of a statute that allows for recovery despite the plaintiff's violation of it. Based on the rulings of the Court in this Opinion, the exceptions need not be addressed.

must be evaluated based on the circumstances facing the plaintiff on a case-by-case basis

within the following legal context:

'The maintenance of an action, under the general rule, may be refused or precluded only where the illegality or immorality with which plaintiff is chargeable has a causative connection with the particular transaction out of which the alleged cause of action asserted arose.

The fact that a person has been guilty of a wrong in one particular does not make him an outlaw or forfeit his right to legal protection and relief in regard to others, and does not preclude him from maintaining an action based on a separate transaction as, where the original wrongdoing is consummated, and unrelated to the later and independent of the wrongdoing of the defendant. . . .

An action may be maintained where the illegal or immoral act or transaction to which plaintiff is a party is merely incidentally or collaterally connected with the cause of action, and plaintiff can establish his cause of action without showing or having to rely upon such act or transaction although the act or transaction may be important as explanatory of other facts in the case . . . .' [1A CJS, Actions, § 30, pp 388-389.]

This Court incorporated the causation requirement into Michigan's wrongful conduct rule in *Manning*. There, the plaintiff, Mrs. Manning, filed a negligence action against a premises owner after she had fallen into a hole located on the premises, and suffered injury. Also located on the premises was a church where Mrs. Manning had been engaged in an illegal bingo game. It was after the bingo game had ended, and she was leaving the premises, that Mrs. Manning fell into the hole. The defendant appeared to have been clearly negligent in its failure to maintain the premises in a reasonably safe condition. Nonetheless, the defendant argued that the plaintiff was not entitled to any recovery because of her participation in illegal bingo game.

This Court rejected the defendant's argument, explaining that, absent a showing that the plaintiff's illegal conduct was a proximate cause of the plaintiff's injuries, the wrongful conduct rule could not apply to bar the plaintiff's claim.

'[The Plaintiff's] injury must have been suffered while and as a proximate result of committing an illegal act. The unlawful act must be at once the source of both his criminal responsibility and his civil right. The injury must be traceable to his own breach of the law and such breach must be an integral and essential part of his case. Where the violation of law is merely a condition and not a contributing cause of the injury, a recovery may be permitted.'

[*Manning*, 345 Mich at 136, quoting *Meador v Hotel Grover*, 193 Miss 392, 405-406; 9 So 2d 782 (1942); *Orzel*, 449 Mich at 564-565.]

## 2
## The Wrongful-Conduct Rule is Inapplicable

The Defendants' invocation of the Wrongful-Conduct Rule is unavailing. It is entirely based on the defense of usury, which is inapplicable. Consequently, the Wrongful-Conduct Rule defense falls as well.

## III
## The Law on Unjust Enrichment

## A
## The Law on Unjust Enrichment

"The elements of a claim for unjust enrichment are: (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Barber v SMH (US), Inc.*, 202 Mich App 366, 375 (1993) (citation omitted). In other words, the law will imply a contract to prevent unjust

enrichment only if the defendant has been unjustly or inequitably enriched at the plaintiff's expense. *Morris Pumps v Centerline Piping Inc,* 273 Mich App 187, 195 (2006).

Our Court of Appeals has summarized unjust enrichment as follows:

'The essential elements of a quasi contractual obligation, upon which recovery may be had, are the receipt of a benefit by a defendant from a plaintiff, which benefit it is inequitable that the defendant retain.' *MEEMIC* [v Morris, 460 Mich 180,] 198 [(1999)], quoting *Moll v Wayne Co,* 332 Mich 274, 278-279 (1952). Thus, in order to sustain a claim of quantum meruit or unjust enrichment, a plaintiff must establish (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant. *Barber v SMH (US), Inc,* 202 Mich App 366, 375 (1993). In other words, the law will imply a contract to prevent unjust enrichment only if the defendant has been unjustly or inequitably enriched at the plaintiff's expense.

[*Morris Pumps,* 273 Mich App at 195-196.]

## B
## ZB Failed to Prove the Unjust Enrichment of SLI

As revealed by the Findings of Fact, the loan proceeds were received by SLI. However, the only time "unjust enrichment" was uttered by a party in the trial was when the Defendants pointed out in closing argument that the claim had been abandoned. Indeed, although it is cursorily addressed in ZB's Trial Brief, ZB made no argument at trial and there was no material discussion in the Trial Brief regarding how SLI benefitted from the proceeds and how there was an inequity. As such, ZB has abandoned this Count. Again, this Court need not scour the record and make legal arguments for ZB. *Barnard Mfg,* 285 Mich App 362; *Carmen,* 237 F3d at 1031; *Adler,* 144 F3d at 672; *Forsyth,* 19 F3d at 1537; *L S Heath & Son, Inc,* 9 F3d at 567; *Guarino,* 980 F2d at 404.

**IV**
**ZB was Fraudulently Induced to Enter into the Transaction**
**and the Victim of Fraud During the Scheme**

**A**
**The Law of Fraud**

**1**
**Fraud Generally**

Generally, in order to sustain a claim for fraudulent misrepresentation, a plaintiff must plead and prove that (1) the defendant made a material representation, (2) the representation was false, (3) when the defendant made the representation, the defendant knew it was false, or made it recklessly, without knowledge of its truth as a positive assertion, (4) the defendant made the representation with the intention that the plaintiff would act upon it, (5) the plaintiff acted in reliance upon it, and (6) the plaintiff suffered damages. *M&D, Inc v McConkey*, 231 Mich App 22, 27-28 (1998). Each of these facts must be proved with a reasonable degree of certainty, and the absence of any one of them is fatal to recovery. *Irwin v Carlton*, 369 Mich 92, 94 (1963) (citations omitted).

**2**
**The Law on Fraud in the Inducement**

The general rule is that "an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud." *Hi-Way Motor Co v Int'l Harvester Co*, 398 Mich

43

330, 336 (1976). But, as noted by our Court of Appeals, there is a key exception to this general rule:

> However, 'Michigan also recognizes fraud in the inducement . . . [which] occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon.' *Samuel D. Begola Serv, Inc v Wild Bros*, 210 Mich App 636, 639 (1995). To establish . . . fraud in the inducement, a party must show that
>
>> '(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that is was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.' *Belle Isle Grill Corp v Detroit,* 256 Mich App 463, 477 (2003) quoting *M & D, Inc v McConkey*, 226 Mich App 801, 806 (1997).
>
> [*Rooyakker & Sitz, PLLC v Plante & Moran, PLLC,* 276 Mich App 146, 161 (2007).]

"When a party fraudulently induces another to enter into a contract, that contract is voidable at the option of the defrauded party and is not void." *Epps v 4 Quarters Restoration LLC*, 498 Mich 518, 538 n 15 (2015) citing *Dunn v Goebel Brewing Co*, 357 Mich 693, 697 (1959).[4] See also *Samuel D. Begola Serv, Inc v Wild Bros.*, 210 Mich App 636, 640 (1995).

---

[4] In *Epps v 4 Quarters Restoration, LLC,* 498 Mich 518, 537 (2015) the Michigan Supreme Court explained the distinction between void and voidable contracts. The Court explained that a void contract is "a contract that does not exist at law; a contract having no legal force or binding effect. Such contract creates no legal rights and either party thereto may ignore it at his pleasure, insofar as it is executory." *Id.*

44

## B

## 1
## ZB was Fraudulently Induced into the Scheme

As revealed in the Findings of Fact, the Offer Letter contained lies as did other representations by Kessler. Those lies were key to inducing ZB into making the loan. These lies were perpetuated in the fraudulent scheme on behalf of Kessler, Kaplan, Divided Sky, SLI, and SLIM. In other words, with full knowledge and support and on behalf of each other and their affiliated companies, (1) Kessler and Kaplan made material representations; (2) the representations were false; (3) when they made the representations, they knew they were false; (4) the representations were made with the intention that ZB would act upon it by lending nearly $5,000,000; (5) ZB acted in reliance upon them by lending the funds; and (6) ZB suffered millions of dollars in losses. ZB has proven Count V.

---

On the other hand, a voidable contract is "not absolutely void, or void in itself," but "may be legally voided at the option of one of the parties[.]" *Id.* at 538. A voidable contract "can be avoided (cancelled) by one party because a right of rescission exists as a result of some defect or illegality (e.g., fraud or incompetence)." *Id.* "[T]he party with the power of avoidance has the unilateral option to either rescind the contract and avoid the obligation of performance, or to ratify the contract and render it enforceable." *Id.* at 548. If a party chooses to rescind a contract, the party may not be able to recover the full benefit of the bargain. *Epps*, 498 Mich at 546. Therefore, "instead of undoing the transaction," a party "may find it more beneficial to seek damages for ... breach of contract." *Id. See also Bazzi v Sentinel Ins Co*, 502 Mich 390, 409 (2018) ([r]escission abrogates a contract and restores the parties to the relative positions that they would have occupied if the contract had never been made").

**C**
**Kaplan, Kessler, SLI, and SLIM Engaged in Fraudulent**
**Misrepresentation after the Transaction was Consummated**

As revealed in the Findings of Fact, Kaplan and Kessler, on behalf and in full concert with SLI and SLIM, (1) made material representations regarding the state of affairs of the scheme, its purpose and parameters, its operations, the nonmateriality of the CMS investigation, the suspension of the scheme by CoventBridge, the existence and operations of the Aid Program, and the scheme's solvency, (2) the representations were false, (3) when the Defendants made the representations, the Defendants knew there were false, (4) they made the misrepresentations with the intention that ZB would act upon them to avoid recalling the loan, (5) ZB acted in reliance upon them, and (6) the ZB suffered millions in damages. Counts V and VI are proven.

**V**

**A**
**The Law on Conversion/Statutory Stealing**

MCL 600.2919a provides as follows:

(1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

(a) Another person's stealing or embezzling property or converting property to the other person's own use.

(b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the

46

person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

(2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

## B
## Kessler, Divided Sky, SLI, and SLIM
## Committed Statutory Stealing

In light of the Findings of Fact, Kaplan, Kessler, Divided Sky, SLI and SLIM stole Verified Investors' funds via false pretenses for their own uses. As the Findings of Fact reveal, the conduct at issue squarely falls with the crime of false pretenses as defined by MCL 750.218. The Defendants were persons "who with the intend to defraud or cheat" made a "false pretense" to obtain money and obtained it. *Id.* This suffices to constitute statutory stealing. *Shiffman v Auto Source Wholesale, LLC*, unpublished per curiam opinion of the Court of Appeals, issued August 14, 2018 (Docket No. 339291).

Whether this amounts to conversion is a closer proposition, but it is rendered moot as it clearly constitutes statutory stealing.

## VI
## Kessler, Divided Sky, and SLIM Engaged in a Civil Conspiracy

## A
## The Law of Civil Conspiracy

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose

47

by criminal or unlawful means." *Swain v Morse*, 332 Mich App 510, 530 (2020) (citation omitted). "[A] claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable tort." *Advoc Org for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 384 (2003) (citation omitted).

For a civil conspiracy to exist, each particular defendant who is to be charged with responsibility shall be proceeding tortiously, which is to say with intent to commit the tort or with negligence. *Rosenberg v Rosenberg Bros Special Account*, 134 Mich App 342, 354 (1984). "One who innocently does an act which furthers the tortious purpose of another is not acting in concert with him." *Id.*

Proof of a civil conspiracy may be established through circumstantial evidence and may be premised on inference. *Temborius v Slatkin*, 157 Mich App 587, 600 (1986). Direct proof of an agreement need not be shown, nor is it necessary to show a formal agreement. "It is sufficient if the circumstances, acts and conduct of the parties establish an agreement in fact." *Id.*

**B**
**Kessler, Divided Sky, and SLIM Civilly Conspired**

In light of the Findings of Fact, there is no question that Kessler, Divided Sky, and SLIM conspired together and with Kaplan to concoct and implement the scheme.

# VII
## Kessler, Divided Sky, SLI, and SLIM Engaged in a Concert of Action


## A
## The Law on Concert of Action

The key to liability under a theory of actual agency is the right of the principal to control the conduct of the agent. As our Court of Appeals recently elaborated in *Laster v Henry Ford Health System* 316 Mich App 726 (2016):

> Generally, Michigan law will impose liability upon a defendant only for his or her own acts of negligence, not the tortious conduct of others. However, an exception exists under the theory of respondeat superior, wherein an employer can be liable for the negligent acts of its employee if the employee was acting within the scope of his employment. *Hamed v Wayne Co,* 490 Mich 1, 10–11 (2011); *Hekman Biscuit Co v Commercial Credit Co.,* 291 Mich 156, 160.
>
> Similarly, in the absence of an employer-employee relationship, vicarious liability can also attach through the concept of agency. As this Court has explained,
>
> > A principal may be vicariously liable to a third party for harms inflicted by his or her agent even though the principal did not participate by act or omission in the agent's tort. Vicarious liability is indirect responsibility imposed by operation of law. Courts impose indirect responsibility on the principal for his or her agent's torts as a matter of public policy, but the principal, having committed no tortious act, is not a "tortfeasor" as that term is commonly defined. Because liability is imputed by law, a plaintiff does not have to prove that the principal acted negligently. Rather, to succeed on a vicarious liability claim, a plaintiff need only prove that an agent has acted negligently. Concomitantly, if the agent has not breached a duty owed to the third party, the principal cannot be held vicariously liable for the agent's actions or omissions. [*Bailey v Schaaf,* 304 Mich App 324, 347 (2014),

49

vacated in part on other grounds 497 Mich 927 (2014) (quotation marks and citations omitted).]

**In an agency relationship, it is the power or ability of the principal to "control" the agent that justifies the imposition of vicarious liability**. See *Breighner v Mich High Sch Athletic Ass'n, Inc,* 255 Mich App 567, 583 (2003); *Little v Howard Johnson Co,* 183 Mich App 675, 680 (1990). Conversely, it is this absence of "control" that explains why an employer generally is not liable for the actions of an independent contractor. See *Campbell v Kovich,* 273 Mich App 227, 233–234 (2006). "An independent contractor is one who, carrying on an independent business, contracts to do a piece of work *according to his own methods,* and without being subject to control of his employer *as to the means by which the result is to be accomplished,* but only as to the result of the work." *Utley v Taylor & Gaskin, Inc,* 305 Mich 561, 570 (1943) (quotation marks and citation omitted; emphasis added). The labels that the parties use in such a relationship are not dispositive; instead,

> [t]he test for whether a worker is an independent contractor or an employee is whether the worker has control *over the method of his or her work:* If the employer of a person or business ostensibly labeled an "independent contractor" retains control *over the method of the work,* there is in fact no contractee-contractor relationship, and the employer may be vicariously liable under the principles of master and servant. [*Campbell,* 273 Mich App at 234 (quotation marks and citations omitted; emphasis added).]

For this reason, it is clear that not just any type of "control" will suffice to transform an independent contractor into an employee or agent; rather, **the "control" must relate to the method of the work being done**.

[*Laster,* 316 Mich App at 734-736 (italicized emphasis in original; bold and underlined emphasis supplied.)]

Applying the foregoing principles to the fact before it, the Court in *Laster* affirmed summary disposition in favor of the defendant hospital, explaining:

> . . . . Here, the parties do not dispute that Dr. Lim is, an independent contractor. Dr. Lim was employed by Surgical Associates of Macomb — not Henry Ford. But plaintiff claims that under the on-call policy, the hospital

50

possessed a sufficient amount of control over Dr. Lim to make him an agent under Michigan's control test. Our review of the record suggests that Dr. Lim is clearly an independent contractor because Henry Ford did not control the manner or method used by on-call doctors, like Dr. Lim, to diagnose or treat their patients.

Here, Henry Ford had very little control over Dr. Lim, and no "control over the method of his . . . work." *Campbell*, 273 Mich App at 234. His on-call responsibilities notwithstanding, Dr. Lim was generally free to see as many or as few patients as he desired, he could generally select his own patients, he did not and was not required to use the administrative machinery of the hospital to bill patients, and he was part of an entirely separate practice with its own staff and employees. Also, the hospital never paid Dr. Lim for his services, and he was free to obtain privileges at other hospitals. The mere fact that a physician is required to maintain privileges at a hospital and undertake on-call responsibilities is not sufficient under Michigan law to constitute "control" over the physician's professional practice of medicine.

*   *   *

Similar to the defendant in *Samodai*,[5] Henry Ford did not retain any, much less sufficient, control and direction of Dr. Lim's actual work, i.e., his practice of medicine. It is key to our holding that the on-call policy relied on by plaintiff and the trial court does not give Henry Ford the right to address or control how any on-call physician, including Dr. Lim, diagnoses or treats a patient. Importantly, there is no record evidence that Henry Ford directed, supervised, or otherwise had any input on how Dr. Lim made his diagnosis or conducted surgery. Accordingly, because plaintiff's medical malpractice claim is predicated on Dr. Lim's exercise of professional judgment, over which the hospital had no control or influence, we hold that under Michigan's control test, Dr. Lim was not an agent of Henry Ford.

[*Id.*, unpub op at 6-7.]

---

[5] *Samodai v Chrysler*, 178 Mich App 252, 256 (1989).

## B
## Kessler, Divided Sky, SLI, and SLIM Engaged in Concerted Action

In light of the Findings of Fact, there is no question that Kessler, Divided Sky, SLI, and SLIM acted in concert with Kaplan to concoct and implement the scheme. In light of the lack of corporate formalities, Kessler and Kaplan, along with their corporate affiliates, simply sloshed around and acted in any manner necessary to effectuate the scheme. They consistently presented themselves as agents for each other.

## VIII
## Divided Sky and SLIM are Liable as Alter Egos of Divided Sky

## A
## The Law on Alter Egos

To apply this theory (which is treated similarly as an attempt to pierce the corporate veil, *RDM Holdings, Ltd v Cont'l Plastics Co*, 281 Mich App 678, 705 (2008)), a plaintiff must prove that (1) the corporate entity is a mere instrumentality of another corporate entity or individual, (2) the corporate entity was used to commit a fraud or wrong, and (3) the plaintiff was injured. *Glenn v TPI Petro, Inc*, 305 Mich App 698, 716 (2014). Other factors to be considered include uncapitalization, failure to keep separate books, lack of separate finances, use of an entity for fraud or illegality, failure to observe corporate formalities, and whether the corporation is a sham. *Id.* at 716.

52

**B**
**SLI and SLIM are Alter Egos of Divided Sky**

In light of the Findings of Fact, there is no question that SLI and SLIM were simply alter egos of Divided Sky. In light of the lack of corporate formalities, undercapitalization, sharing of resources and employees, the scheme, and fraudulent, long-standing misconduct, the corporate veil is hereby pierced.

**IX**
**The Law on Damages**

**A**
**Compensatory Damages of $6,787,226 are Awarded (as of the Date of Trial)**

"The object of awarding damages in cases of breach of contract is to award a sum 'which is the equivalent of performance of the bargain * * * to place the plaintiff in the position he would be in if the contract been fulfilled.'" *Gongola v Yaksich,* 3 Mich App 676, 680-681 (1966), quoting McCormick, Damages, § 137, p 561. Michigan jurisprudence "do[es] not, however, in the assessment of damages, require a mathematical precision in situations of injury where, from the very nature of the circumstances, precision is unattainable." *Stimac v Wissman,* 342 Mich 20, 28 (1955).

In light of the Findings of Fact, outstanding principal and interest, a total of $6,787,226 is awarded as compensatory damages (with applicable post-trial interest).

<h1 style="text-align:center">B<br>Exemplary Damages are Abandoned</h1>

ZB's four sentence request for exemplary damages in its Trial Brief cites no authority and provides only a minimal analysis. As such, the argument is deemed abandoned. See authorities above.

<h1 style="text-align:center">C<br>$20,361.678 in Statutory Stealing Treble Damages are Awarded</h1>

Whether to award treble damages under MCL 600.2919a is permissive and discretionary. See e.g., *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc*, 303 Mich App 441, 449-450 (2013);[6] *Hoffenblum v Hoffenblum,* 308 Mich App 102, 117 (2014), citing *Id.* ("an award of treble damages is within a court's discretion").

In light of the pervasive, dishonest, fraudulent scheme, that discretion is hereby exercised to award treble damages.

<h1 style="text-align:center">D<br>Attorney Fees are Abandoned</h1>

Contractual attorney fees are a category of damages that must be pled and proven to be awarded. See, e.g., *Fleet Business Credit, LLC v Kraphal Ford Lincoln Mercury,* 274 Mich

---

[6] Leave to appeal the Court of Appeals' decision was granted on *other grounds* in *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc,* 497 Mich 864 (2014), and the issue on which leave was granted was affirmed and the matter remanded in *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc* 497 Mich 337 (2015) ("*Aroma Wines II*").

App 584, 598 (2007); *Pransky v Falcon Group, Inc,* 311 Mich App 164 (2015). The statutory stealing statute also allows attorney fees.

Entitlement, however, does not necessarily equate with an award. Michigan jurisprudence has long held that "[t]he burden of proving fees rests on the claimant of those fees." *Petterman v Haverhills Farms, Inc,* 125 Mich App 30, 33 (1983). See also *In re Eddy's Estate,* 354 Mich 334, 347 (1958) ("the burden of proof is on the bank claimant for attorney fees"). Accordingly, a party seeking attorney fees has the burden of proof with regard to the reasonability of fees. *Pirgu v United Servs Auto Ass'n,* 499 Mich 269, 281 (2016); *Smith v Khouri,* 481 Mich 519, 528-529 (2008).

Michigan has a thorough and comprehensive jurisprudential framework for determining reasonable attorney fees, and ZB fails to cite or apply it. The argument is deemed abandoned. See authorities above. The Court is unaware of any stipulation of the parties that attorney fees were to be determined post-trial.

55

# JUDGMENT

In light of the foregoing Findings of Fact and Conclusions of Law, a Judgment is hereby rendered in favor of ZB Verified Investments LLC against Defendants Adam Kessler, Divided Sky, LLC, Supply Line International LLC, and Supply Line International Medical, LLC, jointly and severally, in the amount of $6,787,226 as compensatory damages (with applicable post-trial interest), trebled to $20,361.678 (with appliable post-trial interest).

/s/ Michael Warren

**HON. MICHAEL WARREN**
**CIRCUIT COURT JUDGE**



# EXHIBIT B

# STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

ZB VERIFIED INVESTMENTS                    NO: 2024-207081-CB
Plaintiff

V

KESSLER,ADAM,,                              HON. MICHAEL WARREN
Defendant,

## BUSINESS COURT SCHEDULING ORDER

This matter having come before the Court for a pretrial scheduling conference, motion, stipulation or other means, and the Court being fully advised in the premises, the following is HEREBY ORDERED:

1.  This is the final pretrial scheduling order.  No adjournments or modifications of this order may be made except on motion made and approved by this Court for good cause and with the request of the litigants as evidenced by a signature on the request.
2.  Unless specifically noted below, all dates previously set in the earlier governing scheduling order(s) remain as scheduled therein.
3.  Additional parties shall be joined and pleadings completed no later than BY LEAVE ONLY.
4.  Initial disclosures shall be filed in accordance with MCR 2.302(A).
5.  Each party shall submit its fact witness list and a list of proposed exhibits to opposing counsel and the Court by 1/2/2025.
6.  Each party name their experts by 2/17/2025.
7.  Expert reports shall be exchanged no later than 5/21/2025.
8.  Fact discovery shall be completed by 4/30/2025.
9.  Expert discovery shall be completed by 6/30/2025
10. All dispositive motions shall be filed no later than 7/25/2025.
11. The case shall be facilitated, to be completed no later than 7/15/2025.
12. All motions in limine shall be filed no later than 1/28/2026.
13. The case shall be evaluated on or about EXEMPT.  The Court will send a Case Evaluation notice in accordance with MCR 2.403(G)(1).
14. The appropriateness of this case for some form of alternate dispute resolution shall be brought to the Court's attention as soon as possible.  Settlement conferences may also be requested.
15. The case is set for final pretrial conference on 2/6/2026 at 8:30 a.m.
16. All depositions to be used at trial shall be purged no later than 2/23/2026 or the objections shall be deemed to be waived.
17. In jury trials, proposed jury instructions and verdict form shall be submitted in writing and in electronic form (text file readable by Microsoft Word) to the Court, and a concise theory of the case shall be submitted in writing no later than INAPPLICABLE.
18. In non-jury trials, trial briefs shall be submitted to the Court no later than 2/23/2026.
19. The case is set for trial on 3/2/2026 at 8:30 a.m.
20. The appearance of counsel upon a pleading shall be deemed to be the appearance of every member of his/her law firm.
21. Plaintiff is responsible for providing a copy of this order to added parties or parties filing appearances after the date of this order.

Other:

Date: 12/12/2024                            /s/ Michael Warren
                                            HON. MICHAEL WARREN
                                            CIRCUIT COURT JUDGE

FILED    Received for Filing    Oakland County Clerk    12/12/2024 3:36 PM

# EXHIBIT C

**ZB VERIFIED INVESTMENTS**
Plaintiff

**NO. 2024-207081-CB**

v

**HON. MICHAEL WARREN**

**KESSLER,ADAM,,**
Defendant

## ORDER DENYING MOTION OR STIPULATION TO ADJOURN

The Plaintiff having filed a Motion or Stipulation to Adjourn Scheduling Order (by at least 6 months); the Court having carefully reviewed the Motion or Stipulation; the Court taking notice that it has the authority under the Michigan Constitution and the Michigan Rules of Court to issue orders establishing times for events pursuant to MCR 2.116(G), MCR 2.119, and MCR 2.401 and, further, that trial courts have the right to enforce their scheduling orders (see, e.g., People v Grove, 455 Mich 439, 469 [1997]; EDI Holdings LLC v Lear Corp, 469 Mich 1021 [2004]; Kemerko Clawson LLC v RXIV Inc, 269 Mich App 247 [2005], MCR 2.503; SCAO 2003-7; Local Administrative Order 2004-06 ["LAO 2004-6"]); and the Court being otherwise duly advised in the premises;

IT IS ORDERED, pursuant to the foregoing authorities, that the above-referenced Motion or Stipulation to Adjourn is DENIED for each of the following independent reasons:

☐ The court declines to entertain the motion.

☑ There is no good cause asserted or the reason asserted for the adjournment does not constitute good cause warranting adjournment. MCR 2.503(B)(1) and/or (B)(2)(b).

☑ There is no unforeseen or exceptional circumstance asserted or the reasons asserted for the adjournment do not constitute such circumstances. LAO 2004-6(D).

☐ The Motion or Stipulation is untimely as the date in question has passed.

☐ The Motion or Stipulation fails to state whether other adjournments have been granted in the proceeding, and, if so, the number granted, in violation of MCR 2.503(B)(2) and LAO 2004-6(D)(2).

☐ The Motion or Stipulation fails to comply with MCR 2.503(B)(3) and LAO 2004-6(D)(3) because the entitlement (motion caption) fails to specify whether it is the first or a later request.

☐ It is not evident that all concerned parties have stipulated to the Adjournment.

☐ The Motion or Stipulation fails to include a brief, in violation of MCR 2.119(A)(2).

☐ The Motion or Stipulation fails to cite any authority to support the adjournment, therefore the argument is deemed abandoned. See, e.g., Mitcham v City of Detroit, 355 Mich 182, 203 (1959); Houghton v Keller, 256 Mich App 336, 339-340 (2003).

☑ Other: The necessity of a six month adjournment of the entire scheduling order in light of the Court's refusal to grant the Plaintiff's most recent motion to compel is highly dubious. In essence, the Plaintiff seeks to restart this case.

As proven by the course of conduct of the parties, such an extension will almost certainly result in more motion practice and the likely unproductive use of the resources and times of the Court and the parties.

Nevertheless, as a matter of grace, the Court will adjourn the scheduling order approximately 90 days. In light of the fact that three of the finest and largest law firms in the country are working this file, the Court is highly confident that such an extension is more than sufficient.

FILED    Received for Filing    Oakland County Clerk    12/12/2024 3:23 PM

☑   In addition, oral argument is dispensed with pursuant to MCR 2.119(E)(3).

DATE: 12/12/2024                    /s/ Michael Warren
                                    HON. MICHAEL WARREN
                                    CIRCUIT COURT JUDGE