IN THE MATTER OF:

JOSHUA ADAM KAPLAN,

    Debtor.

_____/

ZB VERIFIED INVESTMENTS LLC,

    Plaintiff,

 vs.

JOSHUA KAPLAN,

    Defendant.

_____/

Case No. 25-48523-tjt
Chapter 7
Judge Thomas J. Tucker

Adv. Pro. No. 25-04234-tjt

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTIVEORDER PRECLUDING DUPLICATIVE DISCOVERY ON <u>ISSUES RESOLVED BY COLLATERAL ESTOPPEL</u>

NOW COMES Defendant, Joshua Kaplan ("Defendant") by and through his attorneys, OSIPOV BIGELMAN, P.C., states as follows:

### Preamble

ZB Verified Investments, LLC ("Plaintiff" or "ZB") seeks a Protective Order that would, as a practical matter, strip Defendant Joshua Kaplan of any meaningful right to conduct discovery in this adversary proceeding — a proceeding in which ZB is pursuing a non-dischargeable judgment in excess of $20,000,000 against him personally. To obtain that result, Plaintiff's Motion makes multiple representations of fact that are directly and demonstrably contradicted by the very record ZB created in the State Court Action, including ZB's own pleadings, its own representations to the State Court, and the State Court's own orders and trial opinion. As set forth below, the

Page **1** of **12**

Motion's central premise — that the State Court conclusively adjudicated the issues now before this Court as to Kaplan — is refuted by Footnote 1 of the very judgment ZB attaches as Exhibit A, which states that the trial "did not address Kaplan's liability." The stakes of these misrepresentations cannot be understated: if accepted, they would permanently foreclose Defendant's right to discovery in a proceeding seeking to render a $20 million judgment non-dischargeable based on a state court trial at which no claims were asserted against him, the automatic stay barred any action against him, and the court itself disclaimed adjudicating his liability.

The Plaintiff's motion makes several misrepresentations that are set forth below and illustrated in the table below.

## I.     BACKGROUND.

On March 11, 2026, Defendant issued his first set of discovery requests (ECF No. 30). On April 15, 2026, Plaintiff provided untimely objections and responses to Defendant's first set of discovery (Interrogatories and Request for Production of Documents). As the objections were untimely, they were waived. On April 19, 2026, Defendant requested that Plaintiff supplement its untimely responses to discovery as they were deficient. **Exhibit A.** On April 27, 2026, the Defendant renewed its request for the Plaintiff to supplement its discovery. **Exhibit B.** On April 28, 2026, the state court issued its trial opinion in favor of ZB and against third parties. Prior to the state court opinion, ZB has not been complying with its discovery obligations for three weeks and had refused to provide available dates for examination.

On May 4, 2026, at 9:00 a.m. the parties had a meet and confer where the Plaintiff refused to discuss any meaningful resolution of their discovery deficiencies, instead using the meet and

confer requirement to buy time to file the present 88-page motion, which was filed a few hours later that day.  ECF NO. 37.

For the reasons stated herein, no good cause exists for the relief sought by the Plaintiff. Plaintiff is not entitled to collateral estoppel, and this Court should deny the Motion and require Plaintiff to comply fully with its discovery obligations.

## II.  THE PLAINTIFF'S FAILED TO LIFT THE STAY TO ADJUDICATE THEIR CLAIMS AGAINST THE DEFENDANT IN STATE COURT.

This Court routinely lifts or modifies the automatic stay to allow Plaintiffs to adjudicate or liquidate their claims in state court proceedings.  The state court proceeding commenced on April 29, 2024.  The Defendant filed a Chapter 7 Bankruptcy petition on August 22, 2025.  The Plaintiff was made immediately aware of the Defendant's bankruptcy case as a notice of automatic stay was filed in the state court proceeding.  The Defendant actively participated in this bankruptcy case by appearing at the First Meeting of Creditors on September 24, 2025, the Continued First Meeting of Creditors on October 8, 2025, by filing a motion for 2004 Examination seeking documentation from the Debtor along with his examination on October 30, 2025[1],  [ECF No. 46], by filing a proof of claim [Claim #22], and then filing this adversary proceeding on November 20, 2025.

The trial against third parties took place in state court March 2-6, 2026.  Despite being fully aware of and actively participating in the Defendant's bankruptcy case, Plaintiff's counsel <u>neglected</u> to seek relief from the automatic stay to have the claims against the Defendant adjudicated or liquidated by the state court.  Having failed to do so, Plaintiff now asks this Court to treat the resulting judgment as though it resolved Kaplan's liability — a position that is

---

[1] The irony of Plaintiff's position is not lost on Defendant. While Plaintiff argues that Defendant has already had all the discovery he needs, Plaintiff itself filed a motion for a Rule 2004 Examination of the Defendant in this bankruptcy case, seeking additional discovery for its own benefit. Plaintiff cannot credibly contend that further discovery is unnecessary while simultaneously pursuing more of its own.

Page **3** of **12**

irreconcilable with the record Plaintiff itself created and with the explicit language of the State Court's own trial opinion.

**III.    PLAINTIFF'S COLLATERAL ESTOPPEL ARGUMENT FAILS BECAUSE THE STATE COURT DID NOT ADJUDICATE ANY ISSUE AS TO DEFENDANT KAPLAN**

ZB asks this Court to preclude Defendant Joshua Kaplan ("Kaplan") from conducting discovery on the ground that the State Court Judgment conclusively resolved the factual issues underlying ZB's nondischargeability claims. This argument fails at its foundation. The doctrine of collateral estoppel requires, as a threshold matter, that the issue in question was "actually litigated and determined" in the prior proceeding. Monat v. State Farm Ins. Co., 469 Mich. 679, 682–84 (2004). The record ZB itself created in the State Court Action — through its own pleadings, the court's orders, and the trial opinion — establishes beyond dispute that nothing was litigated or adjudicated as to Kaplan.

**A.    The Operative Pleading at Trial Contained No Claims Against Kaplan.**

The Second Amended Complaint, filed October 31, 2025, was the operative pleading at trial. **Exhibit C**.  The Second Amended Complaint consisted of Counts I-X, which did not seek any relief against Kaplan, only other parties.  Further, ZB expressly acknowledged this in the Second Amended Complaint itself:

> *Footnote 1: "Claims against Kaplan are administratively stayed due to pending voluntary bankruptcy filing pursuant to chapter 7 of Title 11, United States Code"*
>
> *Footnote 2: "ZB identifies Kaplan in name only and this Amended Complaint is not intended as the commencement or continuation of this action as against Kaplan. Claims against Kaplan are reserved until such time as the bankruptcy action is resolved."*

Where a plaintiff expressly pleads no claims against a party, and expressly reserves those claims for a separate proceeding, there is nothing for the court to litigate or determine as to that party. The State Court trial accordingly proceeded on claims against Adam Kessler, Divided Sky, LLC, Supply Line International, LLC, Supply Line International Medical, LLC, and Sami Ahmad[2] only. Kaplan was not a defendant at trial. He was not a party to the trial. The resulting judgment runs against those defendants — not against Kaplan.

**B.      The State Court's Own Judgment Disclaims Any Adjudication as to Kaplan.**

ZB attaches the State Court's Findings of Fact and Conclusions of Law as Exhibit A to its Motion and asks this Court to give those findings preclusive effect against Kaplan. Yet Footnote 1 of that very document states:

> *"Although he testified, the trial in this case did not address Kaplan's liability because he is embroiled in bankruptcy."*

The judge who issued the findings — the findings ZB now characterizes as conclusive — expressly wrote that the trial did not address Kaplan's liability. ZB cannot ask this Court to give preclusive effect to a judgment whose author specifically disclaimed that it resolved anything as to Kaplan. The absence of any adjudication as to Kaplan is not a procedural technicality; it is memorialized in the judgment itself.

That disclaimer is not limited to a footnote. On May 12, 2026 — the date of this filing — the State Court issued an Order Denying ZB's Motion for Order of Administrative Closing, in which Judge Warren expressly held that the April 28, 2026 Judgment "is not 'final' because it did

---

[2] Ahmad was dismissed on the eve of trial pursuant to a settlement agreement.

Page **5** of **12**

not adjudicate the claims against Kaplan due to his bankruptcy." Exhibit H. This is the most direct possible refutation of ZB's collateral estoppel argument. ZB has asked this Court to treat a judgment as conclusive and final as to Kaplan on precisely the issues it seeks to preclude from discovery. The court that issued that judgment has now ruled, in a signed order entered this same day, that the judgment is not final because it never addressed Kaplan at all. The issuing court and this Court are in complete agreement: nothing was adjudicated as to Kaplan.

**C.**     **<u>The State Court's Own Orders and ZB's Court Pleadings Confirm Kaplan Was Excluded From the Proceedings After His Bankruptcy Filing.</u>**

The record of the State Court proceedings, far from supporting ZB's collateral estoppel argument, documents a deliberate and court-sanctioned removal of Kaplan from the litigation at every stage following his August 22, 2025 bankruptcy filing:

(1)     August 25, 2025 — Notice of Automatic Stay filed. The State Court acknowledged the stay barred all action against Kaplan.

(2)     September 23, 2025 — The State Court dismissed two fraud counts against Kaplan (Counts V and VII) at the summary disposition stage. ZB's motion omits this dismissal entirely, yet now argues those same fraud issues were "conclusively determined" as to him[3]. **Exhibit D[4]**.

(3)     October 8, 2025 — ZB's own motion for leave to file the Second Amended Complaint stated: "Defendant Josh Kaplan has filed for Chapter 7 bankruptcy protection and this action is stayed as to him only as a result thereof. ZB takes no action here with respect to him." **Exhibit E**.

(4)     October 28, 2025 — The State Court's Order granting leave to file the Second Amended Complaint reopened discovery through January 16, 2026 for "Defendants only". **Exhibit F**. <u>Kaplan was not a named Defendant in the Second Amended Complaint so this additional discovery was not available to him</u>. This directly contradicts ZB's representation that "no further discovery was conducted, or permitted to be conducted" after Kaplan's bankruptcy filing.

---

[3] If collateral estoppel is applicable at all in this matter, it would be as a bar to the Plaintiff's claims that were dismissed by the state court when it granted Kaplan's Partial Motion for Summary Disposition.

[4] The Order states that Counts V-VII were dismissed, however, in a later order, this was clarified that Counts V and VII were dismissed, not count VI.

Page **6** of **12**

(5)     February 23, 2026 — <u>Kaplan was subpoenaed by ZB to testify at trial</u> as a fact witness in his personal capacity. A subpoenaed fact witness has no ability to "litigate" issues within the meaning of the collateral estoppel doctrine. **Exhibit G**.

(6)     March 2–6, 2026 — Trial proceeded solely on the Second Amended Complaint which did not assert any of its ten counts against Kaplan.

(7)     May 12, 2026 — The State Court issued an Order Denying ZB's Motion for Order of Administrative Closing, expressly holding that the April 28, 2026 Judgment "is not 'final' because it did not adjudicate the claims against Kaplan due to his bankruptcy." **Exhibit H**. This Order was entered today, the same date as this filing, and constitutes an independent judicial finding by the issuing court that no claims against Kaplan were adjudicated by the April 28, 2026 Judgment.

This is not a case in which a party slipped through a procedural gap. It is a case in which the State Court, ZB, and the court record itself repeatedly and explicitly documented that Kaplan was not part of the proceedings. ZB cannot now selectively invoke the findings from those proceedings as though Kaplan were a full participant.

**D.    <u>ZB's Own Representations to the State Court Are Irreconcilable With Its Collateral Estoppel Argument Here.</u>**

ZB told the State Court it was taking "no action" against Kaplan and that its Second Amended Complaint was "not intended as the commencement or continuation of this action as against Kaplan." ZB further represented that its claims against Kaplan were "reserved until such time as the bankruptcy action is resolved" — i.e., reserved for this adversary proceeding. ZB cannot make that representation to one court and then represent to this Court that those very claims were already resolved. The estoppel, to the extent any applies, runs against ZB.

The following table summarizes the inconsistencies between ZB's representations in the Motion and the record ZB itself created:

Page **7** of **12**

| ZB's Representation in the Motion | What the Record Actually Shows |
|---|---|
| The State Court Judgment "conclusively resolves the factual issues underlying each of ZB's nondischargeability claims" against Kaplan. | The judgment's own Footnote 1 states the trial "did not address Kaplan's liability because he is embroiled in bankruptcy." The court that issued the judgment expressly disclaimed adjudication of any issue as to Kaplan. On May 12, 2026 — the date of this filing — the same court confirmed in a separate Order that the April 28, 2026 Judgment is not "final" because it "did not adjudicate the claims against Kaplan due to his bankruptcy." Exhibit H. |
| The issues were "actually litigated and determined" as to Kaplan. | The Second Amended Complaint — the operative pleading at trial — contained no claims against Kaplan. There were no claims to litigate and therefore no issues to determine. A court cannot "actually litigate and determine" issues as to a party who is not before it. |
| Kaplan "was present throughout trial as a party representative on behalf of the entity defendants." | Kaplan was subpoenaed by ZB on February 23, 2026 in his individual capacity to testify as a fact witness. He was not a participant in the litigation. Witness testimony of a non-party is not "actual litigation." |
| Kaplan "had a full and fair opportunity to litigate" the issues. | The October 28, 2025 Order granting leave to file the Second Amended Complaint reopened discovery through January 16, 2026. As Kaplan was not a named Defendant in the Second Amended Complaint, this additional discovery was not available to him. Moreover, as a non-party to the trial itself, Kaplan had no standing to present evidence, assert defenses, cross-examine witnesses on his own behalf, or make argument to the court — the minimum requirements for any meaningful opportunity to litigate. |
| ZB's claims are the "very same issues" before the Bankruptcy Court. | ZB's Second Amended Complaint contained no claims against Kaplan and (Footnote 2) stated: "this Amended Complaint is not intended as the commencement or continuation of this action as against Kaplan." ZB expressly reserved its claims against Kaplan for the bankruptcy proceeding— the precise proceeding it now contends has already been resolved. |
| No further discovery was conducted after Kaplan's bankruptcy filing. | Discovery was formally reopened by court order on October 28, 2025— more than two months after Kaplan's August 22, 2025 bankruptcy filing — and ran through January 16, 2026. This statement is directly contradicted by the State Court's own order. |
| The State Court Judgment conclusively resolved the fraud issues underlying ZB's nondischargeability claims against Kaplan. | On September 23, 2025, the State Court dismissed two fraud counts against Kaplan — Counts V and VII — pursuant to MCR 2.116(C)(8). ZB's Motion omits this dismissal entirely while simultaneously arguing that the State Court's findings on those same fraud issues are "conclusively determined" as to Kaplan. To the extent collateral estoppel applies to anything in the State Court record as to Kaplan, it operates as a bar to ZB's dismissed claims — not as a sword against him. |

| ZB's Representation in the Motion | What the Record Actually Shows |
|---|---|
| The April 28, 2026 State Court Judgment is a "final" adjudication of the issues underlying ZB's nondischargeability claims sufficient to support collateral estoppel. | On May 12, 2026 — the date of this filing — the State Court issued an Order expressly holding that the April 28, 2026 Judgment is not "final" because it "did not adjudicate the claims against Kaplan due to his bankruptcy." Exhibit H. Collateral estoppel requires a "valid and final judgment." Monat, 469 Mich. at 682. The issuing court has now ruled the judgment does not satisfy that requirement as to Kaplan. |

### E.     Because No Issues Were Actually Litigated and Determined as to Kaplan, Collateral Estoppel Does Not Apply and the Motion Should Be Denied.

Michigan's collateral estoppel doctrine requires that the issue was "actually litigated and determined" in the prior proceeding. Monat, 469 Mich. at 682. "Actual litigation" requires that the party had a genuine opportunity to contest the issue as a party to the proceeding, not merely as a subpoenaed witness (by ZB) in a case where no claims were asserted against him and where he was expressly barred from participating in the final discovery period. None of the elements of collateral estoppel are satisfied here:

- No actual litigation: The operative complaint contained no claims against Kaplan. The court stated it in its trial opinion that did not address his liability.

- No determination: The State Court's own footnote in its trial opinion expressly disclaims any determination of Kaplan's liability.

- No full and fair opportunity: Kaplan was excluded from the final discovery period by court order and was not a party to the trial.

Accordingly, there is no basis to limit discovery in this adversary proceeding on collateral estoppel grounds, and Plaintiff's Motion for Protective Order should be denied.

### IV.     Conclusion.

For the foregoing reasons, Plaintiff's Motion for Protective Order should be denied in its entirety, and Defendant should be permitted to proceed with discovery in this adversary

25-04234-tjt    Doc 42    Filed 05/12/26    Entered 05/12/26 15:36:40    Page 9 of 114

proceeding[5]. Defendant further respectfully requests that this Court award Defendant his reasonable attorneys' fees and costs incurred in opposing this Motion. The Motion advances a collateral estoppel argument that is facially untenable in light of the very documents ZB attaches as exhibits: the State Court's own trial opinion states in Footnote 1 that "the trial in this case did not address Kaplan's liability," and ZB's own Second Amended Complaint states in Footnote 2 that it "is not intended as the commencement or continuation of this action as against Kaplan." Filing an 88-page motion premised on collateral estoppel — while attaching exhibits that directly refute the premise — in a proceeding seeking to render more than $20,000,000 non-dischargeable against a defendant who had no claims asserted against him at trial, warrants an award of fees under Fed. R. Bankr. P. 7037(a)(5)(B). The Court should additionally consider whether the representations in the Motion are consistent with the obligations imposed by Fed. R. Bankr. P. 9011 and 28 U.S.C. § 1927, which require that filings be grounded in fact and law and not submitted for any improper purpose. Defendant does not make this request lightly; he does so because the stakes of the Motion — the permanent foreclosure of his right to defend himself against a $20,000,000 judgment — are too significant to permit the misrepresentations identified herein to pass without consequence.

DATED: May 12, 2026

Respectfully submitted,
**OSIPOV BIGELMAN, P.C.**

*/s/ Jeffrey H. Bigelman*
JEFFREY H. BIGELMAN (P61755)
Attorneys for Defendant
20700 Civic Center Dr., Ste. 420
Southfield, MI 48076
(248) 663-1800
jhb@osbig.com

---

[5] Discovery may need to be extended for the Defendant only due to the Plaintiff's dilatory tactics.

IN THE MATTER OF:

JOSHUA ADAM KAPLAN,

|  |  |
|---|---|
| Debtor. | Case No. 25-48523-tjt |
| | Chapter 7 |
| _____/ | Judge Thomas J. Tucker |

ZB VERIFIED INVESTMENTS LLC,

Plaintiff,                                                                      Adv. Pro. No. 25-04234-tjt

 vs.

JOSHUA KAPLAN,

Defendant.

_____/

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2026, I electronically filed Defendant's Response to

Plaintiff's Motion for Protective order Precluding Duplicative Discovery on Issues Resolved by

Collateral Estoppel and Certificate of Service with Clerk of the Court using the ECF system, which

will send notification of such filing to the following:

Kimberly Ross Clayson on behalf of Plaintiff ZB Verified Investments LLC
kclayson@taftlaw.com,
ttorni@taftlaw.com;DET_Docket_Assist@taftlaw.com;TStorm@taftlaw.com

Respectfully submitted,
**OSIPOV BIGELMAN, P.C.**

DATED: May 12, 2026                   */s/ Jeffrey H. Bigelman*
                                                      JEFFREY H. BIGELMAN (P61755)
                                                      Attorneys for Debtor

Page **11** of **12**

20700 Civic Center Drive, Suite 420
Southfield, MI 48076
Tel: 248-663-1800/Fax: 248-663-1801
jhb@osbig.com

Page **12** of **12**

# Exhibit A

| | |
|---|---|
| **From:** | Jeff Bigelman |
| **To:** | "Clayson, Kim Ross" |
| **Cc:** | Monique Kallabat |
| **Bcc:** | Josh Kaplan |
| **Subject:** | RE: Kaplan: ZB Investments v Kaplan- Discovery Deficiencies |
| **Date:** | Monday, April 27, 2026 9:13:00 AM |
| **Attachments:** | image001.png |

Following up on this, we will need to file a motion to compel if this is not forthcoming.

Sincerely,

## OSIPOV BIGELMAN, P.C.

Jeffrey H. Bigelman, Esq.
20700 Civic Center Drive
Suite 420
Southfield, MI 48076
248.663.1800- Main line
248.663.1801- Facsimile
jhb@osbig.com
www.osbig.com





CONFIDENTIALITY NOTICE:
This email message and any attachments to it, is intended only for the individual or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient, but do not wish to receive communication through this medium, please so advise the sender immediately.

**From:** Jeff Bigelman
**Sent:** Sunday, April 19, 2026 6:00 PM
**To:** Clayson, Kim Ross <kclayson@taftlaw.com>
**Cc:** Monique Kallabat <mk@osbig.com>
**Subject:** Kaplan: ZB Investments v Kaplan- Discovery Deficiencies

Kim-

There are quite a few responses that are problematic but the most is your clients response to the following:

**REQUEST NO. 3:** Any grand jury subpoena that you received from the Federal Government related to Orchard Laboratories and/or Divided Sky and the documents that you produced in response.
**RESPONSE:** Plaintiff objects to this request on the grounds that it is overbroad and is unrelated to the claims at issue in this matter. Answering further, Defendant is in possession of the requested documents.

I have spoken with my client and he is not in possession of the requested documents, so please have your client produce them without further delay.

Thank you.

Sincerely,

**OSIPOV BIGELMAN, P.C.**
Jeffrey H. Bigelman, Esq.
20700 Civic Center Drive
Suite 420
Southfield, MI 48076
248.663.1800- Main line
248.663.1801- Facsimile
jhb@osbig.com
www.osbig.com

# Exhibit B

| From: | Jeff Bigelman |
|---|---|
| To: | "Clayson, Kim Ross" |
| Cc: | Monique Kallabat |
| Subject: | RE: Kaplan: ZB Investments v Kaplan- Discovery Deficiencies |
| Date: | Monday, April 27, 2026 4:04:00 PM |
| Attachments: | image001.png |
| Importance: | High |

This is the only material discovery issue at this point.

That being said I intend to subpoena for examination the corporate representative of Orchards, so please advise dates that you are available ASAP.

In regard to our response to your MSJ, we are requesting that the date be pushed to after the completion of discovery for the following reasons:

1. Permit the completion of discovery, including your supplementation of your discovery responses
2. Allow for the examination of Orchards
3. Allow the state court additional time to rule upon the Usury issue

Please advise if you will stipulate to the same otherwise I will file a motion with the court.

Sincerely,

## OSIPOV BIGELMAN, P.C.

Jeffrey H. Bigelman, Esq.
20700 Civic Center Drive
Suite 420
Southfield, MI 48076
248.663.1800- Main line
248.663.1801- Facsimile
jhb@osbig.com
www.osbig.com





CONFIDENTIALITY NOTICE:
This email message and any attachments to it, is intended only for the individual or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient, but do not wish to receive communication through this medium, please so advise the sender immediately.

**From:** Clayson, Kim Ross <kclayson@taftlaw.com>
**Sent:** Monday, April 27, 2026 9:18 AM
**To:** Jeff Bigelman <jhb@osbig.com>
**Cc:** Monique Kallabat <mk@osbig.com>
**Subject:** Re: Kaplan: ZB Investments v Kaplan- Discovery Deficiencies

Jeff,

As a reminder a motion to compel is not the next proper step. Do you have any other issues with discovery? You mentioned several issues but then named only one issue. If that is all, I can send you the document. If there is anything else, the appropriate next step is to arrange a meet and confer to resolve this.

Kim

> On Apr 27, 2026, at 9:13 AM, Jeff Bigelman <jhb@osbig.com> wrote:
>
> Following up on this, we will need to file a motion to compel if this is not forthcoming.
>
> Sincerely,
>
> **OSIPOV BIGELMAN, P.C.**
> Jeffrey H. Bigelman, Esq.
> 20700 Civic Center Drive
> Suite 420
> Southfield, MI 48076

248.663.1800- Main line
248.663.1801- Facsimile
jhb@osbig.com
www.osbig.com

<image001.png>

<image002.jpg>

CONFIDENTIALITY NOTICE:
This email message and any attachments to it, is intended only for the individual or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient, but do not wish to receive communication through this medium, please so advise the sender immediately.

# Exhibit C

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

ZB VERIFIED INVESTMENTS LLC,

                Plaintiff,

v.

ADAM KESSLER; JOSHUA KAPLAN[1];
SAMI AHMAD; DIVIDED SKY, LLC;
SUPPLY LINE INTERNATIONAL, LLC,
SUPPLY LINE INTERNATIONAL MEDICAL, LLC,
JOHN DOES 1-10

                Defendants.

Case No. 24-207081-CB

Hon. Michael Warren

---

Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
Taft Stettinius & Hollister LLP
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
*Attorneys for Plaintiff*

Thomas W. Cranmer (P25252)
Caroline Giordano (P76658)
Kimberly L. Scott (P69706)
Miller, Canfield, Paddock and Stone, PLC
840 West Long Lake Road, Suite 150
Troy, MI 48098
(248) 879-2000
cranmer@millercanfield.com
*Attorneys for Defendants Kessler, Kaplan,*
*Divided Sky, LLC, and Supply Line*
*International, LLC*

Kelly E. Kane (P81912)
Callan G. Stein (Admitted PHV)
Michael Lowe (Admitted PHV)
Troutman Pepper Hamilton Sanders LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
(248) 359-7300
kelly.kane@troutman.com
callan.stein@troutman.com
michael.lowe@troutman.com
*Attorneys for Defendant Sami Ahmad*

---

## SECOND AMENDED COMPLAINT

---

[1] Claims against Kaplan are administratively stayed due to pending voluntary bankruptcy filing pursuant to chapter 7 of Title 11, United States Code, Section 101 *et seq.* (the "Bankruptcy Code").

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Plaintiff ZB Verified Investments LLC (the "ZB"), through its attorneys, Taft Stettinius & Hollister LLP, alleges the following for its Second Amended Complaint against Defendants Adam Kessler ("Kessler"), Joshua Kaplan[2] ("Kaplan"), Divided Sky, LLC ("DSLLC") Supply Line International Medical, LLC ("SLIM"), Supply Line International, LLC ("Supply") (Kessler, DSLLC, SLIM and Supply are herein after referred to as the "Kessler Defendants"), and Sami Ahmad ("Ahmad") (the Kessler Defendants and Ahmad are collectively, the "Defendants"):

## PARTIES, JURISDICTION, AND VENUE

1. ZB is a Michigan limited liability company whose principal place of business is in Oakland County.

2. Kessler is an individual who resides in Oakland County.

3. Kaplan is an individual who resides in Oakland County.

4. Ahmad is an individual, who upon information and belief, resides in Oakland County.

5. DSLLC is a Michigan limited liability company whose principal place of business is in Oakland County.

6. Supply is a Michigan limited liability company whose principal place of business is in Oakland County.

7. SLIM is a Michigan limited liability company whose principal place of business is in Oakland County.

8. Kaplan is the manager of DSLLC, Supply, and SLIM.

9. This Court has jurisdiction over the parties pursuant to MCL 600.701 and 600.731.

---

[2] ZB identifies Kaplan in name only and this Amended Complaint is not intended as the commencement or continuation of this action as against Kaplan. Claims against Kaplan are reserved until such time as the bankruptcy action is resolved.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

10. Venue is proper in this Court pursuant to MCL 600.1621.

<u>**STATEMENT OF FACTS**</u>

11. In or about April of 2023, DSLLC's principals Kessler and Kaplan approached ZB's principals, independently, with what they termed was a unique investment opportunity.

12. Kessler and Kaplan explained to ZB's principals that they had been operating a highly successful and lucrative business selling COVID-19 test kits to recipients of Medicare and were offering an investment opportunity therein.

13. Kessler and Kaplan advertised their business as a "direct to consumer program paid for by the United States Federal Government."

14. Kessler and Kaplans' offering materials, provided to ZB's principals in order to induce them to invest (the "Offering"), described the participants in the opportunity as follows:

> **Supply Line International Medical** ("SLI") has used its successful supply chain partners to obtain direct relationships to testing manufacturers and has been one of the largest suppliers of COVID testing to states and hospitals throughout the pandemic (the supplier).
>
> **[The Laboratory ("Laboratory")]** is one of the largest independently owned labs in the Midwest and the first independent lab in Michigan to offer COVID testing. [The Laboratory] is serving the nation with a multitude of testing types and screening services (the CLIA lab).
>
> **Verified Health** ("VH") is an innovative, homegrown SAAS tool to manage patient care and testing. A joint venture co-founded by the owners of SLI and [The Laboratory], along with industry leading healthcare developers (the technology delivery tool).

15. The Offering further explained that,

> Pursuant to the Families First coronavirus Response Act ("FFCRA") and the Coronavirus Aid, Relief, and Economic Security Act ("CARES"), during the Public Health Emergency ("PHE") those Recipients have the right to, receive COVID-19 OTC tests at zero cost to the subscriber. Specifically, Medicare

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Recipients are authorized to receive 8 COVID-19 tests per month, every month, until the PHE ends, which is currently set to end on May 11, 2023. While for most Medicare Recipients covid testing will be subject to cost-sharing (deductible and Co-Pay) after the end of the PHE, there is a minimum one (1) year wind down provision of the FFCRA and CARES for Medicaid Recipients, which will continue in to September of 2024. The directive to Medicaid is to ensure lower income families have access to preventative testing and to prevent outbreaks of COVID-19 that spawn hot zones throughout the country.

[The Laboratory] using Verified Health's customer relationship manager platform has been garnering subscriptions from both Medicare and Medicaid and patients throughout the country since early in 2023. To date, the venture has generated more than 150,000 subscriptions. Going forward, the opportunity for Medicaid is even greater, because of the longer lasting nature of the program – it goes until September 2024. Recipients are coming to the platform via online marketing campaigns and TV advertisements. The cost of advertising is roughly$750,000.00 per day. While this seems like a significant outlay the per Subscriber cost breaks down to about $35.00 per subscription and is covered in just the first shipment. Below are the costs and revenue associated for a single subscription.

| **Costs** | | **Profit** | |
|---|---|---|---|
| COGS | $12.80 | Reimbursement | $11.75/per test |
| Advertising | $35.00 | | |
| Pick/Pack/Ship | $10.00 | | |
| Platform | $8.00 | | |
| Postage | $0.90 | | |
| Billing | $4.70 | | |
| Insurance | $0.60 | | |
| Total Expense | $72.00 | 8 Tests Reimbursement | $94.00 Subscriber per month |

When a Recipient opts in - the profit goes up because cost of advertising, postage, and insurance discovery is removed from the refill bringing the profit per Subscriber to $35.50 a 62% profit margin per shipment. An opt in by just 1 percent of Medicaid Recipients is over 900,000 Subscribers which if each Subscriber opted in for at least 6 months generates revenue of over 500 million dollars.

16. As described above and by Kaplan and Kessler, SLIM would obtain the COVID-19 test kits from its supply chain connections, VH owned and operated a website through which

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

25-04234-tjt   Doc 42   Filed 05/12/26   Entered 05/12/26 15:36:40   Page 24 of 114

consumers could apply for and register to receive the tests, and DSLLC would provide the management and marketing to drive consumers to VH's website to register for the tests, thus creating the opportunity to be reimbursed and paid by the US Government.

17. The Laboratory played a critical role in the business, as The Laboratory is an approved Medicare/Medicaid biller and the business could not operate and/or participate in the program to receive reimbursement from the US Government without an approved Medicare/Medicaid biller.

18. As represented by Kessler and Kaplan and understood by ZB's principals at the time (although they were never provided a copy), DSLLC and The Laboratory were parties to a management services contract whereby The Laboratory was required to remit all expenses recouped from the government and DSLLC's share of profits to DSLLC and DSLLC had all responsibility for marketing and customer acquisition functions of the business.

19. As also described above, Kaplan and Kessler told ZB's principals there was a very limited window to participate in this highly successful and highly lucrative business because the Medicare program was going to terminate on May 11, 2023.

20. But, Kaplan and Kessler touted that after those 11 days, there was an even greater opportunity available because of the ability to sell to Medicaid subscribers, which would continue to run until September of 2024.

21. Kaplan and Kessler explained that the business had been highly successful in driving subscribers to VH's website using a technique called "affiliate marketing."

22. Kaplan and Kessler explained affiliate marketing as "a performance-based marketing strategy in which an investor () rewards affiliates () for driving traffic or sales to their website or product…the merchant provides the affiliate with a unique affiliate link or code, which

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

the affiliate then promotes to their audience, such as on their website, blog, social media, or native advertising platform. When a user clicks on the affiliate link and makes purchase, the affiliate earns a commission from the merchant."

23. Kessler described this method of marketing as highly successful, and highly expensive.

24. ZB has since learned that Kessler and Kaplan proposed this performance-based method of marketing to The Laboratory, who definitively told them they could not and were not authorized to market in that manner.

25. Indeed, Kaplan and Kessler represented that they were spending in excess of $750,000 per day on affiliate marketing.

26. Kaplan and Kessler further explained that while their business was highly successful and had generated millions of dollars of revenue in the short time in which they were operating, the US Government's pace of reimbursement did not keep pace with their cash demands and thus they needed a "bridge" to continue marketing until they received their monies from the US Government, via The Laboratory.

27. That is where, Kaplan and Kessler offered, ZB could enter the picture.

28. Specifically, if ZB were to provide DSLLC a sizeable loan that DSLLC would use for marketing (so they were told), DSLLC would agree to repay that loan at very favorable terms.

29. Moreover, as an added incentive to provide funding, Kaplan and Kessler offered ZB a 1% membership interest in VH for each $2 million that ZB was able loan to DSLLC.

30. ZB decided to take their offer.

**The Loan and Loan Documents**

31. On or about April 27, 2023, ZB loaned DSLLC $4,850,000.00 (the "Loan"),

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

evidenced by a Promissory Note, effective as of that date, executed by DSLLC in favor of ZB (the "Note"). A copy of the Note is attached hereto as **Exhibit 1**.

32. The Note provides that the Loan would bear interest at a rate of twenty (20%) percent per annum and that DSLLC was required to make payments of interest on the first day of each month following the effective date thereof. Ex 1.

33. The Note further provides that the Loan would fully mature and that all unpaid principal and interest would become fully due and payable on or about twelve (12) months from the date of the effective date - - April 27, 2024 (the "Maturity Date"). Ex 1.

34. However, the Note also provided an option to ZB, "…at any time after the ninetieth (90th) day after the Effective Date, the Lender may accelerate the Maturity Date to a date selected by the Lender upon sending at least twenty-one (21) days prior written notice to Borrower and the date set forth in the notice form Lender to Borrower shall become the Maturity Date of this Loan…" (the "Acceleration Option").

35. Upon any default and/or failure to pay amounts due at any time, including but not limited to the Maturity Date, the Note provides that the Loan shall bear default interest at a rate of an additional three (3%) percent until cured ("Default Interest").

36. In the event that DSLLC failed to pay any amounts due pursuant to the Note, DSLLC further agreed in the Note to pay all costs of collection, including but not limited to reasonable attorney's fees incurred by ZB. Ex 1.

37. Upon a default or failure to pay amounts due pursuant to the Note, all amounts due and payable are owed, "without notices, presentation or demand for payment, all such being hereby waived by [DSLLC]…" Ex 1.

38. The Note further required DSLLC to provide ZB with financial statements, balance

7

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

sheets and any other financial information ZB requested from time to time. Ex 1.

39.     Finally, it was "acknowledged and agreed" between ZB, DSLLC and Supply, that the Loan was to be paid directly by ZB to Supply, rather than DSLLC, and Supply acknowledged receipt of same by its signature. Ex 1.

40.     As an inducement to enter the Loan and to secure repayment thereof, as of April 27, 2023, each of Kessler, Kaplan, and Ahmad (the "Guarantors") entered into personal "Guaranties" in favor of ZB, by which they agreed to personal liability for all amounts due pursuant to the Note and provided certain representations and warranties (the "Guaranties"). **Exhibit 2**.

41.     Pursuant the Guaranties, the Guarantors

> …Jointly and severally, unconditionally and irrevocably guarantees to [ZB] the full and prompt payment when due of all indebtedness, liabilities and obligations of [DSLLC] to [ZB] howsoever evidenced, governed and/or secured, whether present or future, primary or secondary, absolute or contingent, direct or indirect, several, joint or joint and several (collectively, "Indebtedness"), together with out-of-pocket and reasonable expenses, costs and attorney's fees, incurred by [ZB] in connection with the enforcement of this Guaranty and/or any obligations of the Borrowers to Lenders arising under the Loan Documents. Lender may have immediate recourse against Guarantor for full and immediate payment of the Indebtedness at any time when the Indebtedness, or any portion, has not been paid when due (whether by acceleration or otherwise) and after expiration of all applicable notice and cure periods…Guarantor's obligations under this Guaranty are **UNLIMITED**….

42.     Paragraph 2 of the Guaranties further provide that "Guarantor's liability for payment of the Indebtedness shall be a primary obligation and shall be absolute and unconditional…The obligations set forth in this Guaranty constitute full recourse obligations of the Guarantor, enforceable against each party comprising Guarantor to the full extent of such party's assets and properties…"

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

8

43. Pursuant to Paragraph 3 of the Guaranties, each Guarantor expressly and unconditionally waived, among other things, "…(c) any setoffs or counterclaims against [ZB] which would otherwise impair [ZB's] rights against Guarantor; (d) any demand or notice of any action that Lender takes regarding any Borrower, anyone else, any collateral or any Indebtedness, which guarantor might be entitled to by law or under any other agreement…"

44. Pursuant to Paragraph 4 of the Guaranties, each Guarantor represented and warranted to ZB that, among other things: "…(d) Such Guarantor shall certify and furnish to Lender those financial reports and information required pursuant to the terms of the Loan Documents…(e) that at the time of execution and delivery of this Guaranty, and as long as the Guaranty is in effect, each Guarantor has minimum net worth of Ten Million and xx/100 ($10,000,000) USD and further that minimum of one-half (1/2) of that net worth is in assets solely in the name of each Guarantor..."

45. Upon execution of the Note and Guaranties, ZB disbursed $4,850,000 to Supply as provided by the Note.

**Kessler and Kaplan Lie to ZB About the Success of the Business**

46. Almost immediately, ZB began to ask Kessler and Kaplan for updates about the performance of DSLLC's business.

47. Kessler and Kaplan continually replied with statements that the program was performing extremely well. For example:

a. On April 25, 2023 at 8:40 AM, Kessler wrote to that "4,239 opt ins so far today…Not even 9:00am."

b. On May 5, 2023, ZB asked Kessler how the numbers have been and if ZB could receive weekly/monthly/quarterly updates. Kessler responded, "Quarterly updates work. Haven't' put big heat on Medicaid yet, trying to wrap up Medicare. We've lowered marketing spend but are still getting 5k per day of Medicare. Total April was 300k. Got $5M yesterday as first big payment from

25-04234-tjt   Doc 42   Filed 05/12/26   Entered 05/12/26 15:36:40   Page 29 of 114

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Medicare."

c.  On May 30, 2023, ZB asked Kessler for another update and "When do you think you will start executing on the Medicaid program." In response Kessler wrote, "We started soft launch of Medicare[sic] – very small – to test some new features out. We've collected about $20m and expect another $22m in this week. *Medicaid."

d.  May 30, 2023 when asked why DSLLC had not deployed capital for Medicaid for yet, Kessler responded "Well we haven't deployed the capital from the receivables for Medicaid yet because we are in the process of testing out new features on the website, testing marketing channels, and confirming various insurance procedures for the respective states."

e.  On June 26, 2023 ZB requested an update call. On June 27, 2023, the parties had a zoom call wherein Kessler assured ZB, in substance, that the business was performing incredibly well.

f.  On July 5, 2023, Kaplan sent ZB a memo representing the following:

   i.  "From March of 2023 until the FHE was lifted, approximately 350,000 Medicare recipients signed up to receive Tests of which roughly 300,00 received at least 2 shipments. During the program, The Laboratory dispensed more than 5,000,000 Tests. CMS has requested some additional information from The Laboratory for roughly 70 patients (out of 400,000 since the Program's inception) which we have provided…During the Program, Verified Health exceeded its revenue projections."

   ii.  "…Due to the increased risk resulting from multiple payers, The Laboratory has started the Medicaid Program with a slow ramp. The first two months of the program have been spent testing various insurers state-by-state, to ensure payment runs smoothly. To date, payment in full has been received on the billings for Michigan. Payments for the other states is expected in the next few weeks. We are excited with the results to date."

g.  Attached to that same memo, Kaplan sent a "Project Income Statement" which claimed more than $61 million in revenue and $21 million in net income.

48.  Unfortunately, after filing this lawsuit, ZB discovered that most, if not all of the above representations were knowingly false when made and/or omitted critical material facts that would them not misleading/misrepresentations.

49.  Indeed, from the date of the Loan until late March or early April of 2024, Kessler/Kaplan did not disclose any issues with DSLLC's business.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

50. Rather, between June 29, 2023 and April 4, 2024, DSLLC made payments of interest only, to ZB totaling $926,888.88, although many of those payments were late, ZB assumed that DSLLC was returning money and the Loan would be paid in full.

51. During that time, as the Loan neared the Maturity Date, ZB made several requests to DSLLC for financial and other reasonable information concerning DSLLC's ability to repay, which DSLLC failed to provide in breach of the Note and causing Default Interest to accrue.

52. In or about March or early April of 2024, Kessler disclosed to ZB that the US government had initiated an audit of DSLLC/The Laboratory's claims for reimbursement and was withholding payment of monies due.

53. As a result thereof, Kessler/Kaplan informed ZB that DSLLC would not be able to pay the balance of the of the Loan upon maturity.

54. Kessler/Kaplan however, assured ZB that there was nothing wrong, all claims submitted were legitimate, and the audit was simply "routine" and as a result of errors made by DSLLC's third-party shipper.

55. Kessler/Kaplan told ZB the matter was simply an issue of "timing" and the government was going to pay The Laboratory, who in turn would pay ZB.

56. Kessler/Kaplan told ZB that DSLLC is owed more than $21 million, perhaps as much $30 million by The Laboratory.

57. These representations would turn out to be false and known to be so when made.

**The Loan Maturity and Lawsuit**

58. DSLLC did not make any payments toward the principal or interest on the Loan after April 4, 2024.

59. Pursuant to the Note, all principal and interest due on the Loan fully matured on the

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Maturity Date and were immediately due and payable as of Maturity Date.

60. As of the Maturity Date, the entire principal amount of the Note of $4,850,000, a monthly interest payment of $43,111.11 and accrued Default Interest were outstanding, due and payable.

61. DSLLC breached the Note by failing to repay the entire amount due and payable as of the Maturity Date in the amount of at least $4,893,111.12 plus accrued Default Interest.

62. As a result of DSLLC's breach of the Note and failure to pay amounts due on the Maturity Date, the Loan is further accruing Default Interest.

63. Pursuant to the terms of the Note, DSLLC is likewise liable for all of ZB's costs and attorney's fees incurred in collection.

64. Likewise, each of the Guarantors have, as of the Maturity Date, breached the Guaranties by their failure to pay ZB the entire amount due as of the Maturity Date.

65. Pursuant to the Guaranties, Each of the Guarantors are jointly and severally liable to ZB for all amounts due to ZB pursuant to the Note as of the Maturity Date, including all unpaid interest, Default Interest, principal, costs, and attorney's fees.

66. ZB commenced this action as a result thereof on or about April 28, 2024.

**ZB Discovers Numerous Frauds Committed by the Kessler Defendants**

67. Since the filing of the instant action ZB has discovered numerous material misrepresentations and/or omissions of fact by the Kessler Defendants.

68. First, upon information and belief, ZB has obtained evidence which implies that the monies provided pursuant to the Loan were not used to pay for "affiliate marketing" as was represented to ZB to induce ZB into making the Loan, but rather were used for other purposes of Kaplan, Kessler, Supply and/or SLIM.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

69. Specifically, text messages reveal that on the morning of April 28, 2023, the day that ZB funded the Loan, as ZB was insisting on getting fully executed documents, Kaplan was pressuring Ahmad to send his executed guaranty and had the following exchange:

- 9:00 AM- I have to get documents from you in the next 30 minutes. (Kaplan)

- 9:42 AM- Call you shortly. My NJ universities partners are here this morning (Ahamad).

- 9:43 AM- Sorry bro, this is more important. I signed for 15m personally and the Medicare run ends Sunday. I have 7.5m more coming this am that I told the investors had to be today. NEED THAT DOCUMENT (Kaplan), (emphasis added).

- 9:52 AM – Should I come get it? (Kaplan)

- 11:27 AM - Bro, you're putting me in horrible spot (Kaplan)

- 11:49 AM – Sent (Ahmad).

70. From the exchange, it is believed that Kaplan needed Ahmad's guaranty to obtain ZB's money for purposes other than as represented to ZB.

71. Moreover, from a review of the limited banking records Supply has provided in this case, it appears the entirety of the money loaned by ZB, as well as other parties around the same time, was gone and wired out to unknown accounts within a matter of days, which was contrary to what Kessler and Kaplan told ZB about how its money was going to be deployed.

72. Further, the claims that all of this money was spent on "affiliate marketing" are suspect.

73. Kessler/DSLLC have claimed, at various times and to various parties, to have raised more than $20 million from investors, including ZB.

74. Between April and mid-July of 2023, DSLLC/Supply were paid more than $21 million by The Laboratory - - more than enough to return ZB's money.

75. By then, the Medicare program, which only ran for total of 73 days, was well over

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

with and the numbers just do not add up.

76. A review of records produced seems to indicate that the Kessler and Kaplan took in approximately $6 million more than they claim to have spent on the Medicare/Medicaid program, but there is no indication of where that money went.

77. The invoices provided by DSLLC to allegedly substantiate their marketing expenses are suspect.

78. These invoices provide little if any information about what services were supposedly provided.

79. ZB has learned that The Laboratory is likewise suspicious of DSLLC's "expenses" and has refused to pay them absent supporting documentation.

80. The Laboratory is asserting claims against DSLLC for material breaches of the MSA.

81. Moreover, despite the Kessler and Kaplan claiming that DSLLC is owed a minimum of $20 million, to as much as $30 million from The Laboratory, ZB has learned that The Laboratory contends that DSLLC has been paid all monies it is due from the Medicare program— including monies to repay ZB—and that DSLLC will receive no further payments when and if the government releases any additional monies to The Laboratory.

82. Indeed, in discovery, ZB learned that DSLLC and Orchard entered into a back-dated service contract, which did not provide any terms of compensation for DSLLC.

83. Apparently, per their own testimony, DSLLC and Orchard never actually agreed on terms for DSLLC's compensation.

84. Thus, contrary to Kaplan and Kessler's representations about how successful and profitable DSLLC's business was, DSLLC did not have an ability to profit (and thus an ability to

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

pay ZB its promised interest) at all.

85. Stunningly, also, ZB has obtained evidence that nearly all of the representations in described in Paragraph 47 concerning the financial performance of DSLLC's business were false and/or omitted material facts.

86. First, on or about June 23, 2023, just about 45 days after ZB made the Loan, the CoventBridge Group, on behalf of the Centers for Medicare & Medicaid Services ("CMS"), issued a Notice of Suspension of Part B Medicare Payments to The Laboratory, whereby CMS suspended all payments for reimbursement of COVID-19 test kits pursuant to 42 C.F.R. 405.371(a)(2) as the result of "credible allegations of fraud." (the "Suspension Notice").

87. The Suspension Notice further states that 429 Complaints were filed by beneficiaries of the Medicare program, alleging that various types of fraudulent activity occurred, including identity theft.

88. ZB understands that as result of the management services agreement between DSLLC and The Laboratory, all of the activity under review by CMS was performed and managed by the Kessler Defendants.

89. But importantly, from June of 2023 until March/April of 2024, Kaplan/Kessler did not disclose one word of this to ZB.

90. DSLLC had a duty to do so, as the Note required the disclosure of financial information and ZB certainly asked for that information, as detailed above.

91. But instead and as shown in Paragraph 47 above, Kaplan/Kessler knew that CMS had suspended payments, but continued to lie to ZB and tell ZB the business was doing great.

92. Those lies included specific false representations concerning the performance of the Medicaid program.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

93. Additionally, and unbeknownst to ZB, Kessler and Kaplan paid back DSLLC's other investors in July and August, 2023.

94. And by August, 2023, they sent over $6 million to Supply and SLIM from DSLLC, leaving DSLLC a hollow shell.

95. Finally, Kaplan's and Kessler's statements concerning payments received and expected to be received from the Medicaid program, were totally false and known to be so when made.

96. Neither DSLLC nor The Laboratory were ever paid a single dollar from the Medicaid program, despite telling ZB, in writing, the contrary multiple times.

### COUNT I
### BREACH OF CONTRACT
### (Against DSLLC and Supply)

97. ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

98. The Note is a binding and enforceable contract between ZB and DSLLC.

99. ZB performed its obligations pursuant to the Note by disbursing $4,850,000 to Supply.

100. DSLLC breached the Note by failing to pay ZB all amounts due on the Maturity Date, including interest and principal in the amount of at least $4,893,111.12 plus accrued Default Interest.

101. DSLLC has further breached the Note by its failure to provide financial information requested by ZB on multiple occasions.

102. ZB has been damaged by DSLLC's breaches in amount to be determined at trial, but believed to be in excess of $25,000.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

103. DSLLC is the mere instrumentality of Supply used to commit a wrong through its breach of contract with ZB.

104. DSLLC was undercapitalized such that Supply covered DSLLC's business expenses and finances were not separated between the companies.

105. In fact, Supply and DSLLC comingled funds, business resources, and employees.

106. Before DSLLC was formed, Supply was the one performing marketing services on behalf of the COVID-19 program.

107. Further, DSLLC did not have a bank account at the time the Loan was made and thus the monies were deposited in Supply's bank account.

108. ZB has further learned that numerous purported expenses from DSLLC's business were billed to and/or paid by Supply.

109. Records show that Supply ordered and paid for marketing on behalf of DSLLC, received monies on behalf of DSLLC, and received monies from DSLLC.

110. By August, 2023, once DSLLC had its own bank account, over $5 million was sent to Supply from DSLLC, leaving DSLLC a hollow shell.

111. Supply and DSLLC thus commingled funds, business, employees and other resources such that DSLLC was merely an alter-ego of Supply and it is appropriate to pierce the corporate veil through DSLLC to Supply.

WHEREFORE, ZB requests judgment in its favor and against DSLLC and Supply in an amount to be determined at trial, but in excess of $25,000, plus contractual interest, Default Interest, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

17

## COUNT II
## BREACH OF CONTRACT
### (Against Kessler and Ahmad)

112. ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

113. The Guarantees are binding and enforceable contracts between ZB and the Guarantors.

114. ZB performed its obligations pursuant to the Guarantees by disbursing $4,850,000 to Supply.

115. The Guarantors breached the Guarantees by failing to pay ZB all amounts due on the Maturity Date, including interest and principal in the amount of at least $4,893,111.12 plus accrued Default Interest.

116. ZB has been damaged by the Guarantor's breaches in an amount to be determined at trial, but believed to be in excess of $25,000.

WHEREFORE, ZB requests judgment in its favor and against Kessler and Ahmad, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus contractual interest, Default Interest, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

## COUNT III
## BREACH OF CONTRACT
### (Against Kessler and Ahmad)

117. ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

118. The Guarantees are binding and enforceable contracts between ZB and Guarantors.

119. The Guarantees contain an express representation and warranty that "…(e) that at

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

the time of execution and delivery of this Guaranty, and as long as the Guaranty is in effect, each Guarantor has minimum net worth of Ten Million and xx/100 ($10,000,000) USD and further that minimum of one-half (1/2) of that net worth is in assets solely in the name of each Guarantor."

120. Upon information and belief, the Guarantors breached their express representations and warranties, as it believed, and based upon their own representations, that they did not and do not have a minimum net worth of Ten Million and xx/100 ($10,000,000) USD and further that minimum of one-half (1/2) of that net worth is not held in assets solely in the name of each Guarantor.

121. ZB has been damaged by the Guarantor's breaches in an amount to be determined at trial, but believed to be in excess of $25,000.

WHEREFORE, ZB requests judgment in its favor and against Kessler and Ahmad, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus contractual interest, Default Interest, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

## COUNT IV
## UNJUST ENRICHMENT
### (Against Supply)

122. ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

123. ZB conferred a benefit upon Supply by disbursing $4,850,000 directly to Supply.

124. It is inequitable for Supply to retain the monies disbursed by ZB when DSLLC and the Guarantors have failed to repay the Loan.

125. Supply has thus been unjustly enriched at ZB's expense in an amount to be determined at trial, but believed to be in excess of $25,000.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

WHEREFORE, ZB requests judgment in its favor and against Supply in an amount to be determined at trial, but in excess of $25,000, plus contractual interest, Default Interest, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

**COUNT V**
**FRAUD**
**(Against Kessler, DSLLC, Supply, and SLIM)**

126.    ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

127.    Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, induced ZB to loan DSLLC $4,850,000 by making representations that those monies were going to be used to pay for "affiliate marketing" costs to support DSLLC's supposedly legitimate business selling COVID-19 test kits to Medicare and Medicaid recipients.

128.    Specifically, and as set forth above, in April 2023, through oral and written communications with ZB and the Offering presented to ZB, Kessler represented to ZB that:

- Kessler and Kaplan were operating a highly successful and lucrative business selling COVID-19 test kits to recipients of Medicare;

- Their business was a "direct to consumer program paid for by the United States Federal Government."

- Their business had been "garnering subscriptions from both Medicare and Medicaid and patients throughout the country since early in 2023."

- DSLLC and The Laboratory were parties to a management services contract whereby The Laboratory was required to remit all expenses recouped from the government and DSLLC's share of profits to DSLLC and DSLLC had all responsibility for marketing and customer acquisition functions of the business

- There was a very limited window to participate in this highly successful and highly lucrative business because the Medicare program was going to terminate on May 11, 2023, and after those 11 days, there was an even greater opportunity available because of the ability to sell to Medicaid subscribers, which would continue to run until September of 2024.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

- Their business was spending in excess of $750,000 per day on affiliate marketing.

- "[T]he purpose of the funds was to allow us to maximize traffic for Medicare, which we are running until the end of the month. The purpose of the funds was to bridge the gap of 21 days for when we start receiving payments from CMS for those initial large batches. We should be getting out first big check from CMS next week, around $10M+. So we need funds this week to maximize the affiliate marketing through the end of April."

- "Yeah, the rush is to get the funds in this week to maximize Medicare subscriptions. Any Medicare patients we get this week (through the end of April) we can bill in April, and then again in May. Come May 1, we are transitioning focus to Medicaid, which goes until September 2024. So there's not a big rush."

- "No worries. Medicaid will be largely self funded because we will have already received all the large payments back from CMS for Medicare billings. […] By the time Medicaid comes, the machine will largely run itself."

129. Similarly, and as set forth above, in April 2023, through oral and written communications with ZB and the Offering presented to ZB, Kaplan, on behalf of Kessler and DSLLC, represented to ZB that:

- Kessler and Kaplan were operating a highly successful and lucrative business selling COVID-19 test kits to recipients of Medicare;

- Their business was a "direct to consumer program paid for by the United States Federal Government."

- Their business had been "garnering subscriptions from both Medicare and Medicaid and patients throughout the country since early in 2023."

- DSLLC and The Laboratory were parties to a management services contract whereby The Laboratory was required to remit all expenses recouped from the government and DSLLC's share of profits to DSLLC and DSLLC had all responsibility for marketing and customer acquisition functions of the business

- There was a very limited window to participate in this highly successful and highly lucrative business because the Medicare program was going to terminate on May 11, 2023, and after those 11 days, there was an even greater opportunity available because of the ability to sell to Medicaid subscribers, which would continue to run until September of 2024.

- Their business was spending in excess of $750,000 per day on affiliate

21

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

marketing.

- Kaplan represented that he had conversation with ZB's principals that "we would look to provide testing to Medicaid recipients with – you know, through Orchard through the Verified Health platform."

- Further, Kaplan represented that "We expected Divided Sky's business to continue, with Medicaid at that time being the focus."

- Kaplan represented to ZB that "[…] Medicare was so successful that the direction was that we would move to Medicaid after that date just from a logic perspective, the iron was hot, so to speak, with Medicare and it had meaningful traction, so Medicaid would be focused on as Medicare was wound down, so to speak."

130. Upon information and belief, these representations were false and known to be false at the time they were made because, upon information and belief, DSLLC used the money ZB loaned to DSLLC for other purposes of Kaplan, Kessler, Supply and/or SLIM, DSLLC never had a contract with The Laboratory, and the Kessler Defendants never sold a single test to Medicaid subscribers.

131. Further, DSLLC and Orchard entered into a back-dated service contract, which did not provide any terms of compensation for DSLLC. Nor did DSLLC and Orchard ever actually agree on terms for DSLLC's compensation.

132. Thus, contrary to Kaplan and Kessler's representations about how successful and profitable DSLLC's business was, DSLLC did not have an ability to profit (and thus an ability to pay ZB its promised interest) at all.

133. Kessler and Kaplan's misrepresentations were made, individually and as agents for DSLLC, Supply, and SLIM, with the intent that ZB rely and ZB did rely upon the false representations in making the Loan.

134. Supply and SLIM acted in concert with Kessler and Kaplan to further a common purpose and are therefore also liable for the false representations.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

135. Specifically, the Offering identifies SLIM as a participant in DSLLC's business. Thus, SLIM was a participant in DSLLC's business and was responsible for obtaining the COVID-19 test kits from its supply chain connections and benefitted from the false representations made by its principal and on its behalf.

136. Supply received the Loan proceeds from ZB and subsequently distributed those proceeds in a manner other than represented to ZB, benefitting from the false representations made by its principal and on its behalf.

137. ZB's reliance was reasonable because, among other things, Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, provided ZB with information purportedly establishing the bonafides of their business and even touted the success and returns that other supposed investors had reaped.

138. ZB was damaged by Kessler's and Kaplan's false representations in an amount to be determined at trial, but believed to be in excess of $25,000.

139. Kessler and Kaplan's actions, individually and as agents for DSLLC, Supply, and SLIM, were intentionally willful and wanton such that exemplary damages are appropriate.

WHEREFORE, ZB requests judgment in its favor and against Kessler, DSLLC, Supply, and SLIM for fraud, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus exemplary damages, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

**COUNT VI**
**FRAUD**
**(Against Kessler, DSLLC, Supply, and SLIM)**

140. ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

141. The Note contained obligations upon DSLLC to provide truthful and accurate financial information to ZB upon request.

142. ZB made numerous requests to the Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, to provide information concerning the status of DSLLC's business and financial performance from April of 2023 through April of 2024.

143. Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, made numerous outright misrepresentations of fact to ZB and intentionally omitted material facts concerning the financial performance of DSLLC's business, including but not limited to the following:

- On May 5, 2023, ZB asked Kessler how the numbers have been and if ZB could receive weekly/monthly/quarterly updates. Kessler responded, "Quarterly updates work. Haven't put big heat on Medicaid yet, trying to wrap up Medicare. We've lowered marketing spend but are still getting 5k per day of Medicare. Total April was 300k. Got $5M yesterday as first big payment from Medicare." These representations are believed to be false. The Kessler Defendants never received a single dollar from Medicaid. The Kessler Defendants did not receive $5 million on May 4, 2023.

- On May 30, 2023, ZB asked Kessler for another update and "When do you think you will start executing on the Medicaid program." In response Kessler wrote, "We started soft launch of Medicare[sic] – very small – to test some new features out. We've collected about $20m and expect another $22m in this week. *Medicaid." This was false. There was no payments from Medicaid.

- May 30, 2023 when asked why DSLLC had not deployed capital for Medicaid for yet, Kessler responded "Well we haven't deployed the capital form the receivables for Medicaid yet because we are in the process of testing out new features on the website, testing marketing channels, and confirming various insurance procedures for the respective states." This was false.

- On June 26, 2023 ZB requested an update call. On June 27, 2023, the parties had a zoom call wherein Kessler assured ZB, in substance, that the business was performing incredibly well. This was false.

- On July 5, 2023, Kaplan, on behalf of the Kessler Defendants, sent ZB a memo representing the following:

  o "From March of 2023 until the FHE was lifted, approximately

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

350,000 Medicare recipients signed up to receive Tests of which roughly 300,00 received at least 2 shipments. During the program, The Laboratory dispensed more than 5,000,000 Tests. CMS has requested some additional information from The Laboratory for roughly 70 patients (out of 400,000 since the Program's inception) which we have provided…During the Program, Verified Health exceeded its revenue projections." This was false and/or omitted material facts. The Kessler Defendants had already received the Suspension Notice.

o "…Due to the increased risk resulting from multiple payers, The Laboratory has started the Medicaid Program with a slow ramp. The first two months of the program have been spent testing various insurers state-by-state, to ensure payment runs smoothly. To date, payment in full has been received on the billings for Michigan. Payments for the other states is expected in the next few weeks. We are excited with the results to date." This was false. There were no payments received from Medicaid.

- Attached to that same memo, Kaplan sent a "Project Income Statement" which claimed more than $61 million in revenue and $21 million in net income. Upon information and belief, these numbers are not accurate.

- The Kessler Defendants failed to disclose to ZB for almost an entire year that CMS had issued the Suspension Notice and that all payments and/or participation in any reimbursement program had been suspended.

- In early 2024, as ZB grew concerned about the status of its investment, the Kessler Defendants participated in a phone call with ZB to provide "updates" on the program's status. During this call, Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, made further false and fraudulent statements to ZB:

  ▪ Kaplan: "But there has been absolutely nothing conveyed to us that there is an issue paying us. There's been nothing conveyed to us that we're not getting paid or even the smell of that. Nothing. Nothing close to it." However, Kessler and Kaplan had received the Notice of Suspension from CMS.

  ▪ Kaplan: "So let's go back. We believe that all of the money should have been given to us, rather any of it being retained by the lab. Right. To be clear, that is at dispute with the lab, the topic that they retained a piece of the money in the process, but there is not a dispute as to their obligation to pay the money." Orchard has not acknowledged any obligation to pay DSLLC and in fact contests that it owes DSLLC any additional money.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

- Kaplan: "So more than half of the revenue was paid in our hands, and the rest was approved to be paid but held back in escrow. And then they had a inquiry related to 300 patients out of the 500,000. The inquiry we passed at, like a 96% rate, whatever it is. And the rest of the money is set to be paid out. They have to pay it. I think it's by. I don't know the exact date. I think it's a second week of March, the third week of March. But they have given us a date of when that should be handled by. And the inquiry was not expanded. It was limited to, you know, that 1% of our patient, you know, one and a half percent of our patient base." The investigation related to 429 complaints, not 300. Further, the government did not 'have to pay it,' and it still has not been paid.

- Kaplan: "Sure. Yeah. And that's why, again, we don't view this as like we're drowning in a pool. We'd like to know that we had all the cash on hand, but it's not something that is I'm not losing sleep over it, put it that way. Besides that, the money that's owed by CMS, if CMS, God forbid, came back and took a 50% discount on the cash, which would never happen, but let's just say they did, there's still more than enough money left to pay everybody." Financial records demonstrate that the company had no available funds in early 2024 to repay its lenders.

- Further, and despite representations that the business was performing incredibly well and that there would be money to pay ZB back, DSLLC and Orchard entered into a back-dated service contract, which did not provide any terms of compensation for DSLLC. Nor did DSLLC and Orchard ever actually agree on terms for DSLLC's compensation. Thus, DSLLC did not have an ability to profit (nor an ability to pay ZB its promised interest) at all.

- Additionally, Kessler and Kaplan paid back DSLLC's other investors in July and August, 2023. Further, by August 2023, they sent over $6 million to Supply Line and SLIM from DSLLC, leaving DSLLC a hollow shell. Though this impacted DSLLC's ability to pay ZB and this was never disclosed to ZB.

144. All of the above representations were false, known to be false when made and/or known that material facts were omitted which were required to be disclosed to ZB.

145. Such misrepresentations and/or omissions were made with the intent for ZB to rely upon them and specifically, it is believed, to convince ZB not to exercise the Acceleration Option and pursue enforcement of the Note and Guaranties and to lead ZB to believe the Note would be paid upon maturity.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

146. Supply and SLIM acted in concert with Kessler and Kaplan to further this common purpose and are therefore also liable for the false representations.

147. Specifically, SLIM, a participant in DSLLC's business who was responsible for obtaining the COVID-19 test kits from its supply chain connections, benefitted from the false representations because it was able to keep the scheme running for longer.

148. Supply received the Loan proceeds from ZB and subsequently distributed those proceeds in a manner other than represented to ZB, benefitting from the false representations because it did not need to account for the money upon ZB's exercising of the Acceleration Option.

149. ZB's reliance was reasonable because, among other reasons, DSLLC continued to make interest payments throughout 2023 and into February of 2024, leading ZB to believe that it would be paid upon the maturity of the Note.

150. ZB was damaged by Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, and their false representations and/or material omissions in an amount to be determined at trial, but believed to be in excess of $25,000

151. Kessler and Kaplan's misrepresentations, individually and as agents for DSLLC, Supply, and SLIM, were intentional, willful and wanton, such that exemplary damages are appropriate.

WHEREFORE, ZB requests judgment in its favor and against Kessler, DSLLC, Supply, and SLIM for fraud, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus exemplary damages, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

152. ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

153. Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, induced ZB to loan them money to be used for what was described to ZB's principals as a legitimate, legal business.

154. Specifically, and as set forth above, in April 2023, through oral and written communications with ZB and the Offering presented to ZB, Kessler represented to ZB that:

- Kessler and Kaplan were operating a highly successful and lucrative business selling COVID-19 test kits to recipients of Medicare;

- Their business was a "direct to consumer program paid for by the United States Federal Government."

- Their business had been "garnering subscriptions from both Medicare and Medicaid and patients throughout the country since early in 2023."

- "[T]he purpose of the funds was to allow us to maximize traffic for Medicare, which we are running until the end of the month. The purpose of the funds was to bridge the gap of 21 days for when we start receiving payments from CMS for those initial large batches. We should be getting out first big check from CMS next week, around $10M+. So we need funds this week to maximize the affiliate marketing through the end of April."

- "Yeah, the rush is to get the funds in this week to maximize Medicare subscriptions. Any Medicare patients we get this week (through the end of April) we can bill in April, and then again in May. Come May 1, we are transitioning focus to Medicaid, which goes until September 2024. So there's not a big rush."

- "No worries. Medicaid will be largely self funded because we will have already received all the large payments back from CMS for Medicare billings. [...] By the time Medicaid comes, the machine will largely run itself."

155. Similarly, and as set forth above, in April 2023, through oral and written communications with ZB and the Offering presented to ZB, Kaplan, on behalf of Kessler and

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

DSLLC, represented to ZB that:

- Kessler and Kaplan were operating a highly successful and lucrative business selling COVID-19 test kits to recipients of Medicare;

- Their business was a "direct to consumer program paid for by the United States Federal Government."

- Their business had been "garnering subscriptions from both Medicare and Medicaid and patients throughout the country since early in 2023."

- Kaplan represented that he had conversation with ZB's principals that "we would look to provide testing to Medicaid recipients with – you know, through Orchard through the Verified Health platform."

- Further, Kaplan represented that "We expected Divided Sky's business to continue, with Medicaid at that time being the focus."

- Kaplan represented to ZB that "[…] Medicare was so successful that the direction was that we would move to Medicaid after that date just from a logic perspective, the iron was hot, so to speak, with Medicare and it had meaningful traction, so Medicaid would be focused on as Medicare was wound down, so to speak."

156.   Upon information and belief, those representations were false and known to be false, as the Suspension Notice cites "credible allegations of fraud" by the Kessler Defendants in their selling of COVID-19 test kits.

157.   Further, DSLLC and Orchard entered into a back-dated service contract, which did not provide any terms of compensation for DSLLC. Nor did DSLLC and Orchard ever actually agree on terms for DSLLC's compensation.

158.   Thus, contrary to Kaplan and Kessler's representations about how legitimate and profitable DSLLC's business was, DSLLC did not have an ability to profit (and thus an ability to pay ZB its promised interest) at all.

159.   Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, intended that ZB would rely upon and ZB did rely upon such misrepresentations in agreeing to loan them money.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

160. Supply and SLIM acted in concert with Kessler and Kaplan to further this common purpose and are therefore also liable for the false representations.

161. SLIM, a participant in DSLLC's business and was responsible for obtaining the COVID-19 test kits from its supply chain connections, benefitted from the false representations made by its principal and on its behalf.

162. Supply received the Loan proceeds from ZB and subsequently distributed those proceeds in a manner other than represented to ZB, benefitting from the false representations made by its principal and on its behalf.

163. ZB's reliance was reasonable because it had no reason to believe that the Kessler Defendants were engaged in fraudulent and/or criminal activity.

164. ZB was damaged by Kessler and Kaplan's, individually and as agents for DSLLC, Supply, and SLIM, false representations and/or material omissions in an amount to be determined at trial, but believed to be in excess of $25,000

165. The Kessler Defendants' misrepresentations were intentional, willful and wanton, such that exemplary damages are appropriate.

WHEREFORE, ZB requests judgment in its favor and against Kessler, DSLLC, Supply, and SLIM for fraud, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus exemplary damages, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

## COUNT VIII
### (CONVERSION/STATUTORY STEALING MCL 600.2919a)
### (Against Kessler, DSLLC, Supply, and SLIM)

166. ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

167. The Kessler Defendants induced ZB to loan DSLLC money under false pretenses, by the communication of knowingly false representations that the money would be used to pay the expenses of affiliate marketing utilized to capture Medicare and Medicaid patients to register with VH to receive COVID-19 test kits that would be paid for and/or reimbursed by the Federal Government, that they had a successful Medicaid business, and they had an agreement with Orchard to be paid when they did not.

168. Upon and information and belief, for the reasons stated in Paragraph 68 through 81 above, the monies loaned by ZB were not used for that purpose and were instead used for other purposes.

169. The Kessler Defendants stole ZB's money by false pretenses in violation of MCL 600.2919a.

170. ZB has been damaged as a result in an amount to be determined at trial, but believed to be in excess of $25,000.

WHEREFORE, ZB requests judgment in its favor and against Kessler, DSLLC, Supply, and SLIM for fraud, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, trebled pursuant to MCL 600.2919a, plus pre-and post- judgment statutory interests, costs, attorney's fees pursuant to MCL 600.2919a and such other and further relief the Court deems just and proper.

### COUNT IX
### CIVIL CONSPIRACY
**(Against Kessler, DSLLC, Supply, and SLIM)**

171. ZB repeats and realleges each of the foregoing allegations as though fully restated herein.

172. Defendants illegally, maliciously, and wrongfully conspired with one another with

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

the intent to, and for the illegal purpose of engaging in the impermissible acts described previously in Paragraphs 67 through 96 above.

173. Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, conspired to induce ZB to loan DSLLC $4,850,000 by making representations that those monies were going to be used to pay for "affiliate marketing" costs to support DSLLC's supposedly legitimate business selling COVID-19 test kits to Medicare and Medicaid recipients.

174. Moreover, Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, conspired to make post-contractual misrepresentations and/or omissions with the intent for ZB to rely upon them and specifically, it is believed, to convince ZB not to exercise the Acceleration Option and pursue enforcement of the Note and Guaranties and to lead ZB to believe the Note would be paid upon maturity.

175. Kessler and Kaplan's actions, individually and as agents for DSLLC, Supply, and SLIM actions, in combination, were designed to accomplish a criminal or unlawful purpose or a lawful purpose by criminal or unlawful means.

176. ZB has been damaged as a result in an amount to be determined at trial, but believed to be in excess of $25,000.

WHEREFORE, ZB requests judgment in its favor and against Kessler, DSLLC, Supply, and SLIM, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus exemplary damages, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

**COUNT X**
**CONCERT OF ACTION**
**(Against Kessler, DSLLC, Supply, and SLIM)**

177. ZB repeats and realleges each of the foregoing allegations as though fully restated

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

herein.

178. Defendants Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, acted jointly and tortiously pursuant to a common design to engage in the impermissible acts described previously in Paragraphs 67 through 96 above.

179. Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, acted jointly to induce ZB to loan DSLLC $4,850,000 by making representations that those monies were going to be used to pay for "affiliate marketing" costs to support DSLLC's supposedly legitimate business selling COVID-19 test kits to Medicare and Medicaid recipients.

180. Moreover, Kessler and Kaplan, individually and as agents for DSLLC, Supply, and SLIM, acted jointly to make post-contractual misrepresentations and/or omissions with the intent for ZB to rely upon them and specifically, it is believed, to convince ZB not to exercise the Acceleration Option and pursue enforcement of the Note and Guaranties and to lead ZB to believe the Note would be paid upon maturity.

181. Further, Supply and SLIM acted in concert with Kessler and Kaplan to further a common purpose and are therefore also liable for the false representations.

182. Specifically, the Offering identifies SLIM as a participant in DSLLC's business. Thus, SLIM was a participant in DSLLC's business and was responsible for obtaining the COVID-19 test kits from its supply chain connections and benefitted from the false representations made by its principal and on its behalf.

183. Supply received the Loan proceeds from ZB and subsequently distributed those proceeds in a manner other than represented to ZB, benefitting from the false representations made by its principal and on its behalf.

184. ZB has been damaged as a result in an amount to be determined at trial, but believed

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

to be in excess of $25,000.

WHEREFORE, ZB requests judgment in its favor and against Kessler, DSLLC, Supply, and SLIM, jointly and severally, in an amount to be determined at trial, but in excess of $25,000, plus exemplary damages, pre-and post- judgment statutory interests, costs, attorney's fees and such other and further relief the Court deems just and proper.

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER LLP

*/s/ Ethan R. Holtz*
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
Attorneys for Plaintiff
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com

Dated: October 31, 2025

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit D

ZB VERIFIED INVESTMENTS LLC,

      Plaintiff,

                                          Case No. 24-207081-CB

v                                         Hon. Michael Warren

ADAM KESSLER, JOSHUA KAPLAN,
SAMI AHMAD, DIVIDED SKY, LLC,
SUPPLY LINE INTERNATIONAL, LLC,
SUPPLY LINE INTERNATIONAL MEDICAL, LLC,
and JOHN DOES 1-10,

      Defendants,

and

ADAM KESSLER and JOSHUA KAPLAN,

      Cross-Plaintiffs/Cross-Defendants,

v

SAMI AHMAD,

      Cross-Defendant/Cross-Plaintiff,

and

DIVIDED SKY, LLC,

      Cross-Defendant.

---

**OPINION AND ORDER REGARDING
DEFENDANTS DIVIDED SKY, LLC, JOSHUA KAPLAN, AND ADAM KESSLER'S
MOTION FOR PARTIAL SUMMARY DISPOSITION OF
PLAINTIFF'S AMENDED COMPLAINT UNDER MCR 2.116(C)(8)
&**

DEFENDANTS SUPPLY LINE INTERNATIONAL, LLC AND
SUPPLY LINE INTERNATIONAL MEDICAL, LLC'S
MOTION FOR PARTIAL SUMMARY DISPOSITION OF
PLAINTIFF'S AMENDED COMPLAINT UNDER MCR 2.116(C)(8)
&
SAMI AHMAD'S AMENDED MOTION FOR SUMMARY DISPOSITION
PURSUANT TO MCR 2.116(C)(8)
&
DEFENDANTS DIVIDED SKY, LLC, JOSHUA KAPLAN, AND ADAM KESSLER'S
MOTION FOR SUMMARY DISPOSITION OF
DEFENDANT SAMI AHMAD'S CROSS-CLAIM UNDER MCR 2.116(C)(8)
&
PLAINTIFF'S MOTION FOR SUMMARY DISPOSITION

At a session of said Court, held in the
County of Oakland, State of Michigan
September 23, 2025

PRESENT: HON. MICHAEL WARREN

---

## OPINION

### I

The present cause of action arises out of a $4,850,000.00 loan transaction allegedly designed and conceived to fund a COVID test kit program. The loan was memorialized by a Promissory Note (the "Note") executed by lender ZB Verified Investments LLC ("ZB") and borrower Divided Sky, LLC ("DSLLC"). ZB alleges that DSLLC breached the Note by failing to pay all amounts due on the Maturity Date, and Adam Kessler ("Kessler"), Joshua Kaplan ("Kaplan") and Sami Ahmad ("Ahmad") (collectively, the "Guarantors") breached personal guaranties to pay all amounts due on the Maturity

2

Date.[1] In particular, ZB alleges Breach of Contract (Against DSLLC and Supply) (Count I); Breach of Contract (Against the Guarantors) (Count II); Breach of Contract (Against the Guarantors) (Count III); Unjust Enrichment (Against Supply) (Count IV); Fraud (Against the Kessler Defendants) (Count V); Fraud (Against the Kessler Defendants) (Count VI); Fraud (Against the Kessler Defendants) (Count VII); and Conversions/Statutory Sealing MCL 600.2919a (Against the Kessler Defendants) (Count VIII). In Cross-Complaints, Kaplan and Kessler seek Contribution from Ahmad, and Ahmad alleges Fraudulent Inducement against Kaplan, Kessler, and DSLLC.

Before the Court is **(1)** Defendants Divided Sky, LLC, Joshua Kaplan, and Adam Kessler's Motion for Partial Summary Disposition of Plaintiff's Amended Complaint under MCR 2.116(C)(8)[2,3]; **(2)** Defendants Supply Line International, LLC and Supply Line International Medical, LLC's Motion for Partial Summary Disposition of Plaintiff's Amended Complaint under MCR 2.116(C)(8); **(3)** Sami Ahmad's Amended Motion for Summary Disposition Pursuant to MCR 2.116(C)(8); **(4)** Defendants Divided Sky, LLC, Joshua Kaplan, and Adam Kessler's Motion for Summary Disposition of Defendant Sami Ahmad's Cross-Claim under MCR 2.116(C)(8); and **(5)** Plaintiff's Motion For Summary

---

[1] Kessler and Kaplan are members of DSLLC.
[2] On August 22, 2025, Joshua Kaplan filed a Chapter 7 petition in bankruptcy in the United States Bankruptcy Court, Eastern District of Michigan. As a result, this cause of action is stayed as to him.
[3] The Motion seeks dismissal of Counts III and V-VIII. Defendant Ahmad joins in the argument to dismiss Count III.

3

Disposition. Oral argument is dispensed as it would not assist the Court in its decision-making process.[4]

At stake is whether ZB is entitled to summary disposition in its favor of Counts I and II of its Amended Complaint pursuant to MCR 2.116(C)(9)? Because the Defendants deny material allegations of the Amended Complaint, the answer is "no."

Also at stake is whether summary disposition pursuant to MCR 2.116(C)(8) of Count I against Supply Line is warranted? Because Supply Line is not a party to the Note and ZB has failed to sufficiently plead a purported alter ego theory of liability, the answer is "yes," and Count I is dismissed as to Supply Line.

Further at stake is whether summary disposition pursuant to MCR 2.116(C)(8) of Count III is warranted? Because Count III does not fail as a matter of law, the answer is "no."

---

[4] MCR 2.119(E)(3) provides courts with discretion to dispense with or limit oral argument and to require briefing. MCR 2.116(G)(1) specifically recognizes application of MCR 2.119(E)(3) to summary disposition motions. Subrule (G)(1) additionally authorizes courts to issue orders establishing times for raising and asserting arguments. This Court's Scheduling Order clearly and unambiguously set the time for asserting and raising arguments, and legal authorities to be in the briefing – not to be raised and argued for the first time at oral argument. Therefore, both parties have been afforded due process as they each had notice of the arguments and an opportunity to be heard by responding and replying in writing, and this Court has considered the submissions to be fully apprised of the parties' positions before ruling. Because due process simply requires parties to have a meaningful opportunity to know and respond to the arguments and submissions which has occurred here, the parties have received the process due.

4

Additionally at stake is whether summary disposition pursuant to MCR 2.116(C)(8) of Count IV against Supply Line is warranted? Because Supply Line has failed to demonstrate the ZB has not sufficiently stated a claim, the answer is "no."

Preantepenultimately at stake is whether summary disposition pursuant to MCR 2.116(C)(8) of the Fraud Counts (Counts V-VII) is warranted because of the economic loss doctrine? Although none of the Fraud Counts are barred by the economic loss doctrine, because Counts V and VII fail to plead fraud with particularity, Counts V and VII are dismissed.

Antepenultimately at stake is whether summary disposition pursuant to MCR 2.116(C)(8) of Count VIII is warranted? Because ZB had not demonstrated that Count VIII fails to sufficiently plead a claim for conversion/statutory stealing, the answer is "no."

Penultimately at stake is whether summary disposition pursuant to MCR 2.116(C)(8) of Kessler's Cross-Complaint is warranted? Because Kessler's crossclaim for contribution is premature, the answer is "yes," and Kessler's Cross-Complaint is dismissed.

Finally at stake is whether summary disposition pursuant to MCR 2.116(C)(8) of Ahmad's Cross-Complaint is warranted? Because Kessler's Cross-Complaint sufficiently alleges fraudulent inducement, the answer is "no."

## II
## Background

In April 2023, DSLLC's principals Kaplan and Kessler allegedly approached ZB's principals about an investment opportunity. [Amended Complaint, ¶10.] On or about April 27, 2023, ZB loaned DSLLC $4,850,000.00, effective that date, as evidenced by the Note (the "Loan"). The Note provides that the Loan would bear interest at a rate of twenty (20%) percent per annum and all unpaid principal and interest would become fully due and payable on or about twelve (12) months from the effective date. (the "Maturity Date"). [Note.] Under the Note, ZB was directed to fund the loan proceeds to Supply Line International, LLC ("Supply Line") on behalf of DSLLC. [Note.]

Between June 29, 2023 and April 4, 2024, DSLLC made payments of interest to ZB. [Amended Complaint, ¶49.] As of April 27, 2024, all principal and interest due on the Loan fully matured and the entire principal amount, monthly interest, accrued default interest was allegedly due and payable. [Amended Complaint, ¶58-¶60.] ZB commenced this action on April 28, 2024 and alleges it has discovered numerous material misrepresentations and omissions by the Defendants.

Kessler acknowledges that DSLLC entered into the Note and Kessler and Ahmad acknowledge they executed Guaranties.

**III**
**Summary Disposition of Counts I and II of the Amended Complaint**
**Pursuant to MCR 2.116(C)(9) is Not Warranted**

MCR 2.116(C)(9) permits summary disposition when "the opposing party has failed to state a valid defense to the claim against him or her." A motion for summary disposition under MCR 2.116(C)(9) tests the sufficiency of the defendant's pleadings and is decided by the pleadings alone. *In re Smith Estate*, 226 Mich App 285, 288 (1997). All well-pled allegations must be accepted as true, and only if the non-moving party's defenses are so clearly untenable as a matter of law that no factual development could possibly deny a plaintiff's right to recovery, should the motion be granted. *Grebner v Clinton Charter Twp*, 216 Mich App 736, 740 (1996).

"In deciding a motion under MCR 2.116(C)(9) a court may only look at the parties's pleadings, including the complaint, cross-claim, counterclaim, third-party complaint, an answer to any of these, and a reply to an answer." *Parks v Parks,* unpublished per curiam opinion of the Court of Appeals, issued October 22, 2019 (Docket No. 343867), p 3.

In the instant cause of action, ZB argues that "[i]n their Answer, Defendants admit that ZB loaned Divided Sky the principal amount of $4,850,000.00, that the loan matured, and that Defendants have failed to pay amounts due." [Motion, p 6.] However, in their Answer and Affirmative Defenses, the Defendants deny the allegation that "[t]he Note is a binding and enforceable contract between ZB and DSLLC"; deny the allegation that "DSLLC breached the Note by failing to pay ZB all amounts due on the Maturity Date,

7

including interest and principal in the amount of at least $4,893,111,12 plus accrued Default Interest"; deny the allegation that "DSLLC has further breached the Note by its failure to provide financial information requested by ZB on multiple occasions"; deny the allegation that "[t]he Guarantees are binding and enforceable contracts between ZB and Guarantors"; and deny the allegation that "[t]he Guarantors breached the Guarantees by failing to pay ZB all amounts due on the Maturity Date, including interest and principal in the amount of at least $4,893,111,12 plus accrued Default Interest." [Answer and Affirmative Defenses, ¶92, ¶94, ¶95, ¶101, ¶103.] Summary disposition under MCR 2.116(C)(9) is generally improper where a material allegation of the complaint is categorically denied. *Nasser v Auto Club Ins Ass'n*, 435 Mich 33, 48 (1990); *Fancy v Egrin*, 177 Mich App 714, 724 (1989); *Heligman v Otto*, 161 Mich App 735, 738 (1987) (summary disposition for failure to state a valid defense held improper where defendants categorically denied some of plaintiff's material allegations). Furthermore, the Defendants have asserted several affirmative defenses to ZB's claim. In particular, the Defendants assert that ZB fails to state a claim upon which relief may be granted and ZB's claims are barred in whole or in part by Michigan's usury statutes, the wrongful conduct rule and the doctrine of unclean hands. [Answer and Affirmative Defenses]. Accordingly, summary disposition of Counts I and II of ZB's Amended Complaint under MCR 2.116(C)(9) is not warranted.

8

## IV
## Summary Disposition of the Amended Complaint
## Pursuant to MCR 2.116(C)(8) is Partially Warranted

## A
## Standard of Review

A motion for summary disposition pursuant to MCR 2.116(C)(8) tests the legal sufficiency of the complaint, not whether the complaint can be factually supported. *El-Khalil v Oakwood Healthcare, Inc,* 504 Mich 152, 159-160 (2019); *Pawlak v Redox Corp*, 182 Mich App 758 (1990). A motion for summary disposition based on the failure to state a claim upon which relief may be granted is to be decided on the pleadings alone. *Bailey v Schaaf,* 494 Mich 595, 603 (2013); *Parkhurst Homes, Inc* v *McLaughlin*, 187 Mich App 357 (1991). Exhibits attached to pleadings may be considered under MCR 2.116(C)(8) because they are part of the pleadings pursuant to MCR 2.113(C). *Id.* at 163. Matters of public record may also be considered. MCR 2.113(C)(1)(a). See also *Dalley v Dykema Gossett*, 287 Mich App 296, 301 n 1 (2010) (court documents are matters of public record that may be considered on a motion under MCR 2.116[C][8]).

"All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant." *Maiden v Rozwood*, 461 Mich 109, 119 (1999); *Wade v Dep't of Corrections*, 439 Mich 158, 162 (1992). Summary disposition is proper when the claim is so clearly unenforceable as a matter of law that no factual development can justify a right to recovery. *Parkhurst Homes*, 187 Mich App 357 (1991); *Spiek v Dept of Transportation*, 456 Mich 331, 337 (1998).

9

"[T]he mere statement of a pleader's conclusions, unsupported by allegations of fact, will not suffice to state a cause of action." *ETT Ambulance Serv Corp v Rockford Ambulance, Inc*, 204 Mich App 392, 395 (1994).

**B**
**Breach of Contract (Against DSLLC and Supply) (Count I)**

To establish a prima facie case for breach of contract, "[a] party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller–Davis Co v Ahrens Const, Inc*, 495 Mich 161, 178 (2014).

Supply Line argues that ZB fails to state a claim against it because (a) it is not a party to the Note and (b) ZB has failed to plead an alter ego theory of liability to hold Supply Line liable for breach of contract. The parties agree that there is no contract between ZB and Supply Line. [Amended Complaint, ¶92 ("[t]he Note is a binding and enforceable contract between ZB and DSLLC.")] Further, ZB falls short of alleging an alter ego of liability.

The Amended Complaint alleges that "DSLLC did not have a bank account at the time the Loan was made and thus the monies were deposited in Supply [Line's] bank account," "numerous purposed expenses from DSLLC's business were billed to and/or paid by Supply [Line]," and "Supply [Line] and DSLLC [] commingled funds, business, employees and other resources such that DSLLC was merely an alter-ego of Supply [Line]

10

and it is appropriate to pierce the corporate veil through DSLLC to Supply [Line]."

[Amended Complaint, ¶97-¶99.] However, "[i]n order for a court to order a corporate veil to be pierced, the corporate entity (1) must be a mere instrumentality of another individual or entity, (2) must have been used to commit a wrong or fraud, and (3) there must have been an unjust injury or loss to the plaintiff." *Florence Cement Co v Vettraino*, 292 Mich App 461, 469 (2011). The Amended Complaint lacks such allegations. Instead it simply baldly concludes that piercing the corporate veil is justified. ZB has not pleaded facts or allegations that DSLLC is the mere instrumentality of Supply Line and DSLLC was used to commit a wrong or fraud, resulting in an unjust injury or loss to ZB.[5] Indeed, the Note reflects that the Loan was to be funded to Supply Line and Supply Line was to accept the funds on behalf of DSLLC. In the end, ZB's allegations are insufficient to plead a purported alter ego theory of liability.[6] Accordingly, Count I is dismissed against Supply Line.[7]

---

[5] The 89 pages of account statements attached as Exhibit 2 to ZB's Response are not properly before the Court. These documents were admittedly produced in discovery and not appended to the Amended Complaint.

[6] ZB relies upon *Dutton Partners, LLC v CMS Energy Corp*, 290 Mich App 635 (2010) to supports it argument that it has made sufficient allegations to justify piercing the corporate veil; however, the *Dutton Partners* Court remarked that the plaintiff's alter ego theory of liability actually failed to state a claim: "At the outset, we note that the propriety of the trial court's ruling was questionable in the first instance. Plaintiff never pleaded facts supporting its alter-ego theory in its complaint and never moved to amend to add such facts; thus, plaintiff's complaint likely could have been dismissed for failure to state a claim. However, because the trial court treated the alter-ego theory of liability as if it had been properly pleaded and raised, and ultimately denied defendant's renewed motion on the basis of plaintiff's alter-ego theory, we will treat the matter as if it had been properly presented and preserved." *Dutton Partners*, 290 Mich App at 642.

[7] The Kessler Defendants do not move for summary disposition of Count I.

11

**C**

**Breach of Contract (Against the Guarantors) (Count III)**

**1**

**The Allegations**

The Amended Complaint alleges, in part, as follows:

106.    The Guarantees are binding and enforceable contracts between ZB and Guarantors.

107.    The Guarantees contain an express representation and warranty that "... (e) that at the time of execution and delivery of this Guaranty, and as long as the Guaranty is in effect, each Guarantor has minimum net worth of Ten Million and xx/100 ($10,000,000) USD and further that minimum of one-half (1/2) of that net worth is in assets solely in the name of each Guarantor."

108.    Upon information and belief, the Guarantors breached their express representations and warranties, as it believed, and based upon their own representations, that they did not and do not have a minimum net worth of Ten Million and xx/100 ($10,000,000) USD and further that minimum of one-half (1/2) of that net worth is not held in assets solely in the name of each Guarantor.

109.    ZB has been damaged by the Guarantor's breaches in an amount to be determined at trial, but believed to be in excess of $25,000.

**2**

**Analysis**

"The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512 (2003). "The measure of damages in relation to a breach of contract is the

12

pecuniary value of the benefits the aggrieved party would have received if the contract had not been breached." *Doe v Henry Ford Health System*, 308 Mich App 592, 601 (2014) (quotation marks and citation omitted). "[D]amages need not be fixed with precision to be recovered; [however,] while some uncertainty as to the amount of damages is allowable, certainty as to the fact of the amount of damage caused by the breach of contract is fatal[.] *Home Ins Co v Commercial & Indust Sec Servs, Inc*, 57 Mich App 143, 147 (1974).

Defendants DSLLC and Kessler argue that Count III should be dismissed because the alleged breach on which Count III is based has not caused ZB any actual harm. However, the Amended Complaint alleges that the Guarantors expressly represented their financial status and assets in the Guaranty, the Guarantors breached those express representations and ZB has been damaged by the Guarantors' breaches. DSLLC and Kessler have failed to demonstrate that Count III fails as a matter of law and summary disposition of Count III is denied.

## D
### Unjust Enrichment (Against Supply) (Count IV)

"The elements of a claim for unjust enrichment are: (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Barber v SMH (US), Inc*, 202 Mich App 366, 375 (1993) (citation omitted). In other words, the law will imply a contract to prevent unjust

enrichment only if the defendant has been unjustly or inequitably enriched at the plaintiff's expense. *Morris Pumps v Centerline Piping Inc*, 273 Mich App 187, 195 (2006).

Our Court of Appeals has summarized unjust enrichment as follows:

"'The essential elements of a quasi-contractual obligation, upon which recovery may be had, are the receipt of a benefit by a defendant from a plaintiff, which benefit it is inequitable that the defendant retain.'" *MEEMIC* [*v Morris*, 460 Mich 180,] 198 [(1999)], quoting *Moll v Wayne Co*, 332 Mich 274, 278-279 (1952). Thus, in order to sustain a claim of quantum meruit or unjust enrichment, a plaintiff must establish (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant. *Barber v SMH (US), Inc*, 202 Mich App 366, 375 (1993). In other words, the law will imply a contract to prevent unjust enrichment only if the defendant has been unjustly or inequitably enriched at the plaintiff's expense.

[*Morris Pumps*, 273 Mich App at 195-196.]

The Amended Complaint alleges that "ZB conferred a benefit upon Supply [Line] by disbursing $4,850,000 directly to Supply [Line]" and "[i]t is inequitable for Supply [Line] to retain the monies disbursed by ZB when DSLLC and the Guarantors have failed to repay the Loan." [Amended Complaint, ¶111-¶112.]

Supply Line argues that ZB fails to state a claim because it has failed to allege an inequity where the Amended Complaint acknowledges that the Note directed ZB to deposit the loan proceeds into Supply Line's account and the funds were wired to unknown accounts within a matter of days. However, by focusing on disproving ZB's allegations rather than on the lack of an allegation, Supply Line has abandoned any argument that Amended Complaint fails to meet a pleading requirement, which is the

appropriate inquiry for evaluating a challenge under MCR 2.116(C)(8). *Id.* See also

*Houghton v Keller*, 256 Mich App 336, 339-340 (2003). Accordingly, summary disposition

under MCR 2.116(C)(8) is not warranted.

**E**
**Fraud (Against the Kessler Defendants) (Count V)**
**Fraud (Against the Kessler Defendants) (Count VI)**
**Fraud (Against the Kessler Defendants) (Count VII)**

**1**
**The Fraud Claims (Counts V-VII) are Not Barred by the Economic Loss Doctrine**

The economic loss doctrine is a "judicially created doctrine" that bars tort claims

for economic losses resulting from commercial transactions. Under the economic loss

doctrine, economic losses are only recoverable in contract, not tort. *Quest Diagnostics, Inc*

*v MCI WorldCom, Inc*, 254 Mich App 372, 376 (2002); *Neibarger v Universal Coops, Inc*, 439

Mich 512, 520-523 (1992) (explaining that the economic loss doctrine provides that "where

a purchaser's expectations in a sale are frustrated because the product he bought is not

working properly, his remedy is said to be in contract alone, for he has suffered only

economic losses").

DSLLC and Kessler argue that Counts V-VII are barred by the economic loss

doctrine. However, this cause of action arises from a loan transaction and the economic

loss doctrine does not apply to contracts for services or intentional torts and is instead

only applied to contracts for the sale of goods. See *1-800 Bathtub, LLC v ReBath, LLC*,

unpublished per curiam opinion of the Court of Appeals, issued April 18, 2024 (Docket

15

No. 357932), p 7 ("We have only applied the economic-loss doctrine to contracts for goods, and we have specifically declined to apply the doctrine to service contracts"), citing *Higgins v Lauritzen*, 209 Mich App 266 (1995) (reversing summary disposition on basis that the economic-loss doctrine was wrongly applied to a contract for services) and *Quest Diagnostics,* 254 Mich App at 379 ("This Court has declined to apply the economic[-]loss doctrine where the claim emanates from a contract for services"). Accordingly, summary disposition of Counts V-VII pursuant to the economic loss doctrine is denied.

**2**
**ZB has Not Sufficiently Pleaded a Claim for Fraud (Counts V and VII)**

To sustain a claim for common-law fraud, a plaintiff must prove "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *M&D, Inc v WB McConkey,* 231 Mich App 22, 27 (1998). Under Michigan law, "[f]raud in the inducement occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Samuel D Begola Servs v Wild Brothers,* 210 Mich App 636 (1995). To prevail on a claim for fraud in the inducement, a plaintiff must show "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the

defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *Custom Data Solutions, Inc v Preferred Capital, Inc*, 274 Mich App 239, 243 (2006) (quotation marks and citation omitted).

When pleading "allegations of fraud, . . . the circumstances alleged to constitute fraud must be stated with particularity." MCR 2.112(B)(1). See also *Stephens v Worden Ins Agency, LLC*, 307 Mich App 220, 229–30 (2014) ("Fraud claims must be pleaded with particularity, addressing each element of the tort"). Because of this heightened pleading standard, fraud "is not to be lightly presumed, but must be clearly proved . . . by clear, satisfactory and convincing" evidence. *Cooper v Auto Club Ins Ass'n*, 481 Mich 399, 414 (2008) (citations and quotations omitted). Michigan courts have relied on the federal "who, what, when, where, and how" requirement for particularity in fraud claims. See *Bell v Keller*, unpublished per curiam opinion of the Court of Appeals, issued May 20, 2021 (Docket No. 352421), p 7, quoting *Dileo v Ernst & Young*, 901 F2d 624, 627 (CA 7, 1990).

In the Amended Complaint, ZB identifies Kessler, Kaplan, DSLLC, SLIM and Supply Line collectively as the "Kessler Defendants." Counts V and VII simply plead allegations against the Kessler Defendants. There are no specific references to Kessler, Kaplan, DSLLC, SLIM and/or Supply Line, individually, and the Amended Complaint does not identify which party or parties are alleged to have made fraudulent statements

17

or engaged in fraudulent actions. These group references are not sufficient to apprise the Defendants of the fraudulent conduct alleged against them. See *Benoay v Decker*, 517 F Supp 490, 493 (ED Mich 1981) ("[T]he complaint, therefore, may not rely upon blanket references to acts or omissions by all of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged"), aff'd, 735 F2d 1363 (CA 6, 1984). Consequently, for this reason alone, Counts V and VII lack the required specificity.

ZB's argument that the fraud claims survive because of the concert of action doctrine is misplaced because concert of action is not pleaded in the Amended Complaint. *Urbain v Beierling*, 301 Mich App 114, 132 (2013) ("to establish a concert-of-action claim, a plaintiff must prove that all defendants acted tortiously pursuant to a common design that caused harm to the plaintiff" (quotation marks and citation omitted)). Further, ZB's argument that Supply Line and SLIM are liable for the representations made by their agent is also beyond the allegations of the Amended Complaint. As such, summary disposition of Counts V and VII is warranted.

18

**F**
**Conversion/Statutory Stealing MCL 600.2919a**
**(Against the Kessler Defendants) (Count VIII)**

**1**
**The Law**

Statutory conversion under MCL 600.2919a(1)(a), as amended in 2005, creates a remedy against a person who "steal[s] or embezzl[es] property or convert[s] property to the other person's own use." MCL 600.2919a. MCL 600.2919a provides as follows:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.
>
> (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.
>
> (2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

"[S]imply retaining money does not amount to "buying, receiving or aiding in the concealment of stolen, embezzled or converted property." *Hovanesian v Nam*, 213 Mich App 231, 237 (1995).

19

"A party's conduct may constitute both a breach of contract and an act of conversion only if there was a breach of a duty separate and distinct from the contractual duty." *Can IV Packard Square, LLC v Packard Square, LLC*, unpublished, per curiam opinion of the Court of Appeals, issued June 24, 2021 (Docket Nos. 348857, 350519), p 18. When determining whether a conversion claim is actionable, "the threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation." *Rinaldo's Const Corp v Michigan Bell Tel Co*, 454 Mich 65, 84 (1997).

## 2
### Analysis

The Amended Complaint alleges that "[t]he Kessler Defendants induced ZB to loan DSLLC money under false pretenses, by the communication of knowingly false representations that the money would be used to pay the expenses of affiliate marketing utilized to capture Medicare and Medicaid patients to register with VH to receive COVID-19 test kits that would be paid for and/or reimbursed by the Federal Government; [u]pon and information and belief, for the reasons stated in Paragraph 67 through 80 above, the monies loaned by ZB were not used for that purpose and were instead used for other purposes; [and] [t]he Kessler Defendants those stole ZB's money by false pretenses in violation of MCL 600.2919a." [Amended Complaint, ¶138-¶140.]

DSLLC and Kessler argue that Count VIII is predicated on the same allegations set forth in Count V. Counts V and VIII both allege that the Kessler Defendants induced ZB to loan them money. Count V alleges that "[t]he Kessler Defendants induced ZB to loan

20

DSLLC $4,850,000 by making representations that those monies were going to be used to pay for 'affiliate marketing' costs to support DSLLC's supposedly legitimate business selling COVID-19 test kits to Medicare and Medicaid recipients," [Amended Complaint, ¶115], and Count VIII alleges "[t]he Kessler Defendants induced ZB to loan DSLLC money under false pretenses, by the communication of knowingly false representations that the money would be used to pay the expenses of affiliate marketing utilized to capture Medicare and Medicaid patients to register with VH to receive COVID-19 test kits that would be paid for and/or reimbursed by the Federal Government." [Amended Complaint, ¶138.] However, Count VIII alleges that the false pretenses allowed the Kessler Defendants to steal ZB's money in violation of MCL 600.2919a. DSLLC and Kessler have failed to demonstrate the claims are duplicative. DSLLC and Kessler's argument that Count VIII is barred because it does not allege a legal duty separate from the contractual promise is unavailing because DSLLC and Kessler fail to identify the contractual provision or promise that speaks to the purpose of the Loan and ZB does not allege breach of contract based on the purpose of the Loan.

DSLLC and Kessler further argue that Count VIII cannot lie because ZB consented to a debtor/creditor relationship. "To support an action for conversion of money, the defendant must have obtained the money without the owner's consent to the creation of a debtor-creditor relationship and must have had an obligation to return the specific money entrusted to his care." *Lawsuit Fin, LLC v Curry*, 261 Mich App 579, 591 (2004) (quotation marks and citation omitted). ZB relies on *Shiffman v Auto Source Wholesale, LLC*,

unpublished per curiam opinion of the Court of Appeals, issued August 14, 2018 (Docket No. 339291) where the Court of Appeals determined that the defendant stole money by false pretenses in violation of MCL 600.2919a by taking the plaintiff's loan and using it for personal and other expenses unrelated to the purpose of the loan agreement. However in that case, the funds were transferred pursuant to a false promissory note and a fraudulent guaranty. In the end, DSLLC and Kessler have failed to demonstrate that Count VIII fails as a matter of law, but whether ZB can sustain Count VIII remains to be determined. Accordingly, summary disposition is not warranted.[8]

## V
## Summary Disposition of Kessler's Cross-Complaint
## Pursuant to MCR 2.116(C)(8) is Warranted

## A
## The Law of Contribution

The doctrine of equitable contribution is "founded on principles of equity and natural justice." *Lorimer v Julius Knack Coal Co*, 246 Mich 214, 217 (1929). It provides that one who pays or satisfies "the whole or [bears] more than his aliquot share of the common burden or obligation, upon which several persons are equally liable or which they are bound to discharge, is entitled to contribution against the others to obtain from them payment of their respective shares." *Caldwell v Fox*, 394 Mich 401, 417 (1975). However, "[o]ne joint obligor may not sue another joint obligor, upon their common obligation,

---

[8] DSLLC and Kessler further argue that Count VIII fails because of a "present intent" infirmity. This argument is too convoluted for consideration.

until he has paid the debt, or a larger portion thereof than, as between himself and his co-obligor, he would be liable to pay." *Kalamazoo Trust Co v Merrill*, 159 Mich 649, 655 (1910). See also *Kelly v Sproul*, 153 Mich 691, 692-693 (1908) ("the right of action for contribution does not accrue until payment is made"); *Sziber v Stout*, 419 Mich 514, 533-534 (1984) ("the action [for contribution] accrues when a judgment has been taken or rendered and the third-party plaintiff has paid more than his aliquot share").

**B**
**Analysis**

Ahmad contends that the crossclaim for contribution is premature because Kessler has not in fact paid more than his share of the claimed debt. Kessler does not refute that he has not paid any portion of the debt allegedly owed, but argues that only a stand-alone claim for contribution is premature before payment on an underlying debt is made. Kessler relies on *TacCo Falcon Point, Inc v Clapper*, unpublished per curiam opinion of the Court of Appeals, issued February 1, 2007 (Docket Nos. 271525, 271552, p 6, in which the Court of Appeals determined the circuit court did not err in perfunctorily stating that a third-party plaintiff need not have paid more than his share of an obligation before suing for contribution. However, the Court of Appeals' affirmance was based on two distinct reasons:

> ART first contends that Clapper was not permitted to sue ART, a joint obligor, until Clapper had paid more than his share of the joint obligation. See *Kalamazoo Trust Co v Merrill*, 159 Mich 649, 655; 124 NW 597 (1910) ("[o]ne joint obligor may not sue another joint obligor, upon their common obligation, until he has paid the debt, or a larger portion thereof than, as between himself and his co-obligor, he would be liable to pay"), and *Kelly*

23

*v Sproul*, 153 Mich 691, 692-693; 117 NW 327 (1908) ("the right of action for contribution does not accrue until payment is made"). See also *Sziber v Stout*, 419 Mich 514, 534; 358 NW2d 330 (1984). ART contends that Clapper had not in fact paid more than his share of the joint obligation and therefore could not proceed against ART. The circuit court, in ruling on this issue, perfunctorily stated that Clapper need not have paid more than his share of the obligation before suing ART.

We conclude that no error requiring reversal occurred. First, Clapper did not file a separate lawsuit against ART but instead filed a third-party complaint. This was explicitly authorized under MCR 2.204(A)(1), which states, in pertinent part: "[A]ny time after commencement of an action, a defending party, as a third-party plaintiff, may serve a summons and complaint on a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim." Second, plaintiff deposited the amount of TacCo's judgment with the circuit court. Clapper admits in his appellate brief that "[i]f Clapper is unsuccessful on his appeal as to the TacCo issues, then TacCo will be entitled to the entire $2.5 million." The circuit court was mindful of Clapper's possible payment to TacCo and explicitly stated, in its order, as follows:

> [J]udgment is hereby entered in the amount of 50% (fifty percent) of the amount paid by Third-Party Plaintiff to Plaintiff, provided that execution of this judgment is precluded until payment by Defendant/Third-Party Plaintiff of an amount in excess of 50% of Plaintiff's judgment against Defendant/Third-Party Plaintiff, in which even Defendant/Third-Party Plaintiff may have execution of this Judgment against Third-Party Defendant ART for the excess.

Therefore, the court indicated that Clapper would not, in actuality, be able to successfully execute his claim against ART until after Clapper paid TacCo. Under the circumstances, we find no viable basis on which to reverse the circuit court's ruling.

[*TacCo*, unpub op at 5-6.]

Thus, the circuit court in that case recognized that the third-party plaintiff could not seek contribution until after it paid an excess amount of the underlying judgment.

Here, no judgment has been rendered on the underlying claimed debt and Kessler has not paid more than his purported share of that claimed debt. In sum, Kessler's crossclaim is premature, and summary disposition is warranted.[9]

**V**
**Summary Disposition of Ahmad's Cross-Complaint**
**Pursuant to MCR 2.116(C)(8) is Not Warranted**

**A**
**The Law**

Fraud in the inducement occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Samuel D Begola Servs v Wild Brothers,* 210 Mich App 636 (1995). To prevail on a claim for fraud in the inducement, the plaintiff must demonstrate "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *Custom Data Solutions, Inc v Preferred Capital, Inc*, 274 Mich App 239, 243 (2006) (quotation marks and citation omitted). "A plaintiff cannot merely prove that the defendant failed to disclose something; instead, a plaintiff must show some type of representation by

---

[9] As the crossclaim for contribution is premature, the Court will not determine whether the crossclaim is legally sufficient.

25

words or actions that was false or misleading and was intended to deceive." *Lucas*, 299

Mich App at 364 (quotation marks and citation omitted).

**B**
**The Allegations**

In his Cross-Complaint, Ahmad alleges as follows:

30.     The DSLLC Defendants induced Ahmad to execute a personal guaranty of the approximately $4,850,000 provided by ZB to DSLLC by making the many misrepresentations and material omissions discussed m detail above, including but not limited to, misrepresentations/material omissions that:

> a.     DSLLC needed the money from ZB to pay outstanding expenses it had incurred performing services related to the Medicare OTC Program;
> b.     DSLLC would use the funds from ZB exclusively to pay outstanding expenses it had incurred performing services related to the Medicare OTC Program;
> c.     The funds ZB provided to DSLLC were a 'loan' and not part of an investment contract whereby DSLLC promised ZB equity interests in VH; and,
> d.     DSLLC would repay ZB from the money the Laboratory would pay to DSLLC pursuant to the MSA.

31.     These representations were false. The DSLLC Defendants did not use the funds from ZB to pay expenses solely related to the Medicare OTC Program, the money from ZB was not a 'loan' but rather were proceeds from an investment contract, and DSLLC did not repay ZB from the money the Laboratory paid to DSLLC pursuant to the MSA.

32.     The DSLLC Defendants knew these representations were false at the time they were made, and the DSLLC Defendants knew that their material omissions were misleading at the time they were made.

33.     The DSLLC Defendants made these misrepresentations and material omissions to Ahmad with the intent that Ahmad rely upon them because

26

without a personal guaranty from Ahmad ZB would not have made the loan to DSLLC.

34. Ahmad reasonably and justifiably relied on DSLLC's misrepresentations and material omissions in agreeing to and executing a personal guaranty.

35. Had Ahmad known of the misrepresentations and material missions of the DSLLC Defendants (including the misrepresentations the DSLLC Defendants made to ZB), Ahmad would not have agreed to or executed a personal guaranty.

36. Ahmad has been damaged by the DSLLC Defendants misrepresentations and material omissions in an amount to be determined at trial, but believed to be in excess of $25,000.

37. The DSLLC Defendants' actions were intentionally willful and wanton such that exemplary damages are appropriate.

## C
### Analysis

DSLLC and Kessler first argue that Ahmad's claim is actually for silent fraud but is insufficiently pleaded and should be dismissed. However, Ahmad disavows raising a claim of silent fraud. [Response, p 3.]

DSLLC and Kessler next argue that Ahmad cannot sustain a crossclaim for fraud based on alleged future promises. "In general, an action for fraud cannot be based on the failure of future events to transpire as represented or predicted." *Mercantile Bank of Michigan v CLMIA, LLC*, unpublished per curiam opinion of the Court of Appeals, issued February 12, 2015 (Docket No. 316777), p 8. However, fraud in the inducement rests on a false representation of some future act. *Custom Data Sol*, 274 Mich App at 242-243 (fraud

in the inducement "occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon"). Hence, DSLLC and Kessler's argument is unavailing.

DSLLC and Kessler further argue that Ahmad's crossclaim fails because the ZB Loan was a loan and not an investment. However, this argument focuses on disproving Ahmad's allegation ("The pleadings and instruments attached show that the agreement between ZB and Divided Sky was clearly a loan, not an investment," [Motion, p 13], or a purported lack of evidence, rather than on the lack of an allegation – this attack is fruitless under MCR 2.116(C)(8). *Maiden*, 461 Mich at 119-120; *El-Khalil*, 504 Mich at 162.

Finally, DSLLC and Kessler argue that Ahmad has failed to plead facts demonstrating how the alleged misrepresentations were material to his decision to sign the Guaranty. However, the Cross-Complaint alleges that misrepresentations that "DSLLC needed the money from ZB to pay outstanding expenses it had incurred performing services related to the Medicare OTC Program; DSLLC would use the funds from ZB exclusively to pay outstanding expenses it had incurred performing services related to the Medicare OTC Program; [t]he funds ZB provided to DSLLC were a 'loan' and not part of an investment contract whereby DSLLC promised ZB equity interests in VH; and, DSLLC would repay ZB from the money the Laboratory would pay to DSLLC pursuant to the MSA" were made to induce Ahmad to sign a personal guaranty and had he known of the misrepresentations he would not have executed a personal guaranty. The Cross-Complaint sufficiently alleges fraudulent inducement. In sum, summary

28

disposition of Ahmad's Cross-Complaint pursuant to MCR 2.116(C)(8) is not warranted.[10]

## ORDER

In light of the foregoing Opinion,

**(1)** Defendants Divided Sky, LLC, Joshua Kaplan, and Adam Kessler's Motion for Partial Summary Disposition of Plaintiff's Amended Complaint under MCR 2.116(C)(8) is **GRANTED, IN PART** and Counts V-VII are dismissed against Defendants Divided Sky, LLC and Adam Kessler;

**(2)** Defendants Supply Line International, LLC and Supply Line International Medical, LLC's Motion for Partial Summary Disposition of Plaintiff's Amended Complaint under MCR 2.116(C)(8) is **GRANTED, IN PART** and Count II is dismissed against Supply Line International, LLC and Counts V and VII are dismissed against Supply Line International, LLC and Supply Line International Medical, LLC;

**(3)** Sami Ahmad's Amended Motion for Summary Disposition Pursuant to MCR 2.116(C)(8) is **GRANTED** and Adam Kessler's Cross-Complaint is dismissed;

**(4)** Defendants Divided Sky, LLC, Joshua Kaplan, and Adam Kessler's Motion for Summary Disposition of Defendant Sami Ahmad's Cross-Claim under MCR 2.116(C)(8) is **DENIED;** and

**(5)** Plaintiff's Motion For Summary Disposition is **DENIED.**

---

[10] Supply Line and SLIM's request for summary disposition of Count VIII because there are no allegations regarding Supply Line or SLIM is denied because the allegations in Count VIII are against the "Kessler Defendants" which is defined in the Amended Complaint to include Supply Line and SLIM.

29

**(6)** ANY REQUEST TO AMEND IN LIGHT OF THIS OPINION AND ORDER MUST BE FILED AND SET FOR HEARING NO LATER OCTOBER 21, 2025 OR BE CONSIDERED ABANDONED.

/s/ Michael Warren

**HON. MICHAEL WARREN**
**CIRCUIT COURT JUDGE**



30

# Exhibit E

ZB VERIFIED INVESTMENTS LLC,

     Plaintiff,

v.

ADAM KESSLER; JOSHUA KAPLAN;
SAMI AHMAD; DIVIDED SKY, LLC;
SUPPLY LINE INTERNATIONAL, LLC,
SUPPLY LINE INTERNATIONAL MEDICAL, LLC,
JOHN DOES 1-10

     Defendants.

Case No. 24-207081-CB

Hon. Michael Warren

**NOTICE OF HEARING**

| | |
|---|---|
| Ethan R. Holtz (P71884) | Thomas W. Cranmer (P25252) |
| Emily M. Mayer (P78956) | Caroline Giordano (P76658) |
| Taft Stettinius & Hollister LLP | Kimberly L. Scott (P69706) |
| 27777 Franklin Road, Suite 2500 | Miller, Canfield, Paddock and Stone, PLC |
| Southfield, MI 48034 | 840 West Long Lake Road, Suite 150 |
| (248) 351-3000 | Troy, MI 48098 |
| eholtz@taftlaw.com | (248) 879-2000 |
| emayer@taftlaw.com | cranmer@millercanfield.com |
| *Attorneys for Plaintiff* | *Attorneys for Defendants Kessler, Kaplan, Divided Sky, LLC, and Supply Line International, LLC* |
| | |
| | Kelly E. Kane (P81912) |
| | Callan G. Stein (Admitted PHV) |
| | Michael Lowe (Admitted PHV) |
| | Troutman Pepper Hamilton Sanders LLP |
| | 4000 Town Center, Suite 1800 |
| | Southfield, MI 48075 |
| | (248) 359-7300 |
| | kelly.kane@troutman.com |
| | callan.stein@troutman.com |
| | michael.lowe@troutman.com |
| | *Attorneys for Defendant Sami Ahmad* |

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

<u>**NOTICE OF HEARING**</u>

PLEASE TAKE NOTICE that *Plaintiff's Motion for Leave to File Second Amended Complaint* will be brought on for hearing before the Honorable Michael Warren via Zoom on Wednesday, October 15, 2025 at 8:30 a.m. or as soon thereafter as counsel may be heard.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

/s/ Ethan R. Holtz
Ethan Holtz (P71884)
Emily Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000

Dated: October 8, 2025    *Attorneys for Plaintiff*

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

ZB VERIFIED INVESTMENTS LLC,

Case No. 24-207081-CB

Plaintiff,                                   Hon. Michael Warren

v.

ADAM KESSLER; JOSHUA KAPLAN;
SAMI AHMAD; DIVIDED SKY, LLC;
SUPPLY LINE INTERNATIONAL, LLC,
SUPPLY LINE INTERNATIONAL MEDICAL, LLC,
JOHN DOES 1-10

                 Defendants.

---

Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
Taft Stettinius & Hollister LLP
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
*Attorneys for Plaintiff*

Thomas W. Cranmer (P25252)
Caroline Giordano (P76658)
Kimberly L. Scott (P69706)
Miller, Canfield, Paddock and Stone, PLC
840 West Long Lake Road, Suite 150
Troy, MI 48098
(248) 879-2000
cranmer@millercanfield.com
*Attorneys for Defendants Kessler, Kaplan,*
*Divided Sky, LLC, and Supply Line*
*International, LLC*

Kelly E. Kane (P81912)
Callan G. Stein (Admitted PHV)
Michael Lowe (Admitted PHV)
Troutman Pepper Hamilton Sanders LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
(248) 359-7300
kelly.kane@troutman.com
callan.stein@troutman.com
michael.lowe@troutman.com
*Attorneys for Defendant Sami Ahmad*

---

**PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT PURSUANT TO MCR 2.116(I)(5) AND 2.118(A)(2)**

176643940v6

Plaintiff ZB Verified Investments LLC ("ZB"), through its attorneys Taft, Stettinius & Hollister, LLP, respectfully moves this Court (1) for leave to file a Second Amended Complaint against Defendants Adam Kessler ("Kessler"), Divided Sky, LLC ("Divided Sky"), Supply Line International, LLC ("SLI"), Supply Line International Medical, LLC ("SLIM" and collectively, the "Kessler Defendants")[1] and Sami Ahmad ("Ahmad") pursuant to MCR 2.116(I)(5) and 2.118(A)(2) for the purpose of correcting pleading deficiencies identified by the Court in its September 23, 2025 Opinion and Order, and (2) for leave to file a new or supplementation motion for summary disposition pursuant to MCR 2.116(C)(10) on the re-pleaded claims (collectively, the "Motion").

The facts and law supporting this Motion are fully set forth in the accompanying brief filed with this Motion in accordance with MCR 2.119(A)(2). A proposed Second Amended Complaint is attached to the supporting brief as **Exhibit 1**.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

/s/ Ethan R. Holtz

Ethan Holtz (P71884)
Emily Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
*Attorneys for Plaintiff*

Dated: October 8, 2025

---

[1] Defendant Josh Kaplan has filed for Chapter 7 bankruptcy protection and this action is stayed as to him only as a result thereof. ZB takes no action here with respect to him.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

ZB VERIFIED INVESTMENTS LLC,

                                    Case No. 24-207081-CB

        Plaintiff,                           Hon. Michael Warren

v.

ADAM KESSLER; JOSHUA KAPLAN;
SAMI AHMAD; DIVIDED SKY, LLC;
SUPPLY LINE INTERNATIONAL, LLC,
SUPPLY LINE INTERNATIONAL MEDICAL, LLC,
JOHN DOES 1-10

              Defendants.

| | |
|---|---|
| Ethan R. Holtz (P71884)<br>Emily M. Mayer (P78956)<br>Taft Stettinius & Hollister LLP<br>27777 Franklin Road, Suite 2500<br>Southfield, MI 48034<br>(248) 351-3000<br>eholtz@taftlaw.com<br>emayer@taftlaw.com<br>*Attorneys for Plaintiff* | Thomas W. Cranmer (P25252)<br>Caroline Giordano (P76658)<br>Kimberly L. Scott (P69706)<br>Miller, Canfield, Paddock and Stone, PLC<br>840 West Long Lake Road, Suite 150<br>Troy, MI 48098<br>(248) 879-2000<br>cranmer@millercanfield.com<br>*Attorneys for Defendants Kessler, Kaplan,*<br>*Divided Sky, LLC, and Supply Line*<br>*International, LLC* |
| | Kelly E. Kane (P81912)<br>Callan G. Stein (Admitted PHV)<br>Michael Lowe (Admitted PHV)<br>Troutman Pepper Hamilton Sanders LLP<br>4000 Town Center, Suite 1800<br>Southfield, MI 48075<br>(248) 359-7300<br>sean.dutton@troutman.com<br>callan.stein@troutman.com<br>michael.lowe@troutman.com<br>*Attorneys for Defendant Sami Ahmad* |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND
AMENDED COMPLAINT PURSUANT TO MCR 2.116(I)(5) AND 2.118(A)(2)**

3

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**INTRODUCTION**

On September 23, 2025, this Court granted, in part, Defendants' Motions for Partial Summary Disposition of ZB's First Amended Complaint pursuant to MCR 2.116(C)(8). The Court found that: (1) ZB failed to sufficiently plead an alter ego theory of liability as to Supply Line; and (2) ZB failed to plead fraud with particularity as to the Kessler Defendants in Count V and Count VII. MCR 2.116(I)(5) provides that a party whose complaint is dismissed pursuant to MCR 2.116(C)(8) "shall" have the opportunity to amend their complaint and remedy any pleading defects, pursuant to MCR 2.118(A)(2) unless amendment "would not be justified."

Defendants, who have been on notice of these claims against them since the Amended Complaint was filed almost one year ago, will not be prejudiced by ZB's amendment because they were and are well aware of the facts underlying these claims, have taken extensive discovery of them, and the pleading deficiencies raised by the Court were of form, rather than substance, which require only cosmetic repleading. There has not been any undue delay on the part of ZB, or any delay at all. The law is clear and it is well held that such leave shall be granted. MCR 2.116(I)(5).

Accordingly, and pursuant to the Michigan Court Rules, the Court should grant ZB leave to file the proposed Second Amended Complaint, attached hereto as **Exhibit 1**.

**RELEVANT FACTS**

In late October 2024, the parties filed a variety of Motions for Summary Disposition pursuant to MCR 2.116(C)(8). After the Motions for Summary Disposition pursuant to MCR 2.116(C)(8) were submitted, the parties engaged in extensive discovery. Through discovery, the parties clarified their respective positions and claims. Further, the parties conducted discovery notwithstanding the outstanding Motions for Summary Disposition, ensuring that any potential later denial would not impact their abilities to pursue or defend their claims. After the discovery

4

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

period was over, all parties filed additional Motions for Summary Disposition, pursuant to MCR 2.116(C)(10), on the filing deadline, July 25, 2025.

On September 23, 2025, this Court issued its Opinion and Order regarding the Partial Motions for Summary Disposition. **Exhibit 2**. Relevant to this Motion, the Court granted Supply Line partial Summary Disposition as to Count I because Supply Line is not a party to the Note and the Court held that ZB failed to sufficiently plead a purported alter ego theory of liability. *Id.* at **4**.

The Court also granted Summary Disposition of Count V and VII of ZB's Fraud Claims against the Kessler Defendants because the counts failed to plead fraud with particularity. *Id.* at **5**.[2] Specifically, the Court found that because Counts V and VII simply plead allegations against the Kessler Defendants, and does not identify which party or parties are alleged to have made fraudulent statements, or engaged in fraudulent actions. *Id*. at **17-18**. However, in discovery, Defendants were well apprised and questioned ZB extensively about the basis of such allegations.

The Court set a date by which any request to amend pleadings in light of the Opinion and Order be made – October 21, 2025. **Exhibit 2 at 30**. Accordingly, ZB is submitting this Motion for Leave to Amend its Complaint a second time in order to address the pleading deficiencies outlined by the Court in its Opinion and Order and to file a new or supplementation motion for summary disposition pursuant to MCR 2.116(C)(10) on the re-pleaded claims alone. As discussed further below, the proposed Second Amended Complaint clarifies why the alter ego theory is proper as to Supply Line and Divided Sky, pleads Counts V and VII for fraud with particularity, and pleads that the Defendants were acting pursuant to a common design and conspired to commit

---

[2] On September 30, 2025, the Court clarified that its 9/23/25 Order contained a typographical error and is amended to reflect that Fraud Counts V and VII, but not Count VI, were dismissed. **Exhibit 3**.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

the fraudulent acts. **Exhibit 1**.

**ARGUMENT**

"Amendment is generally a matter of right rather than grace." *Phinney v Perlmutter*, 222 Mich App 513, 522 (1997). MCR 2.118(A)(2) provides that, except where a party may amend a pleading by right pursuant to MCR 2.118(A)(1), "a party may amend a pleading only be leave of the court or by written consent of the adverse party" and "[l]eave shall be freely given when justice so requires."

MCR 2.116(I)(5) provides that if a motion is made pursuant to MCR 2.116(C)(8), "the court **shall** give the parties an opportunity to amend their pleadings as provided by MCR 2.118, unless the evidence then before the court shows that amendment would not be justified." (emphasis added). This is true even after a judgment of dismissal has been granted. *See Midura v Lincoln Consol Schools*, 111 Mich App 558, 561 (1981) ("the entry of a grant of summary judgment does not preclude amendment of the complaint."); *Feliciano v Department of Natural Resources*, 158 Mich App 497 (1987) (grant of summary judgment does not preclude amendment of complaint).

To that end, while the decision whether to grant leave to amend is within this Court's discretion (*Weymers v Khera*, 454 Mich 639, 654 (1997)), "[l]eave to amend should be denied only for particularized reasons, such as undue delay, bad faith, or dilatory motive on the movant's part, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, or where amendment would be futile." *Phinney*, 222 Mich App at 522; *Fyke & Sons v Gunter Co*, 390 Mich 649, 656 (1973) (Michigan's Supreme Court has explained that MCR 2.118(A)(2) "is 'designed to facilitate the amendment of pleadings except where prejudice to the opposing party would result.'"). Similarly, a court must give the parties the opportunity to amend pursuant to MCR 2.118, unless amendment would be futile. *Midura*, 111 Mich App at 561 (citing

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

*Lane v KinderCare Learning-Centers*, *Inc*, 231 Mich App 689 (1998)).

In this instance, because the Court granted the Kessler Defendants' Motion pursuant to MCR 2.116(C)(80), MCR 2.116(I)(5) requires that the Court "shall" give ZB an opportunity to amend. That is especially true since the claimed deficiencies – including the failure to identify which of the Kessler Defendants, specifically, made fraudulent statements – are easily remedied.

Thus, pursuant to MCR 2.116 and MCR 2.118, leave to amend pleadings should generally be freely granted, and this case presents no exception.

**I.      Amendment Should be Granted; There is no Prejudice to Defendants.**

"Prejudice to a party that will justify denial of leave to amend is prejudice that arises when the amendment would prevent the party from having a fair trial." *Sands Appliance Servs, Inc v Wilson*, 463 Mich 231, 239 n 2 (2000) (quoting *Weymers v Khera*, 454 Mich 639 (1997)). An amendment is not prejudicial merely because it would cause a defendant to lose its case on the merits. *Id.* Instead, it arises, for example, where "the opposing party would not be able to properly contest the matter raised in the amendment because important witnesses have died or necessary evidence has been destroyed or lost." *Wolfenbarger v Wright*, 336 Mich. App. 1, 24–25 (2021) (quoting *Weymers v Khera*, 454 Mich 639 (1997)).

Here, the proposed Second Amended Complaint only remedies the deficiencies identified by the Court in its September 23, 2025 Opinion and Order. The Court stated that the Amended Complaint does not plead facts or allegations that Divided Sky is the mere instrumentality of Supply Line and Divided Sky was used to commit a wrong or fraud such that it is proper to plead an alter ego theory of liability. **Exhibit 2 at 10-11**. Further, the Court stated that because fraud requires particularity, ZB has failed to properly plead Counts V and VII because it pleads allegations against the Kessler Defendants, collectively, and not individual party or parties. ***Id.* at 17**. Accordingly, the Second Amended Complaint more clearly identifies how Divided Sky was an

17053041v2

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

instrumentality of Supply Line, clarifies which parties made the fraudulent statements sufficient to apprise the Defendants of their fraudulent conduct, and pleads that the Defendants were acting pursuant to a common design and conspired to commit the fraudulent acts.

Specifically, and by way of example only, Supply Line and Divided Sky comingled funds, business resources, and employees. **Exhibit 1 at ¶ 105**. In fact, before Divided Sky was formed, Supply performed all marketing services on behalf of the COVID-19 program for which ZB made the loan. *Id. at ¶ 106.* Further, Divided Sky was undercapitalized such that SLI covered business expenses for Divided Sky, demonstrated by the fact that finances were not separated between the two companies and they used the same bank account. *Id. at ¶¶ 107-111*.

Regarding the fraud claims, the proposed Second Amended Complaint alleges that Kessler and Kaplan, individually and as agents for Divided Sky, Supply, and SLIM, made the misrepresentations to induce ZB to make the loan and to keep the loan money invested. *Id.* at ¶¶ **127, 153.** Accordingly, ZB was harmed by Kessler's and Kaplan's false representations, including that the program was highly legitimate and successful (it was not), was garnering subscriptions to Medicaid (it was not), and that money would be used to market tests for the program (it was not exclusively used for this purpose). *Id.* at ¶¶ **128, 129, 154, 155.**

*Wolfenbarger v Wright*, 336 Mich App 1 (2021), is instructive as to why leave to amend would not prejudice the Defendants. There, the Court of Appeals, among other things, reviewed whether denial of leave to amend a complaint dismissed pursuant to MCR 2.118(C)(8) was proper. The Court of Appeals determined that the trial court denied the motion to amend because, among other reasons, the motion to amend was too late and therefore defendants would be prejudiced. *Id.* at 20. Regarding whether the request to amend was unduly delayed, the trial court stated that the request was untimely because it was to be decided one week before trial. *Id.* at 24. The Court of

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Appeals disagreed:

> The trial court's reliance on the motion being too late is somewhat perplexing. The trial court granted defendant's motion for summary disposition in an order entered on May 25, 2017. Plaintiffs filed their motion to amend the complaint less than a week later on May 31, 2017. Clearly, plaintiffs were not *unduly* late in bringing their motion when it was brought six days after the trial court dismissed plaintiffs' claims of trespass and nuisance under MCR 2.116(C)(8)."). [*Id.* at 24 (emphasis in original)].

Regarding prejudice, the Court of Appeals found that Defendants would receive a fair trial, regardless of any amendment:

> In this instance, there is nothing to show that defendant would have been denied a fair trial if the complaint had been amended. Indeed, just two weeks earlier, plaintiffs' claims of trespass and nuisance were in existence and therefore were claims defendant had to prepare to defend against. Thus, even though defendant had a pending motion to dismiss those claims, he could not have known with certainty that he would not have to defend against them. [*Id.* at 24-25].

The same result is warranted here. Though the summary disposition and discovery deadlines for this matter have passed, ZB did not delay in filing this Motion nor would any Defendant be prejudiced from the amendment. The reasoning of *Wolfenbarger* should be applied to find that amendment should be granted under these circumstances.

There was no undue delay, bad faith, or dilatory motive on ZB's part which would preclude an amendment.[3] ZB filed this Motion as soon as practicable after the Court's September 23, 2025 Order and September 30, 2025 clarification. Further, Defendants would not be prejudiced though the discovery period has run. Like in *Wolfenbarger*, Defendants have had the full opportunity to gather such discovery as would be necessary to defend against these amended claims.

Regarding the fraud claims, ZB is merely clarifying the specific identity of the parties alleged to have made fraudulent statements and/or engaged in fraudulent actions and providing

---

[3] The Motion that generated this Order was filed in October of 2024. Since that time, ZB and all parties fully acted in good faith to complete discovery, and there was no delay of any kind.

9

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

additional specific examples of such fraudulent statements. In particular, ZB is clarifying that Kessler and Kaplan, individually and as agents for Divided Sky, Supply Line, and SLIM, made demonstrably false statements to induce ZB to enter the note and refrain from exercising the acceleration provision therein. Defendants have known the basis for the fraud claims and this typographical change merely clarifies the speakers of these fraudulent statements, which the Defendants, as the ones who made the statements themselves, have known.

Similarly, because the Court stated that ZB "simply baldly concludes that piercing the corporate veil is justified" [**Exhibit 2 at 11**], ZB is seeking to use the information Defendants have provided through discovery to clarify how Divided Sky was a mere instrumentality of Supply Line, used to commit the fraud resulting in loss to ZB. However, both the allegations and the underlying information has been known to Defendants since the Amended Complaint was filed, as they were the ones who provided this information through discovery and depositions.

Finally, to address that the "concert of action doctrine … is not pleaded in the Amended Complaint," and to show why Supply Line and SLIM are liable for the fraudulent claims, ZB is seeking to add counts for Civil Conspiracy and for Concert of Action. Both of these claims are based on the same underlying facts as the fraud claims, of which Defendants have been aware.

Defendants were fully apprised of these claims against them, including the specific fraudulent statements that formed the basis of the fraud claims, and conducted discovery thereon based on the assumption that they would need to defend against these claims. Accordingly, ZB has not engaged in any bad faith that would prejudice Defendants that would preclude leave to amend the complaint. At the same time, ZB would be prejudiced if it were not permitted to amend its Complaint – a variety of claims for which it conducted discovery would not be permitted due to a pleading error, not due to a deficiency in fact or law.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**II. Amendment is Not Futile Because the Claims State a Valid Claim for Relief.**

"An amendment is futile where, ignoring the substantive merits of the claim, it is legally insufficient on its face." *Hakari v Ski Brule, Inc*, 230 Mich App 352, 355 (1998) (citation omitted). Here, the Court stated that ZB's allegations against Supply Line were deficient because, as to Count I, ZB did not properly plead the alter ego theory of liability that would permit piercing the corporate veil through Divided Sky to Supply Line. **Exhibit 2 at 11**. Further, Counts V and VII did not properly plead the concert of action theory or that that Supply Line and SLIM were liable for the representations made by their agent. *Id*. at 17-18.

The Court also stated that ZB's allegations of Fraud in Counts V and VII were dismissed against Divided Sky and Kessler because the pleadings collectively name the Kessler Defendants, and therefore lack the required specificity to sustain a fraud claim which must be pleaded with particularity. *Id*. The proposed Second Amended Complaint actively remedies all of these insufficiencies.

First, regarding Supply Line and SLIM, Count I of the proposed Second Amended Complaint pleads that Divided Sky is the mere instrumentality of Supply Line and Divided Sky was used to commit the wrong or fraud resulting in loss to ZB, as discussed. **Exhibit 1 at ¶¶ 103– 111.** By pleading, specifically, how Divided Sky was a mere instrumentality of Supply Line used to commit the wrong or fraud, ZB has remedied the issues for Count I outlined by the Court. **Exhibit 2 at 11.**

For ZB's fraud claims in Counts V and VII as to Supply Line and SLIM, the proposed Second Amended Complaint properly pleads the concert of action theory. The proposed Second Amended Complaint demonstrates how all Defendants acted tortiously pursuant to a common design that caused harm to ZB. Further, it adds a count for Concert of Action and Civil Conspiracy on the same underlying facts. For example, the pleadings state that SLI and SLIM acted in concert

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

with Kessler and Kaplan to further a common purpose. **Exhibit 1 at ¶¶ 134, 160, 171-184.** SLIM was a participant in Divided Sky's business and was responsible for obtaining the COVID-19 test kits from its supply chain connections, benefitting from the false representations. *Id.* at **¶¶ 135, 161, 182.** SLI received the Loan proceeds from ZB and subsequently distributed those proceeds in a manner other than represented to ZB, benefitting from the false representations as well. *Id.* at **¶¶ 136, 162, 183.** Further, and addressing why Supply Line and SLIM are liable for the representations made by their agent, Kaplan, the proposed Second Amended Complaint specifies that the misrepresentations were made, individually and as agents for Divided Sky, Supply, and SLIM, with the intent that ZB rely and ZB did rely upon the false representations in making the Loan. *Id.* at **¶¶ 127, 133, 139, 153, 159, 165, 172, 175, and 178.** Moreover, ZB is seeking to add counts for Civil Conspiracy and for Concert of Action to address these deficiencies, based on the same underlying facts.

Second, the proposed Second Amended Complaint more specifically pleads, in Counts V and VII, which parties are alleged to have made fraudulent statements and/or engaged in fraudulent actions. The amendments state specifically that Kessler and Kaplan made representations that the monies were going to be used to support Divided Sky's supposedly legitimate business selling COVID-19 test kits to Medicare and Medicaid recipients. **Exhibit 1 at ¶¶ 127, 153.** These specific statements included those by Kessler representing that they were going to receive funds from CMS, that focus would be transitioning to Medicaid, and that Medicaid will be largely self-funded because payments from CMS for Medicare billings will have been returned. *Id.* at **¶¶ 128, 154**. Further, Kaplan represented that Medicaid would be the next big focus of the testing program, that the business had been successful providing tests to Medicare recipients, and that the successful business would continue beyond the May 11 date. *Id.* at **¶¶ 129, 155**. Those false statements were

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

made, as discussed, in their individual capacities as well as agents for Divided Sky, Supply Line, and SLIM. *Id.* at ¶¶ **127, 153**.

Accordingly, the factual allegations in the Second Amended Complaint fix the deficiencies that this Court pointed out in its Order, and thus, the Second Amended Complaint is not futile.

**III.    The Court Should Grant ZB Leave to File a New or Supplemental Motion for Summary Disposition on the Re-Pleaded Claims Alone.**

MCR 2.116(B)(2) and 2.116(D)(4) permit summary disposition motions pursuant to MCR 2.116(C)(10) to be filed at any time. In fact, the Rules state that it is "within the trial court's discretion to allow a motion filed under this subsection to be considered if the motion is filed after such period." MCR 2.116(D)(4); see also *Baynesan v Wayne State Univ*, 316 Mich App 643, 651 (2016) ("A trial court has the inherent authority to control its own docket.").

In *Phillips v Dass*, No 267992, 2006 WL 2683393, at *1 (Mich Ct App Sept. 19, 2006) [**Exhibit 4**], the Court of Appeals considered whether a trial court abused its discretion when it granted leave to file a motion for summary disposition after the filing deadline set by the court's scheduling order. In upholding the trial court's ruling, the Court of Appeals held that "MCR 2.401 implicitly permits trial courts to decline to entertain motions beyond the deadlines established in scheduling orders. However, conversely, a trial court also may *accept* motions beyond deadlines established in scheduling orders." *Id.* (citing *Kemerko Clawson LLC v RXIV Inc,* 269 Mich App 347, 349 (2006)). That is because "the decision whether to accept or reject a late filing is within the trial court's discretion." *Id*. Among the factors considered in reaching this decision, the Court of Appeals emphasized that "nothing in the record indicates that defendants intentionally withheld their filing for purposes of delay or to otherwise prejudice plaintiff" and that "plaintiff was on notice from defendants' first responsive pleading that they might take the position that the case was filed outside the applicable limitations period." *Id*.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Should the Court grant ZB leave to file its Second Amended Complaint, ZB also requests that the Court grant ZB leave to file a new motion for summary disposition pursuant to MCR 2.116(C)(10) as to its amendments only. ZB timely filed its Motion on these Counts. While Defendants have argued, in response to its Motion, that the claims are moot, nothing has changed. Defendants just fully briefed their replies and are able to re-submit these replies based on the proposed Second Amended Complaint, which is merely a cosmetic repleading.

While the filing deadline for dispositive motions has passed, this Court has discretion to permit ZB to re-file its motion for summary disposition based on its proposed Second Amended Complaint. Defendants will not be prejudiced by this filing; like in *Phillips*, Defendants are on notice of the grounds for summary disposition ZB will assert, as evidenced by the fact that Defendants have already responded to substantially similar arguments in ZB's recently-filed motion for summary disposition. Further, ZB has not intentionally withheld its motion for summary disposition, as it timely filed its motion for summary disposition prior to the Court's September 23, 2025 Order that necessitated amendment.[4] On the other hand, ZB would be prejudiced if this Court were to deny it leave to file a new motion for summary disposition. ZB has complied with all filing deadlines, but its Motion for Summary Disposition pursuant to MCR 2.116(C)(10) was rendered partially moot by the Court's September 23, 2025 Order that came after its Summary Disposition Motion was filed.

<u>**CONCLUSION**</u>

For the foregoing reasons, ZB requests that this Court grant this Motion pursuant to MCR 2.116(I)(5) and MCR 2.118(A)(2), accept Exhibit 1, ZB's proposed Second Amended Complaint,

---

[4] In fact, ZB did file a timely Motion to extend the Court's Scheduling Orders on December 4, 2024, which was denied, in part, by the Court.

25-04234-tjt    Doc 42    Filed 05/12/26    Entered 05/12/26 15:36:40    Page 102 of 114

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

for filing, and grant it leave to file a new or supplementation motion for summary disposition on the re-pleaded claims.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

/s/ Ethan R. Holtz
Ethan Holtz (P71884)
Emily Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
*Attorneys for Plaintiff*

Dated: October 8, 2025

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit F

ZB VERIFIED INVESTMENTS                    NO. 2024-207081-CB
    Plaintiff,

V                                          HON. MICHAEL WARREN

KESSLER,ADAM,,
    Defendant.

<u>ORDER REGARDING MOTION</u>

**Motion Title**: Plaintiff's Motion for Leave to File Second Amended Complaint Pursuant to MCR 2.116(I)(5) and 2.118(A)(2)

**The above-named motion is:**       **Granted in part, denied in part**

**In addition**: Having reviewed the Motion and Response, and otherwise being fully informed in the premises, the Court dispenses with oral argument as it would not assist in rendering a decision.  MCR 2.119(E)(3).

First, there is clear inexcusable delay in connection with this Motion for the reasons articulated in the Response. The Plaintiff has struggled to articulate even the basic elements of several claims. This is now its third attempt to rectify this situation. Meanwhile, a small forest has been sacrificed to repeated briefing and discovery has long since closed, As such, although the Second Amended Complaint may be filed (for the reasons articulated in the Motion), it is contingent upon the Plaintiff is hereby assessed the additional expense incurred by the Defendants in light of the inexcusable delay, including reasonable attorney fees and costs to be incurred for additional discovery (see below) and rendered moot briefing. MCR 2.118(A)(3). The amount of such additional costs shall be fixed by stipulation or motion. The amount must be determined and paid prior to trial or the Second Amendment Complaint shall be considered rescinded.

Discovery is reopened in connection with all amendments in the Second Amended Complaint ON BEHALF OF THE DEFENDANTS ONLY. SUCH DISCOVERY SHALL BE CONCLUDED NO LATER THAN JANUARY 16, 2026.

FILED   Received for Filing   Oakland County Clerk   10/28/2025 1:28 PM

The Plaintiff's request to file a new (or supplemental) motion for summary disposition is DENIED. It is entirely the Plaintiff's fault that it failed to appropriately plead its Complaint and filed a presumably defective motion/failed to file a timely motion based on the Second Amended Complaint.

Dated: 10/28/2025

/s/ Michael Warren
HON. MICHAEL WARREN
CIRCUIT COURT JUDGE

# Exhibit G

| STATE OF MICHIGAN | **SUBPOENA** | **CASE NUMBER and JUDGE** |
|---|---|---|
| 6th **JUDICIAL DISTRICT** Oakland **JUDICIAL CIRCUIT COUNTY** | **Order to Appear and/or Produce** | 2024-207081-CB Hon. Michael Warren |

**Court address**    1200 N. Telegraph Rd., Pontiac, MI 48341      **Court telephone number**
248-858-0344

Police Report Number (if applicable):

| Plaintiff(s)/Petitioner(s) | | Defendant(s)/Respondent(s) |
|---|---|---|
| ☐ People of the State of Michigan ☑ ZB Verified Investments, LLC | | Adam Kessler, et al |
| ☑ Civil      ☐ Criminal | v | Charge |

In the matter of _____

In the Name of the People of the State of Michigan. TO:
**Joshua Kaplan**

**7412 Carlyle Crossing**

**West Bloomfield, MI 48322**

If you require accommodations to use the court because of a disability, or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

## YOU ARE ORDERED TO:

☑ 1. Appear personally at the time and place stated below: You may be required to appear from time to time and day to day until excused.

☑ The court address above      ☐ Other:

| Day Multiple | Date March 2-3, 2026 and March 5-6, 2026 | Time 8:30 AM each day |
|---|---|---|

☑ 2. Testify at trial / examination / hearing.

☐ 3. ☐ Produce copies* of the following items: (Use additional pages if necessary.) _____

_____

*Note: Requesting party must pay reasonable copying costs, which cannot be waived under MCR 2.002.

☐ Permit inspection or copying of the following items: (Use additional pages if necessary.) _____

_____

☐ 4. Testify as to your assets, and bring with you the items listed in line 3 above.

☐ 5. Testify at deposition.      ☐ The deposition will be visually recorded.

☐ 6. Abide by the attached prohibition against transferring or disposing of property. (MCL 600.6104(2), 600.6116, or 600.6119.)

☐ 7. Other: _____

_____

Approved, SCAO
Form MC 11, Rev. 10/24
MCL 600.1455, MCL 600.1701, MCL 600.6104, MCL 600.6110, MCL 600.6116,
MCL 600.6119, MCR 2.002, MCR 2.105, MCR 2.305, MCR 2.315(C)(1),
MCR 2.506

Distribute form to:
Return      Defendant(s)/Respondent(s)
Witness
File
Plaintiff(s)/Petitioner(s)      SRA

Page 1 of 2    25-04234-tjt    Doc 42    Filed 05/12/26    Entered 05/12/26 15:36:40    Page 108 of 114

☑ 8.

| Person requesting subpoena | Telephone number |
|---|---|
| Eli I. Ravid | 248.351.3000 |
| Address 27777 Franklin Road, Suite 2500 | |

| City | State | Zip |
|---|---|---|
| Southfield | MI | **48034** |



**NOTE:** If requesting a debtor's examination under MCL 600.6110, or an injunction under item 6, this subpoena must be issued by a judge. For a debtor examination, the affidavit of debtor examination below must also be completed. Debtor's assets can also be discovered through MCR 2.305 without the need for an affidavit of debtor examination or issuance of this subpoena by a judge.

**FAILURE TO OBEY THE COMMANDS OF THE SUBPOENA OR TO APPEAR AT THE STATED TIME AND PLACE MAY SUBJECT YOU TO PENALTY FOR CONTEMPT OF COURT.**

| Court use only |
|---|
| ☐ Served   ☐ Not served |

/s/ Eli Ravid 2/23/2026

_____
Judge/Clerk/Attorney signature and date

---

### AFFIDAVIT FOR JUDGMENT DEBTOR EXAMINATION

I request that the court issue a subpoena that orders the party named on this form to be examined under oath before a

judge concerning the money or property of_____

for the following reasons:_____


_____
Signature

Subscribed and sworn to before me on _____ .
                                          Date

_____
Deputy clerk/Notary public signature

My commission expires on _____ .

_____
Name (type or print)

Notary public, State of Michigan, County of_____ . ☐ Acting in the County of _____ .
☐ This notarial act was performed using an electronic notarization system or a remote electronic notarization platform.

## PROOF OF SERVICE

**TO PROCESS SERVER:** You must serve the subpoena and file proof of service with the court clerk. If you are unable to complete service, you must return this original and all copies to the court clerk.

### CERTIFICATE OF SERVICE / NONSERVICE

☐ I served   ☐ personally   ☐ by registered or certified mail, return receipt requested, and delivery restricted to the  addressee  (copy of return receipt attached)    a copy of the subpoena, together with any required fees and the attachments listed below, on:

☐ I have attempted to serve a copy of the subpoena, together with any required fees and the attachments listed below, and have been unable to complete service on:

| Name | Date and time of service |
|---|---|
| Place or address of service | |
| Attachments (if any) | |

I declare under the penalties of perjury that this certificate of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | |
|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | **TOTAL FEE** $ |

Signature

Name (type or print)

### ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of a copy of the subpoena, together with any required fees and

_____ on _____ .
Attachments (if any)             Date and time

_____ on behalf of _____
Signature

_____
Name (type or print)

MCR 2.105, MCR 2.107, MCR 2.305(A), MCR 2.506(G)

# Exhibit H

ZB VERIFIED INVESTMENTS                      NO. 2024-207081-CB
    Plaintiff,

V                                         HON. MICHAEL WARREN

KESSLER,ADAM,,
    Defendant.

## ORDER REGARDING MOTION

**Motion Title**: Motion for Order of Administrative Closing due to Bankruptcy Stay, or Alternatively, for Entry of Final Judgment, and for Injunctive Relief

**The above-named motion is:**         **Denied**

**In addition**: Having reviewed the Motion and Response, and otherwise being fully informed in the premises, the Court dispenses with oral argument as it would not assist in rendering a decision. MCR 2.119(E)(3).

OVERVIEW & ARGUMENTS

On April 28, 2026, the Court issued Findings of Fact and Conclusions of Law & Judgment as to all Defendants other than Joshua Kaplan (the "Kessler Defendants"). The April 28, 2026 Judgement is not "final" because it did not adjudicate the claims against Kaplan due to his bankruptcy.

The Plaintiff argues it should not have to wait until Kaplan's bankruptcy (filed on 8/22/25, Notice provided on 8/25/25) is resolved to begin collecting on its judgment.

Accordingly, the Plaintiff moves for entry of an order for administrative closing due to bankruptcy stay as to Kaplan to protect Kaplan's interests and allow the Plaintiff to proceed forward on the April 28, 2026 Judgment.

The Plaintiff alternatively moves the Court to deem the April 28, 2026 Judgment "final" pursuant to MCR 2.604. MCR 2.604 provides as follows:

FILED   Received for Filing   Oakland County Clerk   5/12/2026 1:53 PM

Rule 2.604 Judgment in Actions Involving Multiple Claims or Multiple Parties

(A) Except as provided in subrule (B), an order or other form of decision adjudicating fewer than all the claims, or the rights and liabilities of fewer than all the parties, does not terminate the action as to any of the claims or parties, and the order is subject to revision before entry of final judgment adjudicating all the claims and the rights and liabilities of all the parties. Such an order or other form of decision is not appealable as of right before entry of final judgment. A party may file an application for leave to appeal from such an order.

(B) In receivership and similar actions, the court may direct that an order entered before adjudication of all of the claims and rights and liabilities of all the parties constitutes a final order on an express determination that there is no just reason for delay.

Finally, citing MCR 2.614(A), the Plaintiff moves for injunctive relief enjoying the Kessler Defendants from transferring or disposing of property that could satisfy the judgment before a final judgment is entered due to the Kessler Defendants' bad conduct and concerns they may conceal assets and frustrate collection on the judgment.

MCR 2.614(A) provides that "execution may not issue on a judgment proceedings may not be taken for its enforcement until 21 days after a final judgment (as defined in MCR 7.202[6]) is entered in the case. . . . Nothing in this rule prohibits the court from enjoining the transfer or disposition of property during the 21-day period."

The Response argues that an administrative stay is inappropriate because Kaplan has been discharged under the bankruptcy case (on May 4, 2026, a few days before the instant Motion was filed). The Defendants also argue that this is not an action subject to MCR 2.604(C), and that the Plaintiff has failed to cite appropriate authority or meet its burden for injunctive relief.

ANALYSIS

In light of the discharge of Kaplan in the bankruptcy case, an administrative stay is inappropriate. The issue is now moot.

With regard to entering a final Judgment, MCR 2.604(B) is inapplicable. This is a case involving breach of contract, fraud, and related claims. It is clearly not a "receivership or similar action."

With regard to the request for injunctive relief, by its terms, MCR 2.614(A) cannot be the basis for injunctive relief. The rule only applies when a final judgment has been entered. The gravamen of this Motion is to fill the gap between now and when a final judgment is entered in this case.

Dated: 5/12/2026          /s/ Michael Warren

HON. MICHAEL WARREN
CIRCUIT COURT JUDGE