# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Joshua Adam Kaplan

     Debtor.

_____/

ZB Verified Investments LLC,

     Plaintiff,

v.

Joshua Kaplan,

     Defendants.

_____/

Chapter 7
Case No. 25-48523-tjt

Hon. Thomas J. Tucker

Adv. P. Case No. 25-4234

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Defendant's Motion for Summary Judgment (the "Motion") incredibly tells this Court to ignore the facts and findings established over the course of a multi-year litigation in State Court, to ignore the State Court's judgment which found that Defendant made various false representations and participated in defrauding Plaintiff, and instead, to find that there is no genuine issue of material fact that the opposite is established – that this case is about a "dispute over timing and a third-party's nonpayment – not fraud." Motion at 1. But that is not what the State Court

1

determined after reviewing the evidence and hearing Defendant and his co-conspirators testify, and that is not what this Court should determine either.

Ultimately, Defendant is only correct about one thing – there are no genuine issues of material fact requiring a trial because the facts and evidence make Defendant's fraudulent scheme clear and do not support any finding of dismissal or dischargeability for Defendant. As the State Court found, Defendant "has been caught perpetuating a fraudulent scheme and was attempting to evade responsibility for the same." Findings of Fact, attached to Plaintiff's Amended Motion for Summary Judgment [ECF No.44] as Tab 1 ("FOF"), at 5. In light of that finding and the evidence, Defendant should not be granted summary judgment.

Indeed, the uncontested facts establish non-dischargeability. Defendant and Kessler,[1] acting on behalf of the entity State Court defendants, convinced ZB to make a loan of $4,850,000 to DSLLC through various communications, which contained known lies at the time they were made "intended to induce ZB into entering the loan transaction." FOF at 8. After the loan was funded, Defendant and Kessler consistently told ZB's representatives that all was going to plan and that the scheme was collecting millions of dollars from both the Medicare program and the nonexistent Medicaid Program, despite that being a lie. FOF at 13. Neither

---

[1] Defined terms shall have the meaning ascribed to them in Plaintiff's Amended Motion for Summary Judgment [ECF No.44].

2

Defendant nor Kessler disclosed the existence of a Notice of Suspension of Part B Medicare Payments regarding the program based on "credible allegations of fraud," after which all Care Program payments had been frozen, with the goal of preventing Plaintiff from exercising its option to accelerate repayment. *Id.* at 13-14. And as of the Maturity Date of the Note, Defendant's company failed to pay the principal amount plus accrued interest, in part because Defendant and his co-conspirators misappropriated the loan funds. FOF at 16.

Defendant's own statements and documents, and the State Court's final judgment made after a full bench trial and based on clear and convincing evidence, conclusively establish each element of nondischargeability under 11 U.S.C. §§ 523(a)(2)(A) and (B), 523(a)(4), and 523(a)(6) for which the lesser standard of proof of preponderance of the evidence applies. Defendant's Motion should not be granted because ZB is entitled to a nondischargeable judgment as a matter of law.

## COUNTER-STATEMENT OF FACTS

### I.     Defendant Misrepresents the Existence of the Medicaid Program.

Defendant claims that he did not represent that the loan would fund a Medicaid program and that the program in-fact existed. Motion at 3. That the State Court judgment found that "ZB was fraudulently induced to enter into the transaction when the Defendants misrepresented that the loan was being used to finance a Medicaid Program that was never intended to exist" [FOF at 3], and that "Kessler

3

and Kaplan lied and told potential lenders that a parallel Medicaid COVID-19 OTC test kits program [] would be implemented" [FOF at 7] is apparently not pertinent. But Defendant's claims that the "Medicaid program was real, and ZB knew before funding that the loan proceeds were for the Medicare program" are completely untrue and unsupported by the evidence. Motion at 3.

First, Defendant claims that ZB was told the loan funded Medicare, with Medicaid as a later, self-funded phase, and therefore, there were no misrepresentations to that effect. Motion at 3. Somehow, Defendant spins this to mean that ZB did not think it was funding a Medicaid program and was thus not defrauded. *Id.* at 4. This misconstrues the facts and ZB's testimony.

While the initial funding was represented as being for Medicare, ZB was explicitly told a portion of the funds would be for Medicaid as well. Motion at 3. As Defendant notes, ZB was told that the later Medicaid phase would be "largely self-funded," but not entirely self-funded as Defendant appears to represent. *Id.* And as Defendant testified, he represented that "[…] Medicare was so successful that the direction was that we would move to Medicaid after that date just from a logic perspective, the iron was hot, so to speak, with Medicare and it had meaningful traction, so Medicaid would be focused on as Medicare was wound down, so to speak." Tab 1 at 39:4-16.

4

The offering materials co-authored by Defendant prove the opposite as well. Kaplan, along with his co-conspirators Kessler and Ahmad told ZB's principals that the program would be used to create a "direct consumer program paid for by government" and that Defendant's business had been "garnering subscriptions from both Medicare and Medicaid and patients throughout the country since early in 2023." Defendant's Exhibit U to Motion; Tab 2 at 90:3-5 ("[T]his was sent from myself, Adam, and Sami"). And on April 18, 2023, Kaplan's co-conspirator Kessler sent ZB's principals a "[Verified Health] 12-month Medicaid Forecast" in which Plaintiff was told that it was expected Medicaid would do "equally well, if not better, than Medicare" and that he was requesting ZB "let me know as soon as you are ready to commit funds[.]" Tab 3. That is, the offering materials authored by Defendant demonstrate that Defendant and his co-conspirators wanted ZB to invest in the Medicare and Medicaid opportunity because funds would be used for both programs. See *Id*. ("But If this is something you are interested in finalizing it would be helpful to know sooner than later for our planning."). It is not accurate to say that Plaintiff believed funds would be used solely for the Medicare program.

Defendant's representations were also revealed to have been knowing lies: the truth was that there was no Medicaid Program, no intention to create one, and Verified Health had not been tasked with serving Medicaid patients. FOF at 7. The unrefuted evidence shows that Defendant falsely misrepresented that Medicaid

reimbursements were an existing revenue source of the business. See, e.g., Defendant's Exhibit U to Motion ("Orchard Laboratories using Verified Health's customer relationship manager platform has been garnering subscriptions from both Medicare and Medicaid and patients throughout the country since early in 2023."). Defendant, therefore, fails to establish that there is no genuine issue as to fact that he fraudulently represented that the funding would be used in part for Medicaid.

Second, Defendant's representations regarding the post-loan Medicaid programs similarly fail. Defendant claims that he spent approximately $1.7 million on the program, yet has no evidence to show that any test kits were ever shipped beyond his own testimony. See, e.g., Motion at 6 (The only support that "over 80,000 test kits were physically shipped to Medicaid beneficiaries" is that Defendant testified as such). This alone does not establish a lack of issue of material fact, and the remainder of Defendant's purported evidence is similarly conclusory.

Instead, and based on the same evidence that Defendant now provides, the State Court found that "Orchard never sold a single COVID-19 OTC under the [Medicaid] Program. Orchard never billed Medicaid. No Aid Program was ever started." FOF at 16. Defendant knew this to be true when making those statements – "[a]ll of the foregoing lies were made by Kaplan and Kessler with each other's knowledge … knowing that they were lies, with the intention of inducing ZB into loaning the money and not asking to be repaid the principal until the maturity date

6

of the loan." FOF at 16. And any claim by Defendant that ZB had different knowledge of the facts is refuted – "ZB in fact reasonably relied upon those lies when lending the money and not exercising its rights under the loan documents to ask for repayment of the principal until the maturity date." *Id*.

**II.     Defendant's Claims Regarding the Orchard-Divided Sky Relationship are Directly Contradicted by the Unrefuted Evidence.**

Defendant claims that Divided Sky and Orchard entered into an agreement, allegedly evidenced by twenty-million dollars being paid by Orchard to Divided Sky. Motion at 8.[2] However, and regardless of whether there was a vague unsigned agreement, the key substantive term missing was the lack of an agreement to pay profits. *Id*. at 8-9. Therefore, and again, Defendant's claims go directly counter to the unrefuted evidence and the State Court's findings of fact – they do not establish a lack of genuine issues as to any material fact in dispute in Defendant's favor.

As the State Court found, "Divided Sky and Orchard never actually entered into an agreement about how Divided Sky was going to be paid for services." FOF at 16. "Divided Sky was likely unable to obtain a profit for any services it provided. As such, there was no way to repay ZB once the other investors in the scheme had

---

[2] Exhibit U, which Defendant claims is the unsigned agreement memorialized in writing, is merely a copy of the offering materials provided to potential investors.

been paid back." *Id*. Defendant's conclusory claims regarding the reimbursement of expenses is thus irrelevant to the operative issue of repayment of ZB's loan.[3]

Moreover, for Defendant to call baseless the claims that "Defendant or Divided Sky misappropriated $6,000,000" is also conclusory and unsupported by the evidence. The records demonstrate that the program money, as shown by Supply Line's banking records, was used to pay for ███████████████████████ ███████████████████████████████████████ ███████████████ **Tabs 5 & 6 (filed under seal)**. Based, in part, on this evidence, the State Court found that "Kessler, Kaplan, and their affiliated companies pocketed at least $6,000,000 with no accountability about how the funds were used." FOF at 17. Again, Defendant wants to hand-wave away the clear findings of fact by the State Court supported by evidence and testimony. But merely stating something as fact does not make it so, and it especially does not establish a lack of issue of material fact in Defendant's favor.

---

[3] Defendant's statement of facts on this issue – that the default occurred only because Orchard stopped the program, failed to submit additional billings to CMS, and refused to pay Divided Sky [Motion at 9] – is also misleading and incomplete. Defendant completely excludes any reference to the fact that just about 45 days after ZB made the Loan and two weeks before this July 5 memo, the Centers for Medicare & Medicaid Services ("CMS"), issued a Notice of Suspension of Part B Medicare Payments to Orchard, whereby ██████████████████████████ ██████████████████████████ **Tab 4 (filed under seal)**.

I.  **Defendant's Debt to ZB Is Nondischargeable Under 11 U.S.C. § 523(a)(2).**

    a.  **Defendant's pre-loan statements were false and induced Plaintiff to make the loan.**

Defendant claims that 523(a)(2) is inapplicable because certain of the statements were made by his co-conspirators, that the Medicaid-related statements were forward-looking, and Defendant did not knowingly make any false statement of existing fact. Motion at 17. Each of those statements are incorrect and unsupported by the evidence.

First, Defendant claims that any statement made by Orchard, Divided Sky, and/or SLI were not made by him and therefore cannot stand as the basis for any nondischargeability. Motion at 17. That completely ignores that Defendant is the co-founder of SLI and SLIM, an owner of Verified Health, and a Member of Divided Sky, and therefore, statements made by those companies were made on his behalf. See, e.g., F.R.E. 801(d)(2) (defining as not hearsay statements made by a party's agent or by a party's coconspirator). As the State Court found, "Kaplan and Kessler treated each other and their affiliated entities as one blob entity. They did not maintain corporate formalities and played loose and fast with finances and company governance." FOF at 17. Indeed, and "in light of the lack of corporate formalities, Kessler and Kaplan, along with their corporate affiliates, simply sloshed around and

9

acted in any manner necessary to effectuate the scheme. As such, they consistently presented themselves as agents for each other." *Id*. at 18. Defendant's claim that if he did not literally make a statement then it cannot be imputed to him is disingenuous and untrue.

Second, Defendant's claims that forward looking statement cannot constitute fraud is an incomplete and incorrect proposition of law. Motion at 15. As the very case Defendant cites – *Tocco v. Richman Greer Professional Ass'n*, 912 F. Supp 2.d 494, 516-517 – provides:

> As to statements about future events, the Michigan courts have recognized that an unfulfilled promise to perform in the future is actionable when there is evidence that it was made with a present undisclosed intent not to perform.

Moreover,

> [T]he mere fact that statements relate to the future will not preclude liability for fraud if the statements were intended to be, and were accepted as, representations of fact and involved matters peculiarly within the knowledge of the speaker. A related doctrine, the so-called 'false token' exception to the general rule has also been recognized. This exception pertains where, although no proof of the promisor's intent exists, the facts of the case compel the inference that the promise was but a devise to perpetrate a fraud. *Id*. (internal quotation marks and citations omitted).

Defendant caused materially false written statements to be made and published – including the Offer Letter, the July 5, 2023 memorandum, and the Project Income Statement – all of which contained material misrepresentations regarding the existence and profitability of the Medicaid Program, the revenue generated by the

10

scheme, and the financial condition and prospects of DSLLC. All of these representations were false and known by the Defendant to be false when made, as found by the State Court. FOF at 16. Defendant's proposition is therefore incorrect; Defendant's false statements related to future events that Defendant knew were not going to transpire at the time the false statements were made, and thus are actionable. Defendant cannot just plead that his false statements related to future events and avoid all liability for his statements.

Finally, Defendant cannot establish that he did not knowingly make any false statement of existing fact. Motion at 17. As the State Court found, "[a]ll of the foregoing lies were made by Kaplan and Kessler with each other's knowledge … knowing that they were lies, with the intention of inducing ZB into loaning the money and not asking to be repaid the principal until the maturity date of the loan." FOF at 16. There certainly is a genuine issue of material fact, at the minimum, as to Defendant's knowledge.

Despite what Defendant claims, summary judgment should not be granted in his favor. On the contrary, the evidence, Defendant's own statements, and the State Court's findings conclusively establish each element of Section 523(a)(2). Defendant caused materially false written statements to be made and published, including the Offer Letter, the July 5, 2023 memorandum, and the Project Income Statement, all of which contained material misrepresentations. FOF at 7-9;

11

Defendant's Exhibits U, QQ, RR to Motion. These written statements concerned the financial condition of DSLLC, an insider entity of which Defendant was co-manager, and its purported Medicaid business. *Id*. ZB "in fact reasonably relied upon those lies when lending the money and not exercising its rights under the loan documents to ask for repayment of the principal until the maturity date." FOF at 16. And the lies were made "with the intention of inducing ZB into loaning the money and not asking to be repaid." *Id*. at 16. Defendant was "caught perpetuating a fraudulent scheme" and should not be permitted to discharge is debt to Plaintiff. *Id*. at 5. Because each element of 523(a)(2) is conclusively established, summary judgment in favor of Plaintiff is warranted.

**b. Defendant's post-loan statements induced Plaintiff to forbear from collection, which constitutes an extension under § 523(a)(2).**

Defendant admits that a fraudulently induced forbearance can constitute an "extension, renewal, or refinancing of credit" under § 523(a)(2) sufficient to permit non-dischargeability. Motion at 25. However, Defendant claims that an extension of credit requires an enforceable forbearance arrangement. *Id*. at 26. In support of this claim, Defendant cites a case from the Bankruptcy Court in Pennsylvania, and claims that the Sixth Circuit has never extended the section to mere unilateral forbearance. *Id*. This is untrue.

In *In re Plechaty*, 213 B.R. 119, 124 (B.A.P. 6th Cir. 1997), the Sixth Circuit expressly found that "[i]t would be contrary to logic, and to the plain meaning of the

words in the statute, to require a creditor to make a formal demand and then issue a formal delay for a particular period of time to prove it extended the payment period of a demand note." In the case, the debtor submitted a materially false written personal financial statement that induced the bank to delay demanding payment on a demand note and to continue a workout rather than immediately collect. The Court held that finding the

> "delay in requiring immediate payment to be within the meaning of *extension* under § 523(a)(2) is consistent with a statutory section directed to those debtor/creditor relationships in which a deceitful debtor has taken an active role in initially or subsequently obtaining value from a creditor as a result of a writing that satisfies the specific elements of § 523(a)(2)(B)."

*Id*. at 125. Therefore, a contractual commitment to forbear collection wasn't required – the "indulgence by a creditor giving his debtor further time to pay an existing debt" is sufficient to constitute an extension under § 523(a)(2). *Id*. at 125-126.

Like the lender in *Plechaty*, ZB did not exercise its option to accelerate repayment due to false statements by Defendant made to induce such forbearance – "ZB was confident based on information provided to it by Kessler and Kaplan that its investment was safe and working better than planned." FOF at 15. For example, Defendant and Kessler made false representations regarding the purported success of the program after the loan was made, including the Medicaid portion:

> Due to the increased risk resulting from multiple payers, Orchard has started the Medicaid Program with a slow ramp. The first two months of the program have been spent testing various insurers state-by-state,

13

> to ensure payment runs smoothly. To date, payment in full has been received on the billings for Michigan. Payments for the other states is expected in the next few weeks.

Defendant's Exhibit QQ to Motion. And this was a knowing lie when made – two weeks before this communication, CoventBridge Group, on behalf of the Centers for Medicare & Medicaid Services ("CMS"), issued a Notice of Suspension of Part B Medicare Payments to Orchard, ████████████████████ ████████████████████████████████████████ ████████████████████████ **Tab 4 (filed under seal)**. Defendant mislead Plaintiff into thinking that there were no issues and payments were expected from other states, despite knowing that to be false.

ZB did not exercise its option to accelerate repayment due to these false statements. Defendant claims that they were not relied upon because "when Berger was informed of the CMS inquiry, he did not tell his investors nor contact Orchard, because he did not think it was material." Motion at 21. But Defendant misleads the Court as to the reasoning why ZB's principal felt this was immaterial – ZB did not think it was material "[b]ecause … [w]e were consistently told that this was a routine investigation without materiality." **Tab 7 at 14:22-25**. Again, Defendant and his co-conspirator made these lies "knowing that they were lies, with the intention inducing ZB into … not asking to be repaid the principal until the maturity date of the loan."

14

FOF at 16. And "ZB in fact reasonably relied upon those lies when … not exercising its right under the loan documents" to ask for repayment. *Id.*

Defendant is incorrect about the unrefuted evidence and the law. Plaintiff relied on Defendant's fraudulent post-loan statements to forbear from collection of Defendant's debt. Defendant cannot escape liability for these actions.

**II.      Defendant's Debt to ZB Is Nondischargeable Under 11 U.S.C. § 523(a)(4).**

Defendant claims that Section 523(a)(4) is inapplicable because Kaplan allegedly did not appropriate ZB's property to his own use, rather, ZB lent money to Divided Sky. Motion at 28-29. Again, though, Defendant's attempts to distinguish himself from his co-conspirators is unavailing.

Defendant claims that ZB did not entrust its property to him, and that it was not appropriated for a use other than that for which it was entrusted. Motion at 28. But that simply is unsupported by the facts. As the State Court found, Defendant and his co-conspirators "stole Verified Investors' funds via false pretenses for their own uses" and that their conduct "squarely falls within the crime of false pretenses as defined by MCL 750.218." FOF at 47. And the State Court further found that "ZB's funds were not used for the purpose of funding the scheme. They were used for the Defendants' own purposes rather than those designated in the Offer Letter." *Id.* at 17. These findings squarely rebut Defendant's conclusory claims and defeats his Motion - at the very least, there is a question of fact on this point.

15

Under Michigan law, obtaining property by false pretenses – as codified in MCL 750.218 – is a species of larceny. *People v. Reigle*, 223 Mich. App. 34, 39-40 (1997). The State Court's express finding that Defendant's conduct "squarely falls within the crime of false pretenses as defined by MCL 750.218" thus establishes the larceny element of § 523(a)(4) as a matter of law and conclusively establish that Defendant obtained ZB's funds through false pretenses and converted them to his own use, rendering the debt nondischargeable under Section 523(a)(4) of the Bankruptcy Code.

### III. Defendant's Debt to ZB Is Nondischargeable Under 11 U.S.C. § 523(a)(6).

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." This provision requires a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); see also *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999). To establish willful injury, Plaintiff must prove the Debtor acted (a) with the intent to cause injury or (b) with the belief that injury was substantially certain to result. *Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 583 (6th Cir. 2001). To establish malice, Plaintiff must prove the Debtor's actions were taken (a) in conscious disregard of one's duties or (b) without just cause or excuse. *Initial*

*Invs., Inc. v. Woodford (In re Woodford)*, 560 B.R. 710, 721 (Bankr. E.D. Mich. 2016).

Defendant claims that Section 523(a)(6) of the Bankruptcy Code is inapplicable because the "record shows a legitimate program that Kaplan helped operate, funds deployed for their disclosed purpose, and a collapse precipitated by a government inquiry and Orchard's subsequent refusal to pay, followed by Orchard's continued delays to arbitrate – not by any intentional, wrongful act of Kaplan." Motion at 29. That revisionist history is completely unsupported by the evidence.

The State Court found that Defendant knowingly made false representations [FOF at 7-8], knowingly concealed the CMS investigation [*Id*. at 14-16], knowingly participated in diverting ZB's loan proceeds to unauthorized purposes [*Id*. at 17], and acted in concert with Kessler and the entity Defendants to perpetuate a fraudulent scheme, all with the knowledge that injury to ZB was substantially certain to result [*Id*. at 17-18]. The State Court characterized the scheme as "pervasive" and "dishonest" and found that Defendant was "caught perpetuating a fraudulent scheme." *Id.* at 5.

At the very minimum, these findings establish that there is a genuine issue of material fact as to whether Defendant's conduct was both willful and malicious, rendering the debt nondischargeable under Section 523(a)(6).

17

# CONCLUSION

For the foregoing reasons, ZB respectfully requests that the Court deny

Defendant's Motion for Summary Judgment in its entirety.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

/s/ Kimberly Ross Clayson
Kimberly Ross Clayson(P69804)
Ethan R. Holtz (P71884)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
kclayson@taftlaw.com
eholtz@taftlaw.com
Dated: July 17, 2026 *Counsel for ZB Verified Investments, LLC*

# Tab 1

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

ZB VERIFIED INVESTMENTS LLC,

        Plaintiff,               Case No. 24-207081-CB

vs.                         Hon. Michael Warren

ADAM KESSLER; JOSHUA KAPLAN;

SAMI AHMAD; DIVIDED SKY, LLC,

SUPPLY LINE INTERNATIONAL, LLC,

SUPPLY LINE INTERNATIONAL MEDICAL,

LLC, JOHN DOES 1-10,

        Defendants.


CONFIDENTIAL VIDEOTAPED DEPOSITION


DEPONENT:     JOSHUA KAPLAN,

DATE:         Tuesday, April 15, 2025

TIME:         10:01 a.m.

LOCATION:     Miller Canfield

              101 N. Main Street, Suite 700

              Ann Arbor, Michigan

REPORTER:     Elizabeth G. LaBarge, CSR-4467

VIDEOGRAPHER: Bailey Wellman

JOB NO:       39748

APPEARANCES:

        TAFT, STETTINIUS & HOLLISTER LLP
        By:  Emily M. Mayer, Esq.
             Ethan R. Holtz, Esq., via Zoom
        27777 Franklin Road, Suite 2500
        Southfield, Michigan  48034
        (248) 351-3000
        emayer@taftlaw.com
        eholtz@taftlaw.com

             Appearing on behalf of the Plaintiff.


        MILLER, CANFIELD, PADDOCK AND STONE, PLC
        By:  Kimberly L. Scott, Esq.
             Sarah C. Reasoner, Esq., via Zoom
        101 N. Main Street, Suite 700
        Ann Arbor, Michigan  48104
        (734) 668-7696
        scott@millercanfield.com
        reasoner@millercanfield.com

             Appearing on behalf of Defendants Kessler,
             Kaplan, Divided Sky, LLC, and Supply Line
             International, LLC


        TROUTMAN PEPPER HAMILTON SANDERS LLP
        By:  Callan G. Stein, Esq. (Admitted PHV)
        4000 Town Center, Suite 1800
        Southfield, Michigan  48075
        (248) 359-7300
        callan.stein@troutman.com

             Appearing on behalf of Defendant Sami Ahmad.


        Also Present:   Sami Ahmad
                        Serene C. Katranji, Esq.
                        Adam Kessler, via Zoom
                        Ari B. Berris, Esq., via Zoom

A    Same school.

Q    And do you know Mr. Garrett Lang?

A    I do.

Q    How do you know Mr. Lang?

A    Through Justin Shane.

Q    Okay.  All right.  So you mentioned an entity called Divided Sky, correct?

A    Yes.

Q    Will you explain for me what Divided Sky does, please?

A    Divided Sky was formed specifically for this program that we're here to talk about today, and it's essentially a management company that assembles services for Orchard Laboratories.

Q    Okay.  And what is your title with respect to Divided Sky?

A    The manager.

Q    And when you said -- I think you said when you were explaining the business of Divided Sky, you said it relates to this dispute that we're here for today, and that is, very broadly speaking --

        MS. SCOTT:  When you have a moment, we've got people joining the deposition.

        MS. MAYER:  Oh, sure.

        MS. SCOTT:  And then, Cal, if you could put their names on the record, that would be appreciated.

occurring in the market.

Q    And what did you tell them about it?

A    The overview of what the program was and what was
going on, essentially, and that we were excited about
the opportunity.

Q    Okay.  Can you tell me what the overview you gave them
was, please?

A    I don't know what came from me or Adam and what was
part of an intro verse answering questions, but I can
tell you that the general information that was
gained from the conversation or -- let me rephrase
that -- the information that was offered in the
conversation was the existence of a COVID-19 program,
that Orchard had hired Divided Sky, and Divided Sky
was providing services and goods via third parties to
provide COVID-19 testing to individual beneficiaries
who have a need or want for the testing.

Q    And did you ask Mr. Zimmerman or Mr. Berger to loan
money to Divided Sky during that initial meeting?

A    At some point in the meeting, the opportunity of
lending money absolutely came up.  That was, in my
belief, the purpose of the meeting.  But I believe it
ended more open-ended than that, with them finding
what they wanted their involvement to be.

Q    I don't think I understood that statement, them

don't exactly know, but yes, after April 17th.

BY MS. MAYER:

Q    Okay.  And can you generally tell me about what you discussed with respect to Medicaid coverage?

A    Yes, that -- this email, essentially, and how we would look to provide testing to Medicaid recipients with -- you know, through Orchard through the Verified Health platform.

Q    Okay.  Okay.  And what was the significance of the May 11th, 2023 date with respect to Medicaid?

A    There wasn't with respect to Medicaid.

Q    Okay.  Was there with respect to Medicare?

A    Yes.

Q    Could you please explain that?

A    The program that was introduced by the Government related to Medicare patients would end on May 11th in its then form, we'll call it, and that coverage would change for Americans on how they access COVID testings if they're a Medicare recipient.

Q    Okay.  Did you expect that to have any impact on Divided Sky's business?

A    We expected Divided Sky's business to continue, with Medicaid at that time being the focus.

Q    Okay.  So just to make sure I'm understanding this correctly, on May 11th, Medicare coverage for COVID

that we didn't have the money, the lower the

expectation should be of how we can perform.

BY MS. MAYER:

Q    Okay.  So if I'm understanding what you just told me,

and please tell me if this is incorrect, you had seen

success with the Medicare program, you expected that

success to continue under Medicaid, but it just wasn't

tested yet, is that correct?

          MS. SCOTT:  Object to form.

A    It was not tested to the same degree as Medicare, and

Medicare was so successful that the direction was that

we would move to Medicaid after that date just from a

logic perspective, the iron was hot, so to speak, with

Medicare and it had meaningful traction, so Medicaid

would be focused on as Medicare was wound down, so to

speak.

BY MS. MAYER:

Q    Had prior to May 11th, 2023, had Divided Sky or

Orchard, to your knowledge, provided any tests through

Medicaid?

          MS. SCOTT:  Objection to form.

A    I missed you halfway through, I'm sorry.  Can you

repeat it?

BY MS. MAYER:

Q    Prior to May 11th, 2023, had Divided Sky billed

A    Yes.

Q    Do you know if he made any revisions to the draft
     provided by Mr. Salesin?

A    I do not know the back-and-forth between the two.

Q    Okay.  And did you agree to this interest rate -- let
     me find it, please.

            The first paragraph, I believe, identifies
     an interest rate of 20 percent; is that correct?

            MS. SCOTT:  Object to form.

A    The first paragraph identifies a 20 percent per annum
     rate, yeah.

BY MS. MAYER:

Q    Okay.  And Divided Sky agreed to that interest rate,
     correct?

A    I later learned that the interest rate may be
     different than what's in the note, but at the time the
     note was signed, yes.

Q    Did ZB fund this full 4.85 million?

A    This was funded -- we received a wire from Berger
     Realty.

Q    Okay.  And for the full 4.85 million?

A    I believe it came in, if I recall properly, two
     separate wire transfers.

Q    Was the total amount of the wires 4.85 million?

A    I believe so.

# Tab 2

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

ZB VERIFIED INVESTMENTS LLC,

   Plaintiff,      Case No. 24-207081-CB

vs.             Hon. Michael Warren

ADAM KESSLER; JOSHUA KAPLAN;

SAMI AHMAD; DIVIDED SKY, LLC,

SUPPLY LINE INTERNATIONAL, LLC,

SUPPLY LINE INTERNATIONAL MEDICAL,

LLC, JOHN DOES 1-10,

   Defendants.

CONFIDENTIAL VIDEOTAPED DEPOSITION

DEPONENT: JOSHUA KAPLAN, as Corporate Representative of:
     DIVIDED SKY, LLC; VERIFIED HEALTH;
     SUPPLY LINE INTERNATIONAL, LLC; and
     SUPPLY LINE INTERNATIONAL MEDICAL, LLC

DATE:  Wednesday, April 16, 2025

TIME:  10:03 a.m.

LOCATION: Miller Canfield

     101 N. Main Street, Suite 700

     Ann Arbor, Michigan

REPORTER: Elizabeth G. LaBarge, CSR-4467

JOB NO:  39749

A     I believe I have.

Q     Do you know who drafted this?

A     I believe this was -- I don't know who'd be

consider -- who would be considered the drafter, but

this was sent from myself, Adam, and Sami.

Q     Did you have any involvement in the drafting of this

document?

A     I believe I did.

Q     Okay.  Did Mr. Kessler?

A     I believe he did.

Q     And did Mr. Ahmad?

A     Mr.  Ahmad was given an opportunity to edit, and I

don't recall whether he did or not.

Q     Do you recall when this was drafted?

A     A specific date, no, I don't recall.

Q     Was it drafted for the purpose of sending it to ZB?

A     I don't know if it was specifically for the purpose of

ZB.  I believe it was intended to send to ZB, though,

yes.

Q     Was this shared with any other lenders?

A     I don't recall, it very well may have.

Q     Was this reviewed by legal counsel before it was sent

out?

A     I believe it was.

Q     Who was the counsel who review -- who you believe

reviewed it?

A    It would have been Ari Berris.

Q    Okay.  And then the first page of this reflects that
it was sent to Jason Zimmerman and Mr. Berger on
April 25th, 2023; is that correct?

A    Yes, that's what it says.

Q    Okay.  The paragraph beginning with "Orchard
Laboratories using Verified Health's," so it's the
second from the bottom.

A    Okay.

Q    It states, "Orchard Laboratories using Verified
Health's customer relationship manager platform has
been garnering subscriptions for both Medicare and
Medicaid and patients throughout the country since
early in 2023."

     Is that an accurate statement?

A    I believe it is.

Q    Okay.  It also states elsewhere that the venture had
generated more than 150,000 subscriptions.

     Was that an accurate statement?

A    I believe it is.

Q    Do you know how many it had generated to that point?

A    I don't know what date this was drafted, so I don't
know, no.

Q    The final paragraph on that page, second sentence,

25-04234-tjt   Doc 90   Filed 07/17/26   Entered 07/17/26 16:17:05   Page 30 of 41

# Tab 3

CONFIDENTIAL

| From: | Adam Kessler [adam@civiccompanies.com] |
| Sent: | 4/18/2023 9:47:38 PM |
| To: | Michael Berger [mberger@bergerrealtygroup.com] |
| CC: | Steven Rosenthal [steverosenthal@rockcompanies.com] |
| Subject: | VH 12-month Medicaid Forecast |
| Attachments: | Verified Health Forecast.xlsx |

Michael -

Attached is a forecast for VH over the next year. This assumes a platform fee of $1 per test. It also assumes 5 potential scenarios:
(1) 2,500 opt-ins per day
(2) 7,500 opt-ins per day
(3) 15,000 opt-ins per day
(4) 20,000 opt-ins per day
(5) 25,000 opt-ins per day

For reference, when we have the capital to float it, we are able to pull in over 20,000+ opt-ins per day now with the Medicare program. I am sending you the forecast for Medicaid, which we will start to focus on beginning May 1st. We expect Medicaid to do equally well, if not better, than Medicare.

Under this scenario, every 1% would see roughly the following distributions from profit share:

(1) 2,500 opt-ins per day = $555,600
(2) 7,500 opt-ins per day = $1,666,800
(3) 15,000 opt-ins per day = $3,333,600
(4) 20,000 opt-ins per day = $4,444,800
(5) 25,000 opt-ins per day = $5,556,000

NOTE, these numbers are based on revenue and do not deduct any expenses that would need to be consumed by VH. Right now those expenses are being paid by SLI, but eventually, they will move over to VH. Though they are minimal, if any, and would not materially affect the returns as outlined above.

Please let me know as soon as you are ready to commit funds - you can always add on if needed. But If this is something you are interested in finalizing it would be helpful to know sooner than later for our planning.

Thanks,
Adam


**Adam Kessler**
Civic Companies
(248) 933-3573
adam@civiccompanies.com

CONFIDENTIAL

ZBINV_000025

# Tab 4

(filed under seal)

# Tab 5
(filed under seal)

# Tab 6

(filed under seal)

# Tab 7

STATE OF MICHIGAN
OAKLAND COUNTY CIRCUIT COURT


ZB VERIFIED INVESTMENTS, LLC,

        Plaintiff,

vs.                                     Case No.
                                        2024-207081-CB

ADAM KESSLER; JOSHUA KAPLAN;
SAMI AHMAD; DIVIDED SKY, LLC;
SUPPLY LINE INTERNATIONAL, LLC;
SUPPLY LINE INTERNATIONAL
MEDICAL, LLC; and JOHN DOES
1-10,

        Defendants.
_____/




MICHAEL BERGER - VOL. II


May 14th, 2025
9:05 a.m. - 11:49 a.m.


LOCATION:  Prevail Testimony Management Platform

subject is "Memo," and there is an attachment called a program "OnePager," dated July 5th, 2023.

Let me know when you've had a chance to review this and you're ready for my questions, Mr. Berger.

A.    Okay.

Q.    Okay. I'd like to focus on the very last page of the exhibit. In the right-hand corner, that page has the Bates stamp "DividedSkyZB52."

A.    Okay.

Q.    Take us down there. And this page has the date July 5th, 2023, and the first header is "Orchard Laboratory's Medicare COVID-19 OTC Test Program." If you go down to the second-to-last sentence in that section, it starts with "CMS has requested."

Let me know when you're there. I have my -- I don't know if you can see my pointer.

A.    Yes.

Q.    Okay. So it says "CMS has requested some additional information from Orchard for roughly 70 patients, paren, (out of 400,000 since program's inception), close paren, which we have provided, paren, (including proof of sign up, tracking, and information), and we are working with CMS to answer any outstanding questions they may have."

ZB has alleged that that is a false or misleading statement that was made to ZB by Divided Sky. What did you do when you received information about the 70 patients that Divided -- that CMS was requesting information about?

And what I'm interested in is knowing if you did any investigation on your own or questioned anybody or consulted anybody about what implications there might be for CMS seeking additional information from Orchard?

MR. HOLTZ: Object to the form. It assumes he received any information. Go ahead. You can answer.

THE DEPONENT: We talked to Josh Kaplan and Adam Kessler about the 70 patients, and they continued to minimize, and they said this was a routine questioning. And they supplied all the paper, all the requests.

And they had had no further requests. And then they continued to tell us that the program had done well. Verified Health, in the next sentence, exceeded its revenue projections, so we did not make further inquiry.

BY MS. SCOTT:

Q. Okay. So at this time, when you received

this memo, did you consult with Steve Mendelson about what a CMS inquiry or request for information might pertain to?

A.    I did not.

Q.    Did you speak with Mr. Steve Mendelson when you received this memo about what kind of process might be involved when CMS seeks additional information from an entity like Orchard?

A.    No. I did not. Did not speak to Steven Mendelson about this.

Q.    Did you speak to anybody other than Josh Kaplan and Adam Kessler about the implications of CMS seeking additional information from Orchard?

A.    I already said no, so no.

Q.    Okay. And did you share this memo with the ZB investors?

A.    No.

Q.    Why not?

A.    Because I didn't think it was material.

Q.    And why did you think it wasn't material to the ZB investors?

A.    Because we were told that Verified Health had exceeded its revenue projections. We were consistently told that this was a routine investigation without materiality.

Q.      At this time, by July 5th, 2023, had Josh Kaplan or Adam Kessler told you that CMS has suspended payments --

A.      No.

Q.      -- to Orchard relating to the COVID-19 test kit program?

A.      No.

Q.      When did you learn that the receivables -- let's strike that.

When did you learn that CMS had suspended payments to Orchard for the COVID-19 test kit program?

A.      I believe it was in December on a bus in Israel.

Q.      Was that at the beginning of December or the end of December?

A.      I'd have to look up the exact date, but it was the first half of December. I think it was December.

Q.      Did you share this memo with anybody after you received it?

A.      No.

Q.      Okay. You can put that off to the side. Give me a second. I'm having problems here. Just one second. My apologies. I'm having a -- all right. Here we go. Okay. So I have -- I am marking as Exhibit 36.